**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RENOVATE AMERICA, INC., *et al.*,[1] | ) | Case No. 20-13172 (LSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF SHAWN STONE,
CHIEF EXECUTIVE OFFICER OF RENOVATE AMERICA, INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Shawn Stone, declare under penalty of perjury:

1.     I am the Chief Executive Officer of Renovate America, Inc. ("RAI") and Personal Energy Finance, Inc. ("PEFI" and, together with RAI, the "Debtors"), each a corporation organized under the laws of the state of Delaware and a debtor and debtor in possession in the above-captioned cases.  I have served the Debtors as Chief Executive Officer since June 2019. I generally am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.     I submit this declaration (the "Declaration") to assist this Court and parties in interest to understand the circumstances that compelled the commencement of these chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on December 21, 2020 (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include Renovate America, Inc. (4352) and Personal Energy Finance, Inc. (8208).  The Debtors' service address is 16870 W. Bernardo Dr., Suite 408 San Diego, California 92127.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and prior restructuring initiatives, and/or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized into three primary sections.  The first section provides an overview of the Debtors' corporate history, business operations, and organizational and capital structure.  The second section describes the circumstances leading to the commencement of these chapter 11 cases.  The third and final section lists the First Day Motions and explains the importance of the relief requested therein.

5.      As described more fully in the final section of this Declaration, the Debtors have requested a variety of relief in their First Day Motions to minimize the adverse effects of the commencement of these chapter 11 cases.  I have reviewed and am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe the relief requested in the First Day Motions will aid in the implementation of timely and efficient chapter 11 cases for all of the Debtors that will preserve and maximize the value of their respective estates, and I respectfully submit that, for the reasons discussed herein, each of the First Day Motions should be approved.

## Preliminary Statement[2]

6.      The Debtors are a leader in the home improvement financing industry, specifically as it relates to financing for certain environmentally-friendly home improvement projects. Historically, the Debtors maintained two business divisions:  HERO and Benji.  The Debtors' HERO business, which ceased accepting homeowner's applications in October of 2020, originated Property Assessed Clean Energy ("PACE") assessments for residential projects.  PACE programs, authorized by local governments under state legislation, offer financing in the form of property assessments for residential and commercial renewable energy and efficiency improvements. Benji, the Debtors' remaining business division, provides home improvement financing to contractors and homeowners.  As described in more detail herein, in recent years the Debtors' HERO (PACE) business suffered from declining assessment originations as a result, in part, of legislation became effective in April 2018.

7.      This legislation tightened credit underwriting criteria and made the underwriting process more cumbersome, drastically reducing the Debtors' pool of potential HERO customers, and made it more difficult for contractors to participate in the HERO program.  RAI also incurred significant expenses to defend against and settle growing litigation against it stemming from its HERO business.  Finally, the global COVID-19 pandemic had a considerable negative impact on the Debtors' revenues.  As a result of these factors, the Debtors' revenues and liquidity profile— including their working capital balance and EBITDA—have become dramatically impaired. Notwithstanding year-over-year gains in the Debtors' Benji business and dramatic cuts to the Debtors' operating expenses, these gains and savings have not been sufficient to offset the Debtors' overall losses.

---

[2]   Capitalized terms used but not defined in the Preliminary Statement have the meanings set forth elsewhere in this Declaration.

8.      The weight of the obligations related to the Debtors' HERO business strained the Debtors' ability to achieve profitability and the capital necessary to maintain and grow their business.  As a result, the Debtors' parent retained Moelis & Company LLC ("Moelis") in early 2020 (which Armanino LLP ("Armanino") has subsequently replaced), and in March of 2020, engaged Glass Ratner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley"), each to advise management and RAI's board of directors regarding potential strategic alternatives, including the sale of substantially all of the Debtors' assets.  On May 6, 2020, the Debtors also engaged Bryan Cave Leighton Paisner LLP ("BCLP") as legal counsel in connection with a potential restructuring and sale.

9.      As a result of considerable prepetition marketing efforts, on December 21, 2020, the Debtors entered into that certain Asset Purchase Agreement (the "Stalking Horse Purchase Agreement") with Finance of America Mortgage LLC (the "Stalking Horse Purchaser") whereby the Stalking Horse Purchaser proposes to serve as a stalking horse bidder in connection with a court-approved sale of substantially all of the Debtors' Benji assets.  In consultation with their advisors and the Stalking Horse Purchaser, the Debtors developed bidding procedures for a robust postpetition marketing and sale process to maximize the value of the Debtors' assets, for the benefit of the Debtors' stakeholders.  The Debtors plan to file a motion seeking approval of bidding procedures and the sale as soon as reasonably practicable on or after the Petition Date, followed by a liquidating chapter 11 plan.

10.      Critically, the Debtors, with the assistance of their advisors and after a thorough analysis of potential third-party financing sources, successfully obtained an agreement with the Stalking Horse Purchaser whereby the Stalking Horse Purchaser will provide debtor-in-possession financing.  After vigorous, arm's-length negotiations between the Debtors, the Debtors' advisors,

4

and the Stalking Horse Purchaser and its counsel, the Debtors will request approval of a financing package that will address their liquidity needs, enable them to operate their business in a manner that will permit the Debtors to preserve and maximize the value of their estates, and avoid immediate and irreparable harm to their estates and stakeholders.

I.      **The Debtors' History, Business Operations, and Organizational and Capital Structure.**

A.      The Debtors' History and Business Operations.

i.      ***The Debtors' HERO Business.***

11.      Headquartered in San Diego, California, the Debtors are a leading provider of home improvement financing, originating PACE assessments in three states (which, as discussed below, was recently discontinued) and offering financing in all 50 states as well as the District of Columbia.  RAI was founded in 2009 to provide Home Energy Renovation Opportunity ("HERO") financing initially through PACE assessments for residential borrowers in Western Riverside County, California.  RAI worked with thousands of contractors to provide homeowners with PACE financing options to improve their homes with energy efficient products, such as solar power, energy efficient windows, and HVAC system units.  PACE assessments, offered through home improvement contractors and secured by a non-ad valorem tax lien, are collected through property taxes and take priority over any existing mortgage.  PACE programs must be authorized by state and local governments, but are administered through companies like RAI.

12.      PACE programs allow a property owner to finance the up-front cost of energy or other eligible improvements on a property and then pay the costs back over time through a secured property assessment.  PACE financing for clean energy projects generally are assessed against an existing structure known as a "land-secured financing district," often referred to as an assessment district, a local improvement district, or other similar phrase.  In a conventional assessment district,

the local government issues bonds to fund projects with a public purpose such as streetlights, sewer systems, or underground utility lines.  Property owners that voluntarily choose to participate in a PACE program repay their improvement costs over a set time period—typically 10 to 25 years—through property assessments, which are secured by the property itself and paid as an addition to the owners' property tax bills.  Nonpayment may result in the same repercussions as the failure to pay any other portion of a property tax bill.

13.    On an operational level from the homeowner's prospective, a homeowner applied for a PACE assessment before construction begins with a registered contractor.  Once approved, the homeowner entered into 1) a home improvement contract with the contractor, which defined the scope of the project and 2) an assessment with the municipal entity (*e.g.* an issuer), which permitted the construction project to be financed from a PACE property tax assessment. RAI worked with several different issuers, including the Western Riverside Council of Governments (in numerous jurisdictions across California, including Western Riverside, California), the California Statewide Communities Development Authority (in various Cities and Counties in California); the Missouri Clean Energy District (Missouri); Los Angeles County (including Los Angeles, California); and, the Florida Development Finance Corporation (Florida). Once the work was completed to the homeowners satisfaction, the homeowner signed a completion certificate authorizing the contractor to be paid.  RAI, as program administrator, underwrote the homeowner's application for PACE financing and paid the contractor in full (subject to any applicable dealer fees).

14.    In order to fund the assessment, RAI submitted a funding request to the RAI Lenders (defined below).  The RAI Lenders transferred the money to an escrow account.  RAI also made disbursement requests for money held in the escrow account to refinance the

assessments it funded at approximately 97 percent of the face value of the assessments. The RAI Lenders required RAI to bond or pay off the RAI Lenders within 60 days (or in some cases 90 days). The first column starting with "ING Warehouse Line" of **Exhibit 1.A** to the Cash Management Motion illustrates the flow of money from the RAI Warehouse Facility to the contractors to fund assessments.

15.     Assessments were then compiled into limited obligation municipal bonds. Prior to August 2020, RAI would finance the bonds at an approximate 94 percent advance rate before securitizing the bonds. This loan paid off the RAI Lenders with RAI paying off the difference for money owed to the RAI Lenders above the approximate 94 percent advance rate. The second column starting with "Bond Issuances, Assessments" of **Exhibit 1.A** to the Cash Management Motion shows the flow of money from Barclays Bank PLC to the RAI Warehouse Facility.

16.     RAI formed HERO Funding, LLC, a Delaware LLC ("HERO Funding") in 2014 to, among other things, serve as the parent of several of the Debtors' HERO warehouse borrowing entities that have since been dissolved, to assist in the securitization of the Debtors' HERO bonds, and to serve as a mezzanine warehouse debt borrower. In a typical securitization, RAI worked with various external service providers to create and issue asset backed securities ("ABS") via the securitization process in order to access the most efficient long-term cost of funds for the local government issued PACE bonds that RAI, or its designee, had purchased. Through the years, the ABS structure has evolved, and various rated and unrated instruments have been issued and placed with institutional investors. Beginning in 2017, RAI retained the amount of each transaction necessary to be in conformity with the ABS risk retention rules which came into force for RAI's "sponsored" transactions at that time. The instruments that were issued in the ABS process are backed by the cash flows generated from a discrete pool of local government issued PACE bonds

which, in turn, are supported by the underlying PACE assessments. The local government bills and collects the PACE assessments through their normal tax collection process, and then passes the collections to the PACE trustee who in turn remits those to the ABS trustee. From there, the ABS trustee determines how those collections are to be distributed, in accordance with the ABS indenture, and remits those amounts accordingly. After August 2020, instead of financing the bonds and proceeding with the securitization process, RAI entered into an agreement to sell the bonds to KCP PACE Purchaser, LLC ("KCP"). Information regarding the sale of bonds to KCP is more fully described below.

17.    Between 2009 and 2016, RAI's HERO business expanded significantly. Geographically, and as noted above, RAI expanded its HERO offerings throughout California, Florida, and Missouri. In 2016, RAI originated approximately $944 million in HERO assessments and captured approximately 60 percent of California's over $1.5 billion HERO assessment market.

ii.    *The Debtors' Benji Business*.

18.    In 2014, RAI formed PEFI, which is a wholly-owned subsidiary of RAI, to diversify the company's home improvement financing product menu. Through its Benji business line, PEFI offers point-of-sale home improvement financing to homeowners through contractors. The Benji product is one of a number of home improvement financing options that contractors may offer to homeowners. Depending on the state, the Benji home improvement project financing takes the form of a retail installment contract ("RIC") between the contractor and the homeowner, or a direct installment loan between PEFI and a homeowner, evidenced by a promissory note. In either case, after agreeing upon a home improvement project with their Benji registered contractor, homeowners may apply for Benji financing and undergo a traditional underwriting process. If approved, the homeowner may accept the offered financing terms by signing a

financing agreement.  PEFI funds the contractor once the homeowner confirms completion of the project.  In the RIC scenario, PEFI funds the contractor by purchasing the RIC from the contractor and the consumer repays the Benji financing over the agreed upon term.  If the Benji financing is in the form of a promissory note, then PEFI funds the loan by directly paying the contractor. The average term selected by homeowners when using Benji financing is 8 years with a range of 5 to 12-year terms.  PEFI formerly originated direct installment loans on the paper of, and as a service provider for, a third-party credit union, which has since been discontinued.

19.     As more fully explained below, prior to the petition date, PEFI financed the upfront costs of its Benji product through the PEFI Warehouse Facility with ING Capital LLC.  PEFI then worked with its whole loan buyer, Ameris Bank, who purchased the RICs and promissory notes from PEFI approximately every two weeks pursuant to a Master Purchase and Servicing Agreement between PEFI and Ameris Bank.  Today, PEFI offers the Benji product in all 50 states and the District of Columbia.  Between 2016 and 2019, PEFI increased its Benji origination volume from approximately $28 million to $146 million.

B.     The Debtors' Prepetition Organizational Structure.

20.     RAI is the direct parent of PEFI, the other debtor in these chapter 11 cases. Thrivepoint Financial Holdings, Inc. ("Thrivepoint") is the direct parent and sole owner of the equity interests in RAI.  Because RAI is the primary operating company, RAI and PEFI are party to a shared services agreement to appropriately allocate costs and expenses of the Debtors' ordinary course operations.  A similar arrangement exists between RAI and HERO Funding. A chart depicting the Debtors' prepetition organizational structure appears below:



C.    <u>The Debtors' Prepetition Capital Structure</u>.

21.    As of November 30, 2020, the Debtors had approximately $102.5 million in total assets and approximately $115.3 million in total liabilities.  As described in greater detail below, as of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations totaled approximately $7.3 million, comprising approximately $1.3 million of obligations under the RAI Warehouse Facility (as defined herein), and approximately $6.0 million of obligations under the PEFI Warehouse Facility (as defined herein).

*i.    **The RAI Warehouse Facility**.*

22.    RAI is the borrower under that certain Amended and Restated Credit Agreement, dated as of August 24, 2017 (as amended from time to time, the "<u>RAI Credit Agreement</u>"), with ING Capital LLC, as administrative agent and the initial lender (in such capacity, the "<u>RAI Agent</u>"), Cortland Capital Market Services LLC, as collateral agent, and the lenders from

time to time party thereto (collectively, the "RAI Lenders").  The RAI Credit Agreement provides for a senior secured warehouse credit facility with a maximum commitment of approximately $1.3 million (the "RAI Warehouse Facility").  The obligations owing in respect of the RAI Credit Agreement are guaranteed by RAI's parent, Thrivepoint.  The RAI Agent and the RAI Lenders have a first priority lien on RAI's receivables and the proceeds thereof.

ii.     *The PEFI Warehouse Facility.*

23.     PEFI is the borrower under that certain Loan and Security Agreement, dated as of December 9, 2019 (as amended from time to time, the "PEFI Credit Agreement"), with ING Capital LLC, as administrative agent and the initial lender (in such capacity, the "PEFI Agent"), TMF Group New York, LLC, as collateral agent, and the lenders from time to time party thereto (collectively, the "PEFI Lenders").  The PEFI Credit Agreement provides for a senior secured warehouse credit facility with a maximum commitment of $35 million (the "PEFI Warehouse Facility"), of which $25 million is committed and $10 million is uncommitted. The obligations owing in respect of the PEFI Credit Agreement are guaranteed by RAI's parent, Thrivepoint.  The PEFI Agent and the PEFI Lenders have a first priority lien on PEFI's receivables and the proceeds thereof.

iii.    *Thrivepoint Loan.*

24.     RAI and PEFI are borrowers under that certain Intercompany Loan and Security Agreement, dated as of August 23, 2019 (as amended from time to time, the "Thrivepoint Loan Agreement"), with Thrivepoint, as lender.  Pursuant to the Thrivepoint Loan Agreement, Thrivepoint provided the Debtors with $19 million in financing (the "Thrivepoint Loan") which, as of the Petition Date is an unsecured obligation of the Debtors.

II.     **Circumstances Leading to These Chapter 11 Cases.**

A.      <u>Adverse Market Conditions</u>.

25.     When RAI was founded, underwriting criteria for homeowners who sought PACE financing in California was not as stringent as it is today.  Until recently, PACE financing did not require the same kinds of underwriting requirements as more traditional home improvement financing products.  Requirements for obtaining a PACE assessment were primarily based on the property owners' mortgage and property tax payment history, with the amount of financing available determined largely by the equity in the property.  However, legislation passed in 2017, which became effective on April 1, 2018, established new underwriting guidelines for PACE that required income verification and imposed more rigorous ability-to-pay standards on the borrower. The new legislation also imposed additional requirements on contractors, that became effective on January 1, 2019, including mandating six hours of training in order to enroll as a PACE solicitor agent, which enables a contractor to introduce PACE as a financing option to homeowners.

26.     Since the ability to pay requirements took effect in April 2018, the Debtors' HERO origination volume in California has fallen dramatically.  In the first half of 2020 (the latest data available from the California State Treasurer), new HERO financing in California was approximately $151.5 million, down approximately 81.6 percent from the $824.4 million financed in the second half of 2016.  As depicted in the table below, the dramatic reduction in the PACE marketplace has resulted in a significant reduction in the Debtors' HERO origination volumes and a decrease in the Debtors' revenues, with revenue falling by approximately 81 percent from 2016 to 2019.

| Renovate America, Inc. – Consolidated Financial Metrics | | | | | | | |
|---|---|---|---|---|---|---|---|
| *(in $ millions)* | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| HERO Originations | $21.3 | $109.4 | $302.4 | $702.1 | $943.9 | $711.3 | $286.3 | $134.4 |
| Benji Originations | $0.0 | $0.0 | $0.0 | $1.1 | $27.6 | $101.7 | $134.2 | $145.7 |
| Revenue | $0.7 | $5.3 | $37.9 | $127.2 | $163.7 | $117.7 | $44.5 | $31.0 |
| Net Income | -$4.4 | -$6.2 | -$14.3 | $5.1 | -$5.0 | -$47.4 | -$69.9 | -$36.6 |

27.     Prior to the new legislation, the Debtors made significant investments in their infrastructure and workforce commensurate with their expected volume of the HERO business. Specifically, RAI increased its workforce to over 650 employees and entered into a significant, long-term office lease to house their growing operations. In the face of the rapid decline in the Debtors' business and revenues, they could no longer sustain the weight of these obligations and needed to consider proactive steps to right-size their business operations.

28.     In addition, over the last two years, there has been a sharp increase in homeowners seeking assistance from legal services and other organizations in relation to PACE assessments. Organizations like Public Counsel and Bet Tzedek filed twin class action lawsuits in Los Angeles, California against RAI and other PACE administrators for assessments originated before April 2018, claiming that the Los Angeles County's PACE program harmed numerous homeowners by making assessments that people could not afford to repay. As of the Petition Date, RAI is a defendant, or is providing a defense to indemnified third parties, in 56 cases, which include three class action lawsuits. These lawsuits are pending and no class has been certified to date.

29.     In July of 2017, the State of California, appearing by and through the District Attorneys for seven counties, filed a complaint against RAI in the Superior Court of the State of California, County of Riverside, seeking injunction, civil penalties and other equitable relief arising out of its operation of the HERO business. On August 9, 2019, a *Final Judgement Pursuant to Stipulation* was filed wherein RAI agreed, without admitting any fault, to the payment of

restitution and civil penalties and costs.  Such payments were structured for payment over time placing further cash constraints on the business.

30.     Since the beginning of 2018 through October 2020, the Debtors have spent more than $15 million litigating and settling homeowner HERO litigation.  PEFI, on the other hand, has experienced very little litigation, having only been named (erroneously) in one case involving a HERO assessment.

31.     Finally, in early 2020, the impact of COVID-19 caused the Debtors' HERO business to further deteriorate.  More specifically, HERO originations volume declined by approximately $56 million, or 47 percent, in the 10-month period ending October 31, 2020 compared to the same period in the year prior.

B.     Proactive and Disciplined Approach to Addressing Liquidity Constraints.

32.     As the Debtors' revenue began its precipitous decline between 2018 and 2020, the Debtors considered numerous proactive actions to stabilize their financial position, including: (a) actively managing their debt capital structure; (b) selling assets; (c) minimizing capital expenditures; (d) effectively managing working capital; (e) improving cash flows from operations; and (f) seeking a capital infusion from outside financing sources.  More specifically, the Debtors worked with a real estate broker and ultimately were successful in subleasing space under their former office lease.  The Debtors also significantly reduced their operating expenses from approximately $166 million a year at the peak to an estimated $45 million this year.  Additionally, the Debtors reduced their workforce by approximately 83 percent since the beginning of 2017, from 644 in January 2017 to 115 as of December 9, 2020.

33.     Finally, in an effort to raise capital, in late 2019, Thrivepoint, with the assistance of Performance Trust Capital Partners, LLC ("Performance Trust"), led an extensive effort to

market convertible notes to accredited investors holding equity interests in Thrivepoint. This effort, however, did not generate significant interest from Thrivepoint's equityholders. Accordingly, in January 2020, Thrivepoint pivoted to a Series G preferred offering of up to $25 million and Thrivepoint and Performance Trust reached out to approximately 25 institutional investors outside of Thrivepoint's capital structure. Thrivepoint's efforts to raise capital from outside sources, however, were similarly unsuccessful.

34.     As noted above, RAI stopped accepting HERO applications in October 2020. As part of RAI's efforts to maximize a return to creditors, it entered into two agreements to liquidate its assessment and bond portfolios. One agreement was with KCP PACE Purchaser, LLC, an affiliate of Kawa Capital Partners LLC ("Kawa"), executed on August 14, 2020. Pursuant to this agreement, Kawa agreed to purchase RAI's PACE bond portfolio on a set schedule. The initial purchase was in excess of par plus accrued interest as of the closing date. After paying off its former secured creditor, Barclay's Bank Plc., RAI netted $3.16 million from the initial $27.89 million sale of PACE bonds to Kawa. Kawa also agreed to purchase further PACE bonds using a substantially similar method. To date, there have been nine follow up transactions, for a gross amount of $29.55 million and a net amount of $1.97 million. The Debtors intend to assume this contract after the Petition Date.

35.     RAI also entered into an agreement with Ygrene Energy Fund, Inc. ("Ygrene") for monies in exchange for introducing Ygrene to RAI's government partners and the assignment of contracts to enable Ygrene to launch in Ohio and originate assessments by the assignment of existing RAI contracts in Missouri, Florida, and certain counties in California. The Ygrene agreement resulted in approximately $425,000 to RAI with an opportunity to earn additional

assignment and California referral fees.  The Debtors intend to assume this contract after the Petition Date.

        C.        <u>The Debtors' Prepetition Sale Process</u>.

        36.      The Debtors' prepetition marketing process began in early 2020, when, as a result of their declining HERO revenues and a need to explore strategic alternatives, the Debtors hired Moelis.  With the assistance of Moelis, the Debtors initiated a robust marketing and sale process for substantially all of the Debtors' assets.  As part of this process, the Debtors and their advisors contacted more than 95 potential strategic and financial buyers.  Of that group, 23 parties signed nondisclosure agreements with the Debtors and received confidential information regarding the Debtors, including a confidential information memorandum prepared by the Debtors and their advisors.  In March 2020, a potential buyer for the Debtors' Benji assets was identified.  However, the Debtors and the potential buyer were unable to agree on deal terms, including transaction value and structure, and exclusivity was terminated in June of 2020.

        37.      This led the Debtors to pursue a second broad marketing process beginning in July 2020, led by Armanino, which generated interest from both strategic and financial buyers.  As part of this second process, the Debtors and their advisors contacted more than 81 potential strategic and financial buyers.  Five of these potentially interested parties signed nondisclosure agreements with the Debtors and received confidential information regarding the Debtors, including a confidential information memorandum prepared by the Debtors and their advisors.  The Debtors received interest from a second party and engaged in extensive due diligence during July and August 2020.  However, prior to executing a letter of intent, this potential purchaser informed the Debtors that it would not move forward.

38.     Unfortunately, because of a number of factors during 2020—such as the COVID-19 pandemic, which brought reduced liquidity for home improvement lending—there has been a significant dislocation in the M&A market for consumer lending companies.  Nevertheless, as a result of the efforts of the Debtors' management, the Debtors were subsequently able to reengage one of the parties that had previously passed on the opportunity to submit an indication of interest for the Debtors' Benji assets and, ultimately, the Debtors' marketing efforts paid off.  Following the completion of considerable investigation and diligence by the Debtors and their advisors, the Debtors identified a party to serve as their stalking horse purchaser.

39.     Specifically, the Debtors and the Stalking Horse Purchaser entered into the Stalking Horse Purchase Agreement, whereby the Stalking Horse Purchaser proposes to purchase substantially all of the Debtors' Benji assets for cash consideration of approximately $5 million, which will serve as a competitive baseline of recovery for the Debtors' stakeholders.  The proposed transaction, if approved, will generate significant value for the Debtors' estates, and among other things, is expected to satisfy a significant portion of the prepetition claims against the Debtors and pave the way for confirmation of a chapter 11 plan.

40.     The Debtors, through these chapter 11 cases, will seek authority to market test the transactions contemplated by the Stalking Horse Purchase Agreement to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Debtors' assets. If approved, the proposed bidding procedures will enable the Debtors to move expeditiously towards confirmation of a chapter 11 plan.

D.     Proposed DIP Financing.

41.     Prior to the Petition Date, the Debtors also successfully negotiated and finalized the terms of a revolving debtor in possession financing facility (the "Proposed DIP Financing") with

Finance of America Mortgage LLC ("FOA"), as well as the consensual use of cash collateral of

FOA during these chapter 11 cases.  The Proposed DIP Financing calls for a new secured credit

facility in the amount of $50 million.  The terms of the Proposed DIP Financing are described in

further detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the*

*Debtors to Obtain Senior Secured Financing; (II) Granting Liens and Superpriority*

*Administrative Expense Status; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*

(the "DIP Motion"), filed contemporaneously herewith and incorporated herein.

42.     In the months leading up to the Petition Date, the Debtors and their advisors

engaged in a broad search for financing to fit the Debtors' specific needs and contacted

approximately 9 parties.  The Proposed DIP Financing, however, met the Debtors' specific needs

and presented the best option for the Debtors and their estates.   Specifically, under the

Proposed DIP Financing, FOA will either provide a sufficient borrowing base or serve as the

Debtors' liquidity partner and purchase contracts originated by PEFI under a loan purchase

agreement during the chapter 11 cases.  PEFI may also sell contracts to a third party buyer subject

to FOA's right of first refusal.  This was an integral part of the Proposed DIP Financing, as the

Debtors' current partner, Ameris Bank, previously indicated to the Debtors its desire to discontinue

purchasing Benji loans in the near future.  In addition, the Proposed DIP Financing will provide

the Debtors with increased cash flow, a higher advance rate, and loan purchases to occur on a

weekly basis rather than a bi-monthly basis.

43.     The provisions of the Proposed DIP Financing were extensively negotiated.

For example, I was concerned that the Debtors are required to pay off the entire DIP Facility within

five business after the end of the auction if the Stalking Horse Purchaser is not the winning bidder

at the auction.  I expressed my concerns to the Stalking Horse Purchaser that this provision may

have a potential chilling effect on bidding.  After considerable negotiations, the Stalking Horse Purchaser ultimately would not agree to extend this maturity date.  Notwithstanding my concern that this provision may impact bidding, I nevertheless believe, in my business judgment, that the Proposed DIP Financing is in the best interest of creditors as such financing provides the most favorable terms that the Debtors were able to obtain.

44.     Moreover, the Debtors have an urgent need for the Proposed DIP Financing, which will ensure the Debtors are able to maintain their operations while pursuing a value-maximizing sale.  Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  The Debtors' need for the Proposed DIP Financing, as well as details regarding the terms of the Proposed DIP Financing, are outlined in further detail in the Declaration of Christopher Powell in support of the DIP Motion, filed contemporaneously therewith.

**Proposed Special Electronic Noticing**
**Procedures and Redaction of Employee Information**

45.     In the regular course of Debtors' business operations, PEFI, RAI's wholly owned subsidiary, offers point-of-sale home improvement financing to approximately 4,000 contractors who utilize the Debtors' home improvement financing products (the "Contractors") and roughly 26,000 borrowers (the "Homeowners") through the Benji product.

46.     Through its now-wound down HERO business, RAI worked with numerous Contractors to provide the Contractors' customers—over 38,000 HERO program Homeowners across the United States—with financing options in the form of property assessments to improve their homes with energy efficient upgrades.    Most HERO Homeowners expressed no

dissatisfaction with the HERO financial products (other than routine customer service inquiries or complaints resolved through ordinary, internal channels). However, homeowner litigation arose across this niche industry, and certain HERO Homeowners initiated litigation against the Contractors and RAI and/or its non-debtor affiliates in connection with the home improvement work and/or the financial products and government programs underlying the HERO program. The litigation costs associated with these claims is one of the factors that precipitated these bankruptcy filings.

47.    In the ordinary course of business, RAI's primary means of communicating with its Homeowners is via electronic mail and e-documents. The vast majority of Homeowners submit loan applications to the Debtors electronically. If their loans are declined, these Homeowners are notified via email. Their loan documents and other paperwork are signed using e-signatures and/or the submission of PDF documents. While Homeowners are given the option of electing instead to have documents physically mailed to them, of the roughly 150,000 Homeowners (which includes HERO and Benji Homeowners that were approved for financing, Homeowners with financing pending origination, and Homeowners to whom financing was never originated) whom the Debtors have dealt with over the past two years, approximately 90 percent interact with the Debtor via email and electronic documents. The other roughly 10 percent of these Homeowners have opted out of receiving email or do not have a valid email address on file and therefore are sent mailings and notices to their last known physical address in the Debtors' ordinary course of business.

48.    If the Debtors were required to convert all of their Homeowners from electronic noticing—which the Homeowners have previously consented to in the ordinary course of their dealings with the Debtors—and to instead provide notice by first-class mail of all required notices in these cases, the expense would be cost prohibitive. Stretto estimates that the cost of postage

alone to mail a single notice to some 150,000 Homeowners could exceed $200,000.  In addition, the Debtors would have to pay for copying charges, printing charges, overhead costs, and hourly fees for professionals.  And requiring the Debtors to incur the expense of converting all Homeowners from electronic mailing to physical mailing and to then send them multiple physical notices is certain to materially—perhaps drastically—reduce distributions those Homeowners and other creditors holding general unsecured claims in these cases without providing them with any material benefit.

49.    Accordingly, the Debtors are seeking authority to provide Homeowners with email service in this case in keeping with their ordinary business practices, as outlined below, and to continue to offer these Homeowners with the option of electing to instead receive notices by first class or other physical mail delivery if they desire.  The specific requested procedures our set forth in the Creditor Matrix Motion (defined below).

50.    In addition, the Creditor Matrix Motion seeks to modify certain personal identification information for the Debtors' current and former employees.  Specifically, the Debtors seek authority to redact from the Creditor Matrix and any other papers filed with the Court in these chapter 11 cases (collectively, the "Case Filings") the home addresses of the Debtors' current and former employees.  Instead, in all Case Filings, the Debtors will list (a) the Debtors' corporate address as the current employees' mailing addresses and (b) former employees' mailing addresses as "redacted."  If the Debtors terminate any current employee during these chapter 11 cases, the Debtors will amend the publicly filed Creditor Matrix to update such employee's service address from the Debtors' corporate address to "redacted."  Notwithstanding the publicly filed Creditor Matrix, the Debtors, with Stretto's assistance, will serve all required notices on current employees at their home addresses and on former employees at their last known home addresses.

In addition, the Debtors will distribute to their employees at their current or last known addresses, as applicable, any notices that are received at the Debtors' corporate headquarters in connection with these chapter 11 cases and that are addressed to an employee.  The Debtors will also provide the current or last known home addresses of these employees to the United States Trustee for the District of Delaware, any official committee of unsecured creditors appointed in these chapter 11 cases, and the Court.  And upon receiving a request that is reasonably related to the administration of these chapter 11 cases, or further order of this Court, the Debtors will provide employee home addresses to any other party in interest.

51.     I submit that it is appropriate to authorize the Debtors to redact current and former employees' home addresses from Case Filings.  Such information could be used, among other things, to perpetrate identity theft or seek to locate targets and survivors of domestic violence, harassment, or stalking.

**III.     First Day Motions.**

52.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions, which are incorporated herein by reference, include:

- *the DIP Motion;*

- *Motion of the Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;*

- *Application of the Debtors for Entry of an Order Pursuant to 28 U.S.C. § 156(c) (I) Approving the Appointment and Retention of Stretto as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File and Maintain Consolidated Creditor Lists and (B) Modify Certain Personal Identification Information for Employees, (II) Approving Special Noticing*

*Procedures for the Homeowners, and (III) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>")*;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>")*;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (D) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief; and*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief.*

53.     The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing on an interim basis, honor employee-related wages and benefits obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to giving the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

54.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant

part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

55.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully implementing the Debtors' chapter 11 strategy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  December 22, 2020                    */s/ Shawn Stone*
_____
Shawn Stone
Chief Executive Officer
Renovate America, Inc.