**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RENOVATE AMERICA, INC., *et al.*,[1] | ) | Case No. 20-13172 (LSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED**
**POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS; (III) SCHEDULING A FINAL HEARING;**
**AND (IV) GRANTING RELATED RELIEF**

Renovate America, Inc. ("RAI") and its debtor affiliate, Personal Energy Finance, Inc.

("PEFI"), as debtors and debtors in possession in the above-captioned chapter 11 case

(collectively, the "Debtors"),[2] respectfully submit this motion (this "Motion") and the statements

set forth herein with respect to their proposed postpetition financing.  In support of the Motion, the

Debtors respectfully proffer the *Declaration of Christopher Powell in Support of Debtors' Motion*

*for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured*

*Financing; (II) Granting Liens and Superpriority Administrative Expense Status; (III) Scheduling*

*a Final Hearing; and (IV) Granting Related Relief* (the "Powell Declaration"), filed concurrently

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
     number, include Renovate America, Inc. (4352) and Personal Energy Finance, Inc. (8208).  The Debtors' service
     address is 16870 W. Bernardo Dr., Suite 408 San Diego, California 92127.

2    A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion
     and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Shawn Stone, Chief Executive*
     *Officer of Renovate America, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day
     Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief under chapter 11 of the
     Bankruptcy Code on December 21, 2020 (the "Petition Date").

herewith, and the First Day Declaration.  In further support of this Motion, the Debtors respectfully state the following:

## Preliminary Statement[3]

1.      The Debtors request that the Court approve a senior secured superpriority debtor in possession credit facility in the amount of up to $18 million on an interim basis and up to $50 million in the aggregate on a final basis (collectively, the "DIP Facility") to be provided by Finance of America Mortgage LLC (the "DIP Lender").[4] The DIP Facility will provide the Debtors with sufficient liquidity to stabilize and fund the Debtors' general and corporate operations during these chapter 11 cases.

2.      The Debtors and DIP Lender have also negotiated the terms of the DIP Lender's potential acquisition of substantially all of the Debtors' assets pursuant to a court-approved sale process in accordance with section 363 of the Bankruptcy Code.  The Debtors have filed a motion to approve the bidding procedures and sale process with respect to that transaction simultaneously with the filing of this Motion.  The DIP Facility will allow the Debtors to continue operating and preserve their value as a going concern until a sale can be approved and completed.

3.      Absent approval of the DIP Facility, the Debtors may be left with no alternative but to cease operating and convert these cases to cases under chapter 7 of the Bankruptcy Code. The liquidity provided by the DIP Facility will ensure the Debtors can continue operating and will provide the Debtors with sufficient time to bridge to a sale of substantially all the Debtors' assets.

---

3   Capitalized terms used but not defined herein have the meanings ascribed to such terms further below in this Motion, the DIP Agreement, or in the Interim DIP Order, as applicable.

4   Although Finance of America Mortgage LLC ("FAM") will be the sole initial lender and Agent under the DIP Facility, the DIP Agreement (as defined below) contemplates that the DIP Facility could include other lenders as well.  For ease of reference in this Motion, to the extent any other parties become lenders under the DIP Facility in addition to FAM, such parties are referred to collectively with FAM herein as "DIP Lender".

4.      The DIP Facility was the product of extensive, arm's-length negotiations with the DIP Lender. As discussed herein and in the Powell Declaration, the DIP Facility was preceded by a competitive process designed to find and secure postpetition financing on the best available terms, albeit in a limited market for such financing.

5.      The extensive negotiations between the Debtors and the DIP Lender resulted in an agreement on the terms of a $50 million revolving DIP Facility that will provide the Debtors with sufficient capital to administer these chapter 11 cases and to continue their operations uninterrupted, including the continued origination, purchase, and subsequent sale of retail installment sale contracts and other loans or financing agreements constituting Eligible Contracts (as defined in the DIP Agreement) in the ordinary course of their business. The proposed DIP Facility includes an initial budget (the "Budget," attached as **Exhibit C** to this Motion) with respect to amounts expected to be utilized by the Debtors for operational expenses and activities, as well as certain milestones and covenants, including delivery of financial statements and weekly reports of receipts and budgeted cash usage.

6.      The DIP Facility does not contemplate priming the liens or security interests of the Debtors' existing prepetition secured lenders or the use of such lenders' cash collateral.  Rather, the Debtors intend to satisfy any remaining obligations owing to their prepetition lenders either through the ultimate sale of such lenders' collateral or by utilizing the proceeds of the DIP Facility to satisfy such secured claims in full.

7.      For the reasons set forth below, in the Powell Declaration, and in the First Day Declaration, the Debtors believe that the DIP Facility will preserve and maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders, and entry into the DIP Facility is an exercise of the Debtors' sound business judgment. Accordingly, the Debtors respectfully

request that the Court approve the DIP Facility and enter the Interim DIP Order and the Final DIP Order.

**Concise Statement Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2**

8.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order,"[5] and together with the Interim DIP Order, the "DIP Orders"): (a) authorizing the Debtors to enter into the DIP Facility as set forth in that certain Secured Debtor-in-Possession Loan and Security Agreement attached as **Exhibit B** hereto (the "DIP Agreement" and, together with all agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with the DIP Orders, the "DIP Documents") between the Debtors and the DIP Lender; (b) granting liens and providing superpriority claims with respect to such postpetition financing; (c) modifying the automatic stay on a limited basis as set forth herein; (d) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (e) granting related relief.

9.      The provisions of the DIP Agreement and the Interim DIP Order are the most favorable terms that the Debtors were able to obtain under the circumstances. Moreover, the Debtors have an urgent need to borrow under the DIP Facility. Approval of the DIP Facility will ensure the Debtors are able to maintain their operations (including the continued origination, purchase, and sale of Eligible Contracts as part of the ordinary course of their business), administer these chapter 11 cases, and maximize the value of their estates for the benefit of all stakeholders.

---

5    The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

Accordingly, the Debtors request that the Court approve the DIP Facility and enter the Interim DIP Order and Final DIP Order.

10.     The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as contemplated by Bankruptcy Rules 4001(c)(1)(B) and Local Rule 4001-2.[6]

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Personal Energy Finance, Inc. and Renovate America, Inc.<br><br>*See* DIP Agreement Preamble; Interim DIP Order Preamble. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Finance of America Mortgage LLC (and the other lenders party to the DIP Agreement from time to time)<br><br>*See* DIP Agreement Preamble; Interim DIP Order Preamble. |
| **Term**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | "Maturity Date" means the earliest of (i) the date that is ninety (90) days after the closing date of the DIP Facility; (ii) the effective date of a Chapter 11 plan of the Borrower; (iii) the consummation of the transactions contemplated by the Stalking Horse APA; (iv) the date on which the Auction closes or the Borrower files a notice with the Court identifying a successful Auction bidder or bidders other than the Stalking Horse Bidder, whichever is earlier, or the date on which the Borrower shall otherwise agree (other than pursuant to the Auction) to sell all or substantially all of the Purchased Assets to any party other than the Stalking Horse Bidder; and (v) the acceleration of the Indebtedness, including, without limitation, as a result of the delivery of a Default Notice.<br><br>*See* DIP Agreement § 1.1. |

---

[6]   The summaries contained in this Motion are general summaries only and are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The Maximum Program Amount available for revolving loans under the DIP Facility is up to $50 million, as limited by the Maximum Loan Amount available at any time, which equals the sum of (i) ninety percent (90%) of the Aggregate Principal Balance plus accrued interest under the Contracts as of such date and (ii) the Fixed Commitment Amount as of such date.<br><br>The Initial Program Amount to be borrowed prior to entry of the Final DIP Order is $18 million.<br><br>*See* DIP Agreement §§ 1.1, 2.1; Interim DIP Order Preamble, ¶ 3. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Conditions precedent to the initial draw under the DIP Facility include the following: (a) the execution of certain loan documents and other documents; (b) the due authorization of the transactions; (c) the creation and perfection of security interests in favor of the DIP Lender; (d) the submission of a Funding Request and Compliance Certificate; (e) entry of the Interim DIP Order; (f) payment of certain fees and expenses of the DIP Lender as part of the draw; (g) compliance with certain representations and warranties; (h) no existence of an Event of Default or Termination Event; (i) the Debtors' completion of certain know-your-customer requirements; (j) no occurrence of any Material Adverse Effect; and (k) the payment in full and termination of the Prepetition PEFI Warehouse Facility (as defined below).<br><br>*See* DIP Agreement § 4.1.<br><br>Conditions precedent to subsequent draws under the DIP Facility include the following: (a) the Debtors having made accessible all Required Documents for all Contracts to be pledged as Collateral and all loan documents continuing to be in force and effect; (b) the DIP Lender's security interests remaining in full force and effect; (c) the Debtors having submitted a timely Funding Request and Compliance Certificate; (d) payment of certain fees and expenses of the DIP Lender; (e) compliance with certain representations and warranties; (f) no existence of an Event of Default or Termination Event; (g) no occurrence of any Material Adverse Effect; (h) no order having been entered reversing, amending, staying, vacating, terminating, or otherwise modifying the Interim DIP Order or the Final DIP Order, as applicable; and (i) following entry of the Bid Procedures Order, no order having been entered reversing, amending, staying, vacating, terminating or otherwise modifying the Bid Procedures Order without the consent of the DIP Lender. |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| | *See* DIP Agreement § 4.2. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Interest Rate means 7% per annum, compounded monthly. Post-Default Interest Rate means 9% per annum, compounded monthly. *See* DIP Agreement § 1.1. |
| **Use of DIP Facility** Local Rule 4001-2(a)(ii) **Prepetition Debt Repayment** Local Rule 4001-2(a)(i)(E) | Borrower shall use each Draw solely for purposes of financing Eligible Contracts, the payment of the Origination Fee and Agent Fees and Expenses (including certain fees and expenses of the Lender Professionals), the repayment in full of all outstanding obligations under the PEFI / ING Facility, or for general corporate purposes as contemplated by and in accordance in all material respects with the terms of the DIP Budget (subject to the Permitted Variances). *See* DIP Agreement §§ 6.4, 6.16; Interim DIP Order ¶¶ G(iv), 2, 9, 11. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Origination Fee is $175,000. Borrower is also obligated to pay certain fees and expenses of the DIP Lender, including reasonable costs and expenses of the DIP Lender's professionals in connection with the financing and the chapter 11 cases. *See* DIP Agreement §§ 1.1, 2.2. |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The use of proceeds of the DIP Facility is subject to the Budget, attached to the Interim DIP Order as Exhibit B, subject to certain permitted variances. *See* DIP Agreement §§ 6.4, 6.16; Interim DIP Order ¶¶ 9, 11. |
| **Case and Sale Milestones** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | By the times and the dates set forth below (as any such time and date may be extended with the consent of the Administrative Agent), the Debtors shall cause the following to occur (collectively, the "Milestones"): (a) By no later than one (1) Business Day following the Petition Date, the Borrower shall have filed a motion seeking approval of the Bid Procedures Order, in form and substance acceptable to the Required Lenders; (b) By no later than three (3) days following the Petition Date, the Court shall have entered the Interim DIP Order; |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| | (c)  By no later than fifteen (15) days following the Petition Date, the Court shall have entered the Bid Procedures Order, which order shall designate FAM as the "Stalking Horse Bidder" and the Stalking Horse APA as the "Stalking Horse Bid" (each as defined in the Bid Procedures Order); |
| | (d)  By no later than thirty five (35) days following the Petition Date, the Court shall have entered the Final DIP Order; |
| | (e)  By no later than thirty five (35) days following the entry of the Bid Procedures Order, the Borrower shall have either (i) received Qualified Bids (as defined in the Bid Procedures Order) or (ii) announced the cancellation of the Auction and the designation of the Stalking Horse Bid of the Stalking Horse Bidder as the prevailing bid, and the deadline to object to the Sale Order and to object to the assumption and assignment of executory contracts (including cure amounts with respect thereto) shall have occurred; |
| | (f)  By no later than forty (40) days following the entry of the Bid Procedures Order, if Qualified Bids are received prior to the deadline set forth in the preceding Milestone, the Borrower shall conduct an Auction for the sale of the Purchased Assets; |
| | (g)  By no later than forty five (45) days following the entry of the Bid Procedures Order, if the Borrower has selected a bidder other than the Stalking Horse Bidder as the winning bidder, the deadline to object to the conduct of the Auction and the proposed sale to such alternate bidder shall have occurred; |
| | (h)  By no later than fifty (50) days after entry of the Bid Procedures Order, the Court shall have entered the Sale Order approving the Sale Transaction; and |
| | (i)  By no later than fifteen (15) days after entry of the Sale Order, the Sale Transaction shall have closed and all Indebtedness and other obligations under the DIP Agreement shall have been indefeasibly satisfied in full. |
| | *See* DIP Agreement § 6.5. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rules 4001-2(a)(i)(D), | DIP Lender will be granted superpriority claims pursuant to section 364(c)(1) and liens securing such claims on all property of the Debtors pursuant to section 364(c)(2) and 364(c)(3), subject only to Permitted |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| 4001-2(a)(ii) | Prior Liens and the Carve Out, with respect to all obligations under the DIP Facility.<br><br>*See* DIP Agreement § 3.1; Interim DIP Order ¶¶ 5-7. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(F) | The Interim DIP Order provides for a Carve Out from the DIP Lender's collateral that includes (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time and consistent with the Budget, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 (allocated $150,000 to the Debtor Professionals and $50,000 to the Committee Professionals) incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.<br><br>*See* Interim DIP Order ¶ 26. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x)<br>Local Rule 4001-2(a)(i)(C) | The Interim DIP Order provides that, subject to the entry of a Final DIP Order, no costs or expenses of administration which have been or may be incurred in the chapter 11 cases at any time shall be charged against the DIP Lender or its claims or collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise .<br><br>*See* Interim DIP Order ¶¶ H, 31. |
| **Stipulations to Prepetition Liens and Claims and Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | Pursuant to paragraphs F and 29 of the Interim DIP Order, the Debtors make certain stipulations with respect to their Prepetition Secured Obligations and the extent, validity, enforceability, and priority of the liens and security interests securing the claims of the Prepetition Secured Parties. The stipulations will be binding on third parties if not challenged by the Challenge Deadline set forth in the Interim DIP Order, which is |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(B) | generally (1) for a Creditors' Committee, sixty (60) calendar days from the date of the Creditors' Committee's appointment, or (2) seventy-five (75) calendar days from the entry of the Interim DIP Order for any other party in interest with requisite standing.<br><br>See Interim DIP Order ¶¶ F, 29. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | The DIP Agreement contains numerous events of default (subject in some cases to applicable cure periods), including as summarized below:<br><br>        (a)  Debtors' default in payment of amounts owing in respect of Indebtedness when due.<br><br>        (b)  Debtors' diversion of funds as prohibited under the DIP Agreement.<br><br>        (c)  Existence of a Program Deficiency that is not timely cured.<br><br>        (d)  Debtors' violation or failure to comply with Section 3.4 or Section 3.7 of the DIP Agreement, regarding datasite access.<br><br>        (e)  Debtors' defaults under any other Loan Documents and certain other agreements or orders, including the Stalking Horse APA, the FAM Loan Purchase Agreement, the DIP Orders, the Bid Procedures Order, or the FAM LPA Approval Order.<br><br>        (f)  Debtors' termination of the Stalking Horse APA other than as a result of a breach thereof by FAM or the taking of any action to restrict, prohibit, or impede the rights of the Secured Parties to credit bid.<br><br>        (g)  Debtors' selection of a winning bidder at the Auction, or other agreement to sell all or substantially all of the Purchased Assets to any party, other than the Stalking Horse Bidder, unless such bidder provides the written commitment and proof of funds described in Section 2.1(f) to pay off the outstanding amounts under the DIP Facility in full.<br><br>        (h)  Debtors' termination of the FAM Loan Purchase Agreement other than as a result of a breach thereof by FAM or the taking of any action to restrict, prohibit, or impede the rights of FAM under the FAM Loan Purchase Agreement.<br><br>        (i)  The Deposit Account Control Agreement is not in full force and effect. |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| | (j)  Debtors' default (after expiration of any applicable grace or cure periods) under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor, the result of which could be reasonably likely to cause a Material Adverse Effect.<br><br>(k)  Any representation or warranty of Debtors made under the DIP Agreement or any of the other Loan Documents, or any certificate, document, report, Funding Request, or financial or other statement delivered thereby, proves to be incorrect or misleading in any material respect as of the time made or deemed made.<br><br>(l)  Any Loan Document granting the Collateral Agent a Security Interest in any of the Collateral ceases to be in full force and effect (including the failure of any such Loan Document to create a valid first priority Security Interest (subject only to Permitted Liens)).<br><br>(m)  Any material provision of the DIP Agreement or any other Loan Document to which Debtors are a party shall cease to be in full force and effect or Debtors shall assert in writing (which may be provided via electronic mail) that the DIP Agreement is no longer in full force and or effect.<br><br>(n)  This Court or any court adjudicating an appeal of an order of this Court enters an order that is adverse to the DIP Lender's rights in certain respects as described in the DIP Agreement or Debtors file a motion seeking entry of an order granting certain types of relief adverse to the DIP Lender as described in the DIP Agreement.<br><br>(o)  The Debtors or any of their executive officers be indicted for a felony offense that is a business or financial related crime.<br><br>(p)  The representation set forth in Section 5.1(d) of the DIP Agreement regarding other debts owed by the Debtors fails to be correct, or the Debtors or any Affiliate file a motion to obtain additional financing from a party other than the DIP Lender under Section 364(c) or Section 364(d) of the Bankruptcy Code or to use cash collateral under Section 363(c) of the Bankruptcy Code that does not have the prior written consent of the Agents and the Lenders.<br><br>(q)  The activities of the Debtors are suspended or terminated by a regulatory authority. |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| | (r)  A Material Adverse Effect (other than those occurrences which are customarily a result of events and circumstances leading up to and following the filing of the Bankruptcy Cases) occurs.<br><br>(s) The occurrence of any Event of Default (after expiration of any applicable grace or cure periods) under the Renovate / ING Facility after the Petition Date other than any Event of Default arising out of or relating to the commencement of the Bankruptcy Cases.<br><br>The events of default under the Interim DIP Order include the defaults under the DIP Agreement as well as the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim DIP Order (except where such failure would not adversely affect the DIP Lender).<br><br>*See* DIP Agreement § 8.1; Interim DIP Order ¶ 20. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Paragraph 12 of the Interim DIP Order modifies the automatic stay to permit the Debtors to incur obligations, grant liens, and take certain other actions provided for under the DIP Facility, including paying the Prepetition PEFI Warehouse Obligations in full.  In addition, paragraph 21 of the Interim DIP Order modifies the automatic stay to permit the DIP Lender to terminate the DIP Agreement and to exercise remedies with respect to its collateral following a 5-day Remedies Notice Period without further Court approval, unless the Court orders otherwise.<br><br>*See* Interim DIP Order ¶¶ 12, 21. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens will be immediately and automatically effective, binding, and fully perfected without any further action upon entry of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶¶ 5, 6, 13. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Agreement provides in Section 9.6 that the Debtors will indemnify, hold harmless, and waive certain claims against the DIP Lender and other related parties, including that the Debtors shall indemnify and hold harmless the DIP Lender and its respective Affiliates, officers, directors, employees, agents, managers of, and any Person controlling any of, the foregoing (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, obligations, expenses, penalties, actions, suits, judgments and |

| Bankruptcy Code/Local Rule | Summary Material Terms |
|---|---|
| | disbursements of any kind or nature whatsoever (including with respect to any Indemnified Party, the reasonable and documented fees and disbursements of one counsel and one local counsel in each appropriate jurisdiction) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of the execution, delivery, enforcement, performance, administration of or otherwise arising out of or incurred in connection with this Agreement, any other Loan Document or any transaction contemplated hereby or thereby (and regardless of whether or not any such transactions are consummated) (collectively, the "Liabilities"); except that the Debtors shall have no duty to indemnify or hold harmless any Indemnified Party with respect to any liability to the extent such Liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, material breach or willful misconduct.<br><br>The Debtors also agree to indemnify and hold harmless the Collateral Agent and related parties pursuant to section 3.8 of the DIP Agreement.<br><br>See DIP Agreement § 9.6; Interim DIP Order ¶ 24. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i)(D) | The DIP Agreement and the Interim DIP Order provide that, subject to entry of the Final DIP Order, the DIP Lender will be entitled to liens on all avoidance actions of the Debtors and their proceeds as part of the DIP Lender's collateral.<br><br>*See* DIP Agreement § 1.1; Interim DIP Order ¶ 5. |

## Jurisdiction and Venue

11.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

12.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The bases for the relief requested herein are sections 105, 362, 363, 364, 503, 506,

and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"),

Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## Relief Requested

14.    By this Motion, the Debtors request that the Court:

a.    authorize the Debtors to enter into the DIP Facility, consisting of up to $18 million of secured postpetition financing on an interim basis and $50 million in the aggregate on a final basis, subject to and pursuant to the terms and conditions set forth in the Interim DIP Order, the Final DIP Order, and the DIP Agreement;

b.    authorize the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

c.    authorize the Debtors to (i) grant the DIP Lender superpriority administrative claims and all other benefits and protections allowable under sections 364(c)(1), 507(b), and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, except for the Carve Out; and (ii) grant the DIP Lender, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, perfected first-priority claims and security interests in the DIP Collateral, subject only to the Permitted Prior Liens and the Carve Out;

d.    authorize the DIP Lender to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined and to the extent provided in the DIP Agreement);

e.    authorize the Debtors to use the proceeds of the DIP Facility to satisfy certain outstanding, undisputed prepetition secured claims;

f.    subject to entry of the Final DIP Order, authorize the Debtors to grant liens to the DIP Lenders on the Avoidance Actions;

g.      subject to entry of the Final DIP Order, waive the Debtors' right to surcharge against the DIP Collateral (as defined in the Interim DIP Order) pursuant to section 506(c) of the Bankruptcy Code;

h.      schedule the Final Hearing for a date that is before the 25th day after the Petition Date to consider entry of the Final DIP Order authorizing the borrowings under, and the Debtors' entry into, the DIP Agreement on a final basis, and approve the Debtors' proposed notice procedures with respect thereto; and

i.      modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders.

**I.      The Debtors' Prepetition Capital Structure.**

15.     As of November 30, 2020, the Debtors had approximately $102.5 million in total assets and approximately $115.3 million in total liabilities.  As described in greater detail below, as of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations totaled approximately $7.3 million, comprised of approximately $1.3 million of obligations under the RAI Warehouse Facility (as defined herein), and approximately $6.0 million of obligations under the PEFI Warehouse Facility (as defined herein).

**A.      PEFI Warehouse Facility.**

16.     PEFI is the borrower under that certain Loan and Security Agreement, dated as of December 9, 2019 (as amended from time to time, the **"PEFI Credit Agreement"**), with ING Capital, LLC, as administrative agent and the initial lender (in such capacity, the **"PEFI Agent"**), TMF Group New York, LLC, as collateral agent, and the lenders from time to time party thereto (collectively, the **"PEFI Lenders"**).  The PEFI Agent and PEFI Lenders collectively are referred to as the **"PEFI Secured Parties."**  The PEFI Credit Agreement provides for a senior secured warehouse credit facility with a maximum amount of $35 million (the **"PEFI Warehouse Facility"**), of which $25 million is committed and $10 million is uncommitted.

17.     Pursuant to the PEFI Credit Agreement, PEFI granted to the PEFI Agent, for the benefit of itself and the other PEFI Secured Parties, a lien on and security in all of its right, title and

interest in the following (collectively, the "**Prepetition PEFI Warehouse Liens**"): (i) all "Contracts" (as defined in the PEFI Credit Agreement) identified by PEFI in connection with the funding of revolving loans under the PEFI Warehouse Facility; (ii) all income, payments and proceeds of or in respect of such Contracts, the Deposit Account (as defined in the PEFI Credit Agreement) and the Escrow Account (as defined in the PEFI Credit Agreement) and all funds on deposit therein; (iii) all rights of PEFI under the Servicing Agreement (as defined in the PEFI Credit Agreement) in respect of the Contracts owned by PEFI; (iv) all other Loan Documents (as defined in the PEFI Credit Agreement) to which PEFI was a party; (v) all books and records relating to the Contracts (including the Required Documents and the Contract Files, each as defined in the PEFI Credit Agreement); (vi) all properties or assets to which PEFI has been granted a security interest as collateral in respect of such Contracts; and (vii) all income on, payments of and proceeds of the foregoing (all of the foregoing being herein referred to collectively as, the "**Prepetition PEFI Collateral**").

18.    Immediately prior to the Petition Date, the aggregate principal amount outstanding under the PEFI Warehouse Facility was $6,000,000, of which approximately $2,779,473 has been used to purchase Contracts constituting Prepetition PEFI Collateral, and the remainder of which remains unused and in escrow (such amounts owed to the PEFI Lenders, together with any accrued and unpaid interest, fees, expenses and disbursements payable under the PEFI Credit Agreement the "**Prepetition PEFI Warehouse Obligations**"),

B.    **RAI Warehouse Facility.**

19.    RAI is the borrower under that certain Amended and Restated Credit Agreement, dated as of August 24, 2017 (as amended from time to time, the "**RAI Credit Agreement**" and, together with the PEFI Credit Agreement, the **"Prepetition Credit Agreements"**), with ING Capital LLC, as administrative agent and the initial lender (in such capacity, the "**RAI Agent**"), Cortland

Capital Market Services LLC, as collateral agent, and the lenders from time to time party thereto (collectively, the "**RAI Lenders**").  The RAI Agent and RAI Lenders collectively are referred to herein as the "**RAI Secured Parties**," and the PEFI Secured Parties and RAI Secured Parties are collectively referred herein to as the "**Prepetition Secured Parties**."  The RAI Credit Agreement provides for a senior secured warehouse credit facility with a maximum commitment of approximately $1.3 million (the "**RAI Warehouse Facility**" and, together with the PEFI Warehouse Facility, the "**Prepetition Secured Facilities**").  The Prepetition Credit Agreements and all agreements executed in connection therewith are collectively referred to as the "**Prepetition Secured Documents**".

20.     Pursuant to the RAI Credit Agreement, RAI granted to the RAI Agent, for the benefit of itself and the other RAI Secured Parties, a lien on and security interest in all of its right, title and interest in certain Receivables (as defined in the RAI Credit Agreement) of RAI, all income, payments and proceeds of or in respect of such Receivables, and related collateral in connection with the Debtors' HERO business (the "**Prepetition RAI Collateral**").

21.     Immediately prior to the Petition Date, the aggregate principal amount outstanding under the RAI Warehouse Facility was approximately $1,252,944 (such amount owed to the RAI Lenders, together with any accrued and unpaid interest, fees, expenses and disbursements payable under the RAI Credit Agreement, the "**Prepetition RAI Warehouse Obligations**" and, together with the Prepetition PEFI Warehouse Obligations, the "**Prepetition Secured Obligations**").

C.     **Thrivepoint Loan.**

22.     RAI and PEFI are also borrowers under that certain Intercompany Loan and Security Agreement, dated as of August 23, 2019 (as amended from time to time, the "**Thrivepoint Loan Agreement**"), with Thrivepoint Financial Holdings, Inc. ("**Thrivepoint**"), as lender.  Pursuant to the Thrivepoint Loan Agreement, Thrivepoint provided the Debtors with $19 million in prepetition

financing. The Debtors' obligations to Thrivepoint under the Thrivepoint Loan Agreement are unsecured.

### D.    Prepetition Liens and Prepetition Secured Obligations.

23.    As of the Petition Date, the Debtors believe that:  (a) the liens of the PEFI Secured Parties on the Prepetition PEFI Collateral and the liens of the RAI Secured Parties on the Prepetition RAI Collateral (such liens, collectively, the "**Prepetition Liens**" and such collateral, collectively, the "**Prepetition Collateral**") were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the PEFI Credit Agreement or the RAI Credit Agreement, as applicable, and any other lien arising as a matter of law (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "**Permitted Prior Liens**"); (b) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (c) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of PEFI (in the case of the Prepetition PEFI Warehouse Obligations) and RAI (in the case of the Prepetition RAI Warehouse Obligations), enforceable in accordance with the terms of the respective Prepetition Secured Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections,

challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon or related to the Prepetition Secured Facilities; (f) it is appropriate to waive, discharge, and release any right to challenge any of the Prepetition Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Secured Obligations (for the avoidance of doubt, subject and without prejudice to, the rights of parties-in-interest, including any Creditors' Committee or any other statutory committee that may be appointed in the Chapter 11 Cases, to challenge such liens or claims in accordance with the terms of the Interim and Final DIP Orders); and (g) the Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

**II.     The Debtors Have an Immediate Need for Cash.**

24.     As described in the Powell Declaration, the Debtors have an immediate and critical need to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations and to administer these chapter 11 cases.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, customers, and other commercial counterparties, to pay their employees, and otherwise to finance their operations requires the availability of the DIP Facility for working capital and to obtain funds to continue originating and purchasing Eligible Contracts in the ordinary course of their business, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and/or financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility.

25.    As of the Petition Date, the Debtors' available cash balance was approximately $3.6 million,[7] which amount is insufficient to operate their business enterprise during these cases and continue paying their debts as they come due while maintaining sufficient liquidity to address any unexpected obligations that may arise in the course of their business. Without prompt access to postpetition financing, the Debtors will be unable to pay wages for their employees, pay vendors to supply necessary goods and services, continue originating, purchasing, and selling Eligible Contracts in the ordinary course of business to generate cash flow, preserve and maximize the value of their estates, and administer these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. See Powell Decl. ¶¶ 12-14.

## III.    Alternative Sources of Financing Are Not Readily Available.

26.    The Debtors believe it would not be possible to administer these chapter 11 estates prudently without access to postpetition financing, and the DIP Facility is the best financing option the Debtors have been able to obtain.

27.    In the months leading up to the Petition Date, the Debtors and their advisors engaged in a broad search for financing to fit the Debtors' specific needs.  In November 2020, the Debtors initiated a competitive marketing process designed to secure postpetition financing on the best available terms.  As part of this process, the Debtors solicited proposals for postpetition financing from five parties in addition to the DIP Lender.  The Debtors' advisors contacted an additional four parties to solicit proposals for postpetition financing.  With regard to the nine alternative lenders contacted, one party expressed interest in moving forward but indicated a

---

7 The Debtors' unrestricted cash balances generally are not subject to the Prepetition Liens of the Prepetition Secured Parties and do not constitute Prepetition Collateral.  Rather, the Prepetition Secured Parties receive payment of the Prepetition Secured Obligations at the time their Prepetition Collateral is liquidated through sales by the Debtors to third parties.  Thus, the Debtors' available cash is not cash collateral of the Prepetition Secured Parties.

minimum fee amount of $2 million. Other potential lenders expressed concern with providing the postpetition financing due to, among other things, the size of the facility sought being smaller than necessary to achieve financial return hurdles, the term of the facility sought being shorter than necessary to achieve financial return hurdles, and the nature of the Debtors' collateral being outside the potential lenders' area of expertise.  Additionally, these potential lenders did not address the Debtors' need for a new downstream purchaser of their Benji loans to replace the Debtors' existing downstream purchaser, Ameris Bank, or proposed to do so on terms inferior to the Loan Purchase Agreement proposed with the DIP Lender, which provides for a purchase price of 102% of face value of relevant Eligible Contracts. The latter is superior to the current arrangement with Ameris Bank and all other indicative pricing the Debtors have received from potential new downstream purchasers.  *See* Powell Decl. ¶ 24.

28.     The DIP Facility is the best source of debtor in possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  *See* Powell Decl. ¶ 25.  The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, or (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Lender (a) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets (subject to the Prepetition Liens of the Prepetition

Secured Parties in the Prepetition Collateral), (b) superpriority claims and liens, and (c) the other protections set forth in the proposed Interim DIP Order.

**IV.    Payment of Prepetition PEFI Warehouse Obligations under the DIP Facility.**

29.    The DIP Facility contemplates the immediate payment in full of the $6.0 million PEFI Warehouse Obligations owing under the PEFI Warehouse Facility, of which the Debtors estimate approximately $2.8 million is outstanding as of the Petition Date, with the remaining amounts being held as restricted cash reserves in escrow under the PEFI Warehouse Facility.  The DIP Lender has required that the satisfaction of the outstanding PEFI Warehouse Obligations and the termination of the Prepetition PEFI Warehouse Liens occur simultaneously with the funding of initial draw under the DIP Facility because PEFI intends to continue funding transactions involving Eligible Contracts in the ordinary course of its business on a postpetition basis, and the parties wish to avoid any issues with respect to the need for the DIP Liens to prime or otherwise have priority over the Prepetition PEFI Warehouse Liens.  In addition, the terms of the DIP Facility are more favorable to the Debtors than the existing PEFI Warehouse Facility, so immediate payment of the PEFI Warehouse Obligations will reduce costs and expenses for the Debtors related to their financing.  Although the Debtors are not aware of a basis to challenge the Prepetition PEFI Warehouse Liens or PEFI Warehouse Obligations, the proposed Interim DIP Order provides the opportunity for other parties in interest in these cases to review and challenge such liens and claims, if appropriate, for a period of 75 days from the entry of the Interim DIP Order (or, for any Creditors' Committee that may be appointed, 60 days from the date of such appointment).

**Basis for Relief**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Facility.**

    A.    **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

30.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Courts generally grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

31.    In determining whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good

faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

32.     Courts consider whether the terms of postpetition financing are fair and reasonable in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). Courts also sometimes consider non-economic benefits a debtor may receive under a proposed postpetition facility. For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

33.     In this case, the Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment following extensive negotiations with the DIP Lender, an arm's-length process, a search for other financing options, and the Debtors' careful evaluation of their limited

available alternatives. Considering the insufficiency of their existing cash resources and their lack of

viable alternatives, the Debtors and their advisors determined that the Debtors need the DIP Facility to

support their operations and related costs of administration during these cases. The Debtors' ability to

operate their business, including originating or purchasing new Eligible Contracts for their portfolio,

depends on having access to sufficient liquidity.  The Debtors negotiated the DIP Agreement and other

DIP Documents with the DIP Lender in good faith, at arm's-length, and with the assistance of their

respective advisors, and the Debtors believe that they have obtained the best financing available to give

them an opportunity to consummate a sale of substantially all of their assets.  Accordingly, the Debtors'

entry into the DIP Documents is a reasonable exercise of their business judgment, and it should be

approved.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

34.      The Debtors propose to obtain financing under the DIP Facility by providing security

interests and liens to the DIP Lender as set forth in the DIP Documents pursuant to section 364(c) of

the Bankruptcy Code.  In particular, the Debtors intend to provide to the DIP Lenders perfected first

priority claims, liens, and security interests in the DIP Collateral, subject only to the Prepetition Liens

in the Prepetition Collateral that remain after the payoff of the Prepetition PEFI Warehouse Obligations

and termination of the Prepetition PEFI Warehouse Liens.

35.      A debtor may obtain postpetition credit under section 364(c) if the court finds, after

notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under Section

503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); s*ee also In re Crouse Grp.,* Inc., 71 B.R.

544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is

authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts

have articulated a three-part test to determine whether a debtor is entitled to financing under section

364(c) of the Bankruptcy Code, including whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp*., 71 B.R. at 549.

36.    As described above and as set forth in the Powell Declaration, the Debtors have an immediate need for financing to continue their operations uninterrupted on a postpetition basis. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases. *See* Powell Decl. ¶¶ 12-14, 27.  Absent the DIP Facility, which will allow the Debtors to meet their working capital needs during these chapter 11 cases and consummate the proposed sale transaction, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Under the circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreement, are fair, reasonable, and adequate.  As a result, the Debtors submit that they have met the standard for obtaining postpetition financing and granting the required liens and claims.

37.    When a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit sufficient to meet their needs. Therefore, approving

a superpriority claim in favor of the DIP Lenders as well as first-priority liens on all property of the

Debtors subject only to the Permitted Prior Liens is reasonable and appropriate.

**C.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

38.     A debtor is only required to show "by a good faith effort that credit was not available

without" the protections afforded to lenders under section 364(c) of the Bankruptcy Code. *In re*

*Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*,

137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, when only a few lenders are likely to be

willing or able to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to

require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100

B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99*

*B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986)

(demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful

contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660,

663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured

loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't*

*Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of

financing under section 364(a) and (b)).

39.     As explained in this Motion, the Debtors believe alternative sources of financing are

not reasonably available under the Debtors' current circumstances and given the nature of the Debtors'

business.  *See* Powell Decl. ¶¶ 24-26.  Therefore, the Debtors submit that the requirement of section

364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the

Debtors is satisfied.

      **D.**      **The Repayment of the Prepetition PEFI Warehouse Obligations under the DIP Facility Is Appropriate.**

      40.      Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Under established law in the Third Circuit, such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

      41.      Courts have recognized that refinancing of less economical secured debt through a DIP loan may be authorized under Section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010) (citing cases approving repayment of prepetition secured loans through DIP financing).  Courts in this district have authorized repayment of prepetition secured debt in interim DIP orders.  *See*, *e.g.*, *In re Pyxus International, Inc.,* No. 20-11570 (LSS), Docket No. 84, at ¶ 9 (Bankr D. Del. June 17, 2020) (interim DIP order authorizing repayment of prepetition credit facility); *In re Pace Indus., LLC*, No. 20-10927 (MFW), Docket No. 72, Order at ¶ 1.4 (Bankr. D. Del. Apr. 15, 2020) (order authorizing DIP ABL revolving loan that included repayment of $92 million prepetition ABL facility); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW), Docket No. 130, Order at ¶ 2(d) (Bankr. D. Del. Mar. 20, 2018) (order authorizing a DIP ABL revolving loan that included the refinancing of prepetition indebtedness).

42.     In this case, the Debtors seek to use approximately $2,779,473 of the proceeds of the DIP Facility to satisfy all outstanding Prepetition PEFI Warehouse Obligations (not otherwise satisfied by cash held in escrow pursuant to the PEFI Warehouse Facility).  The immediate payoff of the Prepetition PEFI Warehouse Obligations and termination of the Prepetition PEFI Warehouse Liens will allow the Debtors to borrow the same funds on more favorable terms from the DIP Lender pursuant to the DIP Facility, and it will allow the parties to avoid any need for the Debtors to request financing that would require priming the existing Prepetition PEFI Warehouse Liens. In addition, the amount to be paid off is relatively small in comparison with the overall size of the DIP Facility.

43.     Although the Debtors are not aware of any basis to challenge the Prepetition PEFI Warehouse Obligations or the Prepetition PEFI Warehouse Liens, the proposed Interim DIP Order provides other parties in interest in these cases the opportunity to review and challenge such interests for a period of 75 days from the entry of the Interim DIP Order (or, for any Creditors' Committee that may be appointed, 60 days from the date of such appointment) and to seek recovery of the postpetition payment of the Prepetition PEFI Warehouse Obligations.  Thus, no party's interests will be harmed by the granting of such relief.  Under the circumstances, repayment of the Prepetition PEFI Warehouse Obligations is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

## II.     The Fees Under the DIP Documents are Reasonable.

44.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender in connection with the DIP Facility. In particular, the Debtors have agreed to pay an origination fee of $175,000 in connection with the DIP Facility upon funding of the initial draw, in addition to certain other fees and costs of the DIP Lender and its professionals in connection with the DIP Facility and these chapter 11 cases.

45.     The Debtors understand that payment of such fees are a required component of debtor in possession financing arrangements.  The Debtors believe the origination fee payable under the DIP Facility is "below market" as compared to fees typically charged by lenders in connection with debtor in possession financing facilities of similar size.  Accordingly, the Debtors submit that their agreement to pay the fees required under the DIP Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment, and request that the Court authorize the Debtors to pay such fees in connection with the initial draw and on a go-forward basis as and to the extent required under the DIP Facility.

III.     **The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

46.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, providing as follows:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

47.     As explained above and in the Powell Declaration, the Debtors have negotiated the DIP Facility with the DIP Lender at arm's length and in good faith, and the Debtors have determined in their reasonable judgment that the DIP Facility provides the best terms available for postpetition financing.  The Debtors believe the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  The DIP Facility will permit the Debtors to

run a Court-approved sale process for their assets on a postpetition basis, with the DIP Lender as the

initial stalking-horse bidder.  As a result, the Court should find that the DIP Lender qualifies as a lender

in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of

the protections afforded by that section.

### IV.     The Automatic Stay Should Be Modified on a Limited Basis.

48.     The proposed Interim DIP Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code will be modified to, among other things, (a) permit the Debtors

to grant the DIP Liens and DIP Superpriority Claim; (b) permit the Debtors to perform such acts as the

DIP Agent or DIP Lenders may reasonably request to assure the perfection and priority of the liens

granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent and DIP

Lenders under the DIP Documents, the DIP Facility, and the Interim DIP Order; and (d) authorize the

Debtors to make, and the DIP Agent and the DIP Lenders to retain and apply, payments made in

accordance with the terms of the Interim DIP Order and the DIP Documents, including the Debtors'

repayment in full of the Prepetition PEFI Warehouse Obligations.

49.     Paragraph 21 of the proposed Interim DIP Order also modifies the automatic stay to

permit the DIP Lender to take certain actions without further Court approval, including termination of

the DIP Facility and the exercise of certain other remedies, following the occurrence of an Event of

Default and the expiration of a required five-day Remedies Notice Period, unless the Court orders

otherwise.

50.     Modifications of the stay such as these are normal features of debtor in possession

financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the

circumstances of these chapter 11 cases. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533

(KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak*

*Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Heights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**V.    Failure to Obtain Immediate Access to the DIP Facility on an Interim Basis Would Cause the Debtors Immediate and Irreparable Harm.**

51.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. The Court may, however, conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate prior to the end of the 14-day period.

52.    Accordingly, the Debtors request that the Court hold a hearing on an expedited basis to consider entry of the Interim DIP Order, authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive immediate funding under the DIP Facility. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating (including originating or purchasing new Eligible Contracts), to pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions. *See* Powell Decl. ¶ 27.  This interim and expedited relief will enable the Debtors to preserve and maximize value and to avoid immediate and irreparable harm to their estates and all parties in interest, pending the Final Hearing.

**Request for Final Hearing**

53.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, not more than 25 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

54.     To implement the foregoing successfully, the Debtors request that the Court approve the provisions of the proposed Interim DIP Order recognizing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

55.     The Debtors have provided notice of this Motion, either by facsimile, electronic mail, overnight courier, or hand delivery, to certain know parties in interest, including the following:  (i) the U.S. Trustee; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the DIP Lender; (iv) the Prepetition Secured Parties; (v) all parties asserting liens against the Debtors' assets; (vi) the state attorneys general for all states in which the Debtors operate; (vii) the U.S. Attorney's Office for the District of Delaware; and (ix) the Internal Revenue Service.  As this Motion is seeking "first day" relief, within two Business Days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

56.     No prior request for the relief sought in this Motion has been made to this or any other court.

[Remainder of page intentionally left blank]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim DIP Order

and Final DIP Order, granting the relief requested herein, and grant such other relief as the Court

deems appropriate under the circumstances.


Dated:  December 22, 2020                    */s/ Mette H. Kurth*
Wilmington, Delaware                         Mette H. Kurth (DE Bar No. 6496)
                                             **CULHANE MEADOWS, PLLC**
                                             4023 Kennett Pike #165
                                             Wilmington, Delaware 19807
                                             Telephone:    (302) 660-8331
                                             Email:        mkurth@cm.law

                                             - and -

                                             Sharon Z. Weiss (*pro hac vice* admission pending)
                                             **BRYAN CAVE LEIGHTON PAISNER LLP**
                                             120 Broadway, Suite 300
                                             Santa Monica, California 90401
                                             Telephone:    (310) 576-2100
                                             Facsimile:    (310) 576-2200
                                             Email:        sharon.weiss@bclplaw.com

                                             - and -

                                             Timothy R. Bow (*pro hac vice* admission pending)
                                             **BRYAN CAVE LEIGHTON PAISNER LLP**
                                             161 North Clark Street, Suite 4300
                                             Chicago, Illinois 60601
                                             Telephone:    (312) 602-5000
                                             Facsimile:    (312) 602-5050
                                             Email:        timothy.bow@bclplaw.com

                                             *Proposed Counsel to the Debtors*

## Exhibit A

**Proposed Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RENOVATE AMERICA, INC., *et al.*,[1] | ) | Case No. 20-13172 (LSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR
SECURED POSTPETITION FINANCING; (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) SCHEDULING A
<u>FINAL HEARING AND (IV) GRANTING RELATED RELIEF</u>**

Upon consideration of the motion (the "**DIP Motion**")[2] of the above-captioned debtors

and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases

(collectively, the "**Chapter 11 Cases**"), seeking entry of an interim order (this "**Interim**

**Order**") and a Final Order (as defined herein) pursuant to sections 105, 362, 363, 364(c)(l),

364(c)(2), 364(c)(3), 364(e), 506, and 507 of title 11 of the United States Code (the

"**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules for the

United States Bankruptcy Court, District of Delaware (the "**Local Rules**"), *inter alia*:

    i.    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority

        basis consisting of a senior secured superpriority revolving credit facility (the "**DIP**

        **Facility**"; and the financial institutions party thereto from time to time as lenders, as

        provided in the DIP Credit Agreement, the "**DIP Lenders**") providing for loans of up to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include Renovate America, Inc. ("<u>RAI</u>") (4352) and Personal Energy Finance, Inc. ("<u>PEFI</u>") (8208).  The Debtors' service address is 16870 W. Bernardo Dr., Suite 408 San Diego, California 92127.

$50,000,000 (the "**DIP Loans**") pursuant to the terms and conditions of that certain *Secured Debtor-in-Possession Loan and Security Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**," together with the schedules and exhibits attached thereto, and all agreements, documents, instruments and amendments executed and delivered in connection therewith, the "**DIP Documents**"), by and among the Debtors, Finance of America Mortgage LLC, as Administrative Agent, Collateral Agent, and Initial Lender ("**FAM**" or, in its capacity as administrative agent and collateral agent, the "**DIP Agent**") and the other lenders from time to time party thereto (together with FAM, the "**DIP Lenders**"), substantially in the form of **Exhibit B** attached to the DIP Motion;

ii.    authorizing the Debtors, during the period from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the DIP Termination Date (as defined herein) (such period, the "**Interim Period**"), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, to request extensions of credit up to an initial aggregate outstanding principal amount of $18,000,000 at any one time outstanding under the DIP Facility pursuant to the terms of the DIP Documents and this Interim Order (collectively, the "**Interim Financing**"), and authorizing and directing the Debtors to make an initial draw as part of the Interim Financing sufficient to pay in full the outstanding Prepetition PEFI Warehouse Obligations (as defined below);

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the DIP Motion or the DIP Credit Agreement (as defined below), as applicable.

iii.    authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements and documents related thereto, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

iv.    authorizing the Debtors to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Agent and DIP Lenders (collectively, and including the Origination Fee, fees and expenses of the Agents and Lender Professionals (as defined in the DIP Credit Agreement), and all other Indebtedness (as defined in the DIP Credit Agreement), the "**DIP Obligations**"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and in any Successor Case (as defined herein), subject to the Carve Out (as defined herein);

v.    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), which liens shall have the priorities set forth herein and shall be subject to the Carve Out;

vi.    authorizing the Debtors to use proceeds of the DIP Facility in accordance with this Interim Order and the DIP Documents, including in accordance with the Budget (subject to Permitted Variances, unless otherwise expressly specified in the DIP Credit Agreement) as required herein;

vii.    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, the Origination Fee and the reasonable fees and disbursements of the DIP Agent (including without limitation the Lender

Professionals), as and to the extent provided in, and in accordance with, the applicable DIP Documents and this Interim Order;

viii.     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, and to provide for the immediate effectiveness of this Interim Order; and

ix.     scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the First Day Declaration, the *Declaration of Christopher Powell in Support of the Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III), Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**Powell Declaration**"), the DIP Documents, and the evidence submitted and arguments made at the interim hearing (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001, and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit

4

Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date**.  On December 21, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not yet appointed an official committee of

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee subsequently appointed, a "**Creditors' Committee**").

E.      **Notice**.      Proper and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

F.      **Debtors' Stipulations**.      After consultation with their attorneys and financial advisors, and subject and without prejudice to, the rights of parties-in-interest, including any Creditors' Committee or any other statutory committee that may be appointed in the Chapter 11 Cases, as set forth in paragraph 29 herein, the Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i)-(v) are referred to herein, collectively, as the "**Debtors' Stipulations**"):

(i)      *PEFI Warehouse Facility*.      PEFI is the borrower under that certain Loan and Security Agreement, dated as of December 9, 2019 (as amended from time to time, the "**PEFI Credit Agreement**"), with ING Capital, LLC, as administrative agent and the initial lender (in such capacity, the "**PEFI Agent**"), TMF Group New York, LLC, as collateral agent, and the lenders from time to time party thereto (collectively, the "**PEFI Lenders**").  The PEFI Agent and PEFI Lenders collectively are referred to as the "**PEFI Secured Parties**."  The PEFI Credit Agreement provides for a senior secured warehouse credit facility with a maximum amount of $35 million (the "**PEFI Warehouse Facility**"), of which $25 million is committed and $10 million is uncommitted.

(ii)      *RAI Warehouse Facility*.      RAI is the borrower under that certain Amended and Restated Credit Agreement, dated as of August 24, 2017 (as amended from time to time, the "**RAI Credit Agreement**" and, together with the PEFI Credit Agreement, the "**Prepetition Credit Agreements**"), with ING Capital LLC, as administrative agent and the initial lender (in

such capacity, the "**RAI Agent**"), Cortland Capital Market Services LLC, as collateral agent, and the lenders from time to time party thereto (collectively, the "**RAI Lenders**").  The RAI Agent and RAI Lenders collectively are referred to as the "**RAI Secured Parties**," and the PEFI Secured Parties and RAI Secured Parties are collectively referred to as the "**Prepetition Secured Parties**."  The RAI Credit Agreement provides for a senior secured warehouse credit facility with a maximum commitment of approximately $1.3 million (the "**RAI Warehouse Facility**" and, together with the PEFI Warehouse Facility, the "**Prepetition Secured Facilities**").  The Prepetition Credit Agreements and all agreements executed in connection therewith are collectively referred to as the "**Prepetition Secured Documents**".

        (iii)    *Prepetition Secured Obligations*.  Under the PEFI Warehouse Facility, the PEFI Lenders provided to PEFI commitments in respect of revolving loans in the aggregate principal amount of up to $25,000,000 (and an additional uncommitted amount of $10,000,000). Under the RAI Warehouse Facility, the RAI Lenders provided to RAI commitments in respect of revolving loans in the aggregate principal amount as of the Petition Date of up to approximately $1,300,000 as of the Petition Date. Immediately prior to the Petition Date, (1) the aggregate principal amount outstanding under the PEFI Warehouse Facility was $6,000,000, of which approximately $2,779,473 has been used to purchase Contracts constituting Prepetition PEFI Collateral (as defined below), and the remainder of which remains unused and in escrow (such amounts owed to the PEFI Lenders, together with any accrued and unpaid interest, fees, expenses and disbursements payable under the PEFI Credit Agreement the "**Prepetition PEFI Warehouse Obligations**"), and (2) the aggregate principal amount outstanding under the RAI Warehouse Facility was approximately $1,252,944 (such amount owed to the RAI Lenders, together with any accrued and unpaid interest, fees, expenses and disbursements payable under

the RAI Credit Agreement, the "**Prepetition RAI Warehouse Obligations**" and, together with the Prepetition PEFI Warehouse Obligations, the "**Prepetition Secured Obligations**").

      (iv)    *Prepetition Liens and Prepetition Collateral*.  As more fully set forth in the PEFI Credit Agreement and the RAI Credit Agreement, respectively, prior to the Petition Date:

      (a)    pursuant to the PEFI Credit Agreement, PEFI granted to the PEFI Agent, for the benefit of itself and the other PEFI Secured Parties, a lien on and security in all of its right, title and interest in the following (collectively, the "**Prepetition PEFI Warehouse Liens**"): (i) all "Contracts" (as defined in the PEFI Credit Agreement) identified by PEFI in connection with the funding of revolving loans under the PEFI Warehouse Facility; (ii) all income, payments and proceeds of or in respect of such Contracts, the Deposit Account (as defined in the PEFI Credit Agreement) and the Escrow Account (as defined in the PEFI Credit Agreement) and all funds on deposit therein; (iii) all rights of PEFI under the Servicing Agreement (as defined in the PEFI Credit Agreement) in respect of the Contracts owned by PEFI; (iv) all other Loan Documents (as defined in the PEFI Credit Agreement) to which PEFI was a party; (v) all books and records relating to the Contracts (including the Required Documents and the Contract Files, each as defined in the PEFI Credit Agreement); (vi) all properties or assets to which PEFI has been granted a security interest as collateral in respect of such Contracts; and (vii) all income on, payments of and proceeds of the foregoing (all of the foregoing being herein referred to collectively as, the "**Prepetition PEFI Collateral**"); and

      (b)    pursuant to the RAI Credit Agreement, RAI granted to the RAI Agent, for the benefit of itself and the other RAI Secured Parties, a lien on and security interest in all of its right, title and interest in certain Receivables (as defined in the RAI Credit Agreement) of RAI,

all income, payments and proceeds of or in respect of such Receivables, and related collateral in connection with the Debtors' HERO business (the "**Prepetition RAI Collateral**").

(v)     *Validity, Perfection and Priority of Prepetition Liens and Prepetition Secured Obligations*.  As of the Petition Date:  (a) the liens of the PEFI Secured Parties on the Prepetition PEFI Collateral and the liens of the RAI Secured Parties on the Prepetition RAI Collateral (such liens, collectively, the "**Prepetition Liens**" and such collateral, collectively, the "**Prepetition Collateral**") were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the PEFI Credit Agreement or the RAI Credit Agreement, as applicable, and any other lien arising as a matter of law (in each case, to the extent that such existing liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "**Permitted Prior Liens**")[4]; (b) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (c) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of PEFI (in the case of the Prepetition PEFI Warehouse Obligations) and RAI (in the case of the Prepetition RAI Warehouse Obligations), enforceable in

---

[4]     Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agent, the Prepetition Secured Parties, or a Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien and/or security interests (except as otherwise provided herein with respect to the Debtors in connection with the Debtors' Stipulations and subject to the requirements regarding any Challenge (as defined below) to the Debtors' Stipulations).   The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the Prepetition Liens and DIP Liens.

accordance with the terms of the respective Prepetition Secured Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon or related to the Prepetition Secured Facilities; (f) the Debtors have waived, discharged and released any right to challenge any of the Prepetition Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent and priority of the liens securing the Prepetition Secured Obligations (for the avoidance of doubt, subject and without prejudice to, the rights of parties-in-interest, including any Creditors' Committee or any other statutory committee that may be appointed in the Chapter 11 Cases, as set forth in paragraph 29 herein); and (g) the Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

G.    **Findings Regarding Postpetition Financing**

(i)    *Request for Postpetition Financing*.    The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents to administer their Chapter 11 Cases and fund their operations in accordance with the Budget (as

defined herein) (subject to Permitted Variances, unless otherwise expressly specified in the DIP Credit Agreement). At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to the DIP Agent (acting at the direction of DIP Lenders holding in excess of fifty percent (50%) of the outstanding loans and commitments under the DIP Facility (the "**Required DIP Lenders**")), in its sole discretion. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Need for Postpetition Financing*. The Debtors have an immediate and critical need to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations and to administer these Chapter 11 Cases. The ability of the Debtors to maintain business relationships with their vendors, suppliers, customers, and other commercial counterparties, to pay their employees, and otherwise to finance their operations requires the availability of the DIP Facility for working capital and to obtain funds to continue purchasing loans and contracts in the ordinary course of their business, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and/or financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility.

(iii)     *No Credit Available on More Favorable Terms*. The DIP Facility is the best source of debtor in possession financing available to the Debtors. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors are unable to obtain unsecured credit allowable

11

under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also

been unable to obtain (a) unsecured credit having priority over that of administrative expenses of

the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, or (b) credit

secured solely by a lien on property of the Debtors and their estates that is not otherwise subject

to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP

Agent, for the benefit of itself and the DIP Lenders (1) perfected security interests in and liens on

(each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities

set forth in paragraph 6 hereof, (2) superpriority claims and liens, and (3) the other protections

set forth in this Interim Order.

        (iv)    *Use of Proceeds of the DIP Facility*.  As a condition to the Debtors' entry

into the DIP Documents and the extensions of credit under the DIP Facility, the DIP Agent, the

DIP Lenders and the Debtors have agreed that the proceeds of the DIP Facility shall be used, in

each case in a manner consistent with the terms and conditions of this Interim Order and the DIP

Documents and in accordance with the approved budget in connection therewith, as the same

may be modified from time to time consistent with the terms of the DIP Documents and subject

to such variances as permitted in the DIP Credit Agreement (such variances, "**Permitted**

**Variances**," and such budget, the "**Budget**"[5]), and as otherwise provided in this Interim Order

and the DIP Documents, solely for the purpose of:  (a) financing Eligible Contracts; (b) the

payment of the Origination Fee and Agent Fees and Expenses (including the fees and expenses

of the Lender Professionals in accordance with the DIP Credit Agreement); (c) the repayment in

full of the Prepetition PEFI Warehouse Obligations; and (d) general corporate purposes as

---

[5] A copy of the initial Budget is attached hereto as **Exhibit B**, any updates to which must be acceptable to the DIP Agent in its sole and absolute discretion, subject to Permitted Variances.

contemplated by and in accordance in all material respects with the terms of the Budget (subject to the Permitted Variances).

(v)     *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Credit Agreement and the extensions of credit under the DIP Facility, the Debtors, the DIP Agent, and the DIP Lenders have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Loan Documents.

H.     **Section 506(c) Waiver Subject to Final Order**.  In light of the DIP Agent's and DIP Lenders' agreement that their liens and superpriority claims shall be subject to the Carve Out, subject to and effective only upon entry of a Final Order, the DIP Agent and the DIP Lenders are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.     **Good Faith of the DIP Agent and DIP Lenders**.

(i)     *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide the DIP Facility to the Debtors subject to: (a) entry of this Interim Order and, subsequently, the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Superpriority Claim and DIP Liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid

thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, are appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The terms and conditions of the DIP Facility were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, and the DIP Lenders with the assistance and counsel of their respective advisors.  Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agent and the DIP Lenders within the meaning of section 364(e) of the Bankruptcy Code.

J. **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

K. **Notice of Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including, among others: (i) the U.S. Trustee; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the DIP Agent and DIP Lenders; (iv) the Prepetition Secured Parties, (v) all other holders of other debt instruments issued by the Debtors; (vi) all parties asserting liens against the Debtors' assets; (vii)  the state attorneys general for all states in which the Debtors operate; (viii) the U.S. Attorney's Office for the District of Delaware; (ix) the Internal Revenue Service; (x) any party that has requested service pursuant to Bankruptcy Rule 2002; and (xi) any such other party entitled to notice under the Bankruptcy Rules and Local Rules.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.    <u>Interim Financing Approved</u>.  The DIP Motion is granted on an interim basis as set forth herein, and the DIP Facility, in an amount up to the Interim Financing, is authorized and approved, in each case, subject to the terms and conditions set forth in the DIP Documents or this Interim Order, as applicable.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.    <u>Authorization of the DIP Financing</u>.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to, in accordance with this Interim Order, (i) pay in full the Prepetition PEFI Warehouse Obligations from the proceeds of an initial draw from the Interim Financing, and (ii) pay any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval, including, without limitation, the Origination Fee (as defined in the DIP Credit Agreement), as well as any reasonable and documented fees and disbursements of the DIP Agent's and the DIP

Lenders' professionals, as set forth herein and to the extent provided in the DIP Credit Agreement, whether or not such professional fees and disbursements arose before or after the Petition Date, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3.      Authorization to Borrow.   In order to prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order and (ii) the DIP Termination Date, and subject to the terms, conditions, limitations on availability, and reserves set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request initial revolving loans up to an aggregate outstanding principal amount of up to $18,000,000 at any one time outstanding under the DIP Facility.

4.      DIP Obligations. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, under

the DIP Documents or this Interim Order, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, on the DIP Termination Date, subject to the Carve Out requirements in paragraph 26 herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.    <u>DIP Liens</u>.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "**DIP Liens**"), with the priorities set forth in paragraph 6 herein, on all of the Debtors' real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible (the "**DIP Collateral**"), including without limitation:   (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper,

contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, and proceeds of the foregoing, wherever located, including insurance or other proceeds, (b) all owned real property interests and all leasehold real property interests and proceeds thereof, (c) subject to, and upon entry of, the Final Order, any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**") and the proceeds thereof ("**Avoidance Action Proceeds**"), and (d) all other property of the Debtors.

6.      _DIP Lien Priority_.  The DIP Liens are valid, automatically fully-perfected, and non-avoidable.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be first priority liens on all DIP Collateral that (A) as of the Petition Date, was unencumbered (and does not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, subject to entry of the Final Order, Avoidance Actions and Avoidance Action Proceeds) or (B) becomes unencumbered upon the repayment in full of the Prepetition PEFI Warehouse Obligations, subject only to the Carve Out.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be junior priority liens solely with respect to DIP Collateral that either (A) constitutes Prepetition RAI Collateral or (B) is subject to a

Permitted Prior Lien. Other than as set forth in this Interim Order or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.   The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.     Superpriority Claims.  Upon the entry of this Interim Order, the DIP Agent and DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (a "**DIP Superpriority Claim**") for all DIP Obligations:  (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature as and to the extent provided for by sections 503(b) and 507(b) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the DIP Superpriority Claim shall be subject in all respects to the Carve Out.

8.     No Obligation to Extend Credit.  The DIP Agent and DIP Lenders shall have no obligation to make any loan under the DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the DIP Documents and this Interim

Order have been satisfied in full or waived by the DIP Agent (acting at the direction of the Required DIP Lenders, as applicable, and in accordance with the terms of the DIP Credit Agreement).

9.    <u>Use of Proceeds of DIP Facility</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility, in accordance with the Budget (subject to Permitted Variances, unless otherwise expressly specified in the DIP Credit Agreement and except as otherwise provided in this Interim Order and the DIP Documents with respect to the fees of Professional Persons), only for the purposes specifically set forth in this Interim Order and the DIP Documents (including to repay in full the Prepetition PEFI Warehouse Obligations and to pay the Origination Fee and the fees and expenses of the DIP Agent, including the Lender Professionals, to the extent set forth in the DIP Documents), and in compliance with the terms and conditions in this Interim Order and the DIP Documents.  The Debtors are hereby authorized to execute a customary payoff letter and/or other documentation by and among the Debtors and PEFI Secured Parties in connection with the repayment in full of the Prepetition PEFI Warehouse Obligations.  The Prepetition PEFI Warehouse Liens on the Prepetition PEFI Collateral shall be automatically released and terminated upon the repayment in full of the Prepetition PEFI Warehouse Obligations, subject to the provisions of paragraph 29 below.

10.    <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without further order of the Court if:   (a) the amendment, modification, or supplement (i) is in accordance with the DIP Documents, and (ii) does not prejudice the rights of the Debtors or their estates in any material respect;  (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel to the Creditors' Committee (if

appointed), any other statutory committee appointed in the Chapter 11 Cases, ING Capital LLC, and the U.S. Trustee (collectively, the "**Notice Parties**"); and (c) notice of the amendment, modification or supplement is filed with the Court; *provided*, that neither consent of the Notice Parties nor approval of the Court will be necessary to effectuate any such amendment, modification or supplement, and *provided further* that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard regarding such proposed amendment, modification, or supplement.

11.    <u>Budget Maintenance and Compliance</u>.  Commencing on third business day of the first full calendar week following the week of the entry of the Interim Order and on the third business day of each week thereafter, the Debtors will deliver to the DIP Agent and the Lender Professionals a variance report as of the end of the preceding week comparing, for each line item set forth in the Budget and on a cumulative basis: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative rolling basis since the Petition Date; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative rolling basis since the Petition Date; together with a statement certifying compliance with the Permitted Variances for such periods (each a "**Measuring Period**") and explaining in reasonable detail all material variances (each such report, a "**Variance Report**," which shall be in a form reasonably acceptable to the DIP Agent). For purposes of each Measuring Period, the Debtors shall calculate:  (x) the numerical difference between total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative basis since the Petition Date, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "**Receipts Variance**"); and (y) the numerical difference

between total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative basis since the Petition Date, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period; *provided* the disbursements shall not include any amounts in the Budget related to professional fees (the "**Disbursements Variance**").

12.     <u>Modification of Automatic Stay</u>.   The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:   (a) permit the Debtors to grant the DIP Liens and DIP Superpriority Claim; (b) permit the Debtors to perform such acts as the DIP Agent or DIP Lenders may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent and DIP Lenders under the DIP Documents, the DIP Facility, and this Interim Order; and (d) authorize the Debtors to make, and the DIP Agent and the DIP Lenders to retain and apply, payments made in accordance with the terms of this Interim Order and the DIP Documents, including the Debtors' repayment in full of the Prepetition PEFI Warehouse Obligations.

13.     <u>Perfection of DIP Liens</u>.   This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, securities account control agreement, or other similar agreement) to grant, attach, validate or perfect (in accordance with applicable non-bankruptcy law) the DIP

Liens, or to entitle the DIP Agent and the DIP Lenders to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent is authorized, but not required, to file, subject to the terms and priorities of this Interim Order, as in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The Debtors, without further consent of any party, are authorized to execute and deliver, upon request of the DIP Agent, all such financing statements, mortgages, notices, and other documents as the DIP Agent may reasonably request.  The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

14.     Application of Proceeds of Collateral.  As a condition to the entry of the DIP Documents and the extensions of credit under the DIP Facility, the Debtors have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply all net proceeds of DIP Collateral in accordance with the DIP Credit Agreement until the DIP Obligations have been indefeasibly paid in full, in cash.  For the avoidance of doubt, the payment of the Prepetition PEFI Warehouse Obligations is subject to the preservation of rights provided in paragraph 29 herein.

15.     Protections of Rights of DIP Agent and DIP Lenders.

(i)    The Debtors will, until the DIP Termination Date, (A) maintain books, records, and accounts to the extent and as required by the DIP Documents, (B) reasonably cooperate with, consult with, and provide to the DIP Agent and the DIP Lenders all such information and documents that any or all of the Debtors are obligated (including upon the request by the DIP Agent (acting at the direction of the Required DIP Lenders)) to provide under the DIP Documents or the provisions of this Interim Order, (C) upon reasonable advance notice, permit consultants, advisors, and other representatives of each of the DIP Agent (acting at the direction of the Required DIP Lenders) and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents, (D) permit the DIP Agent (acting at the direction of the Required DIP Lenders), the DIP Lenders, and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets as and to the extent required by the DIP Documents, and (E) upon reasonable advance notice, permit the DIP Agent (acting at the direction of the Required DIP Lenders) and the DIP Lenders to conduct, at their reasonable discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral as and to the extent required by the DIP Documents.

(ii)     The DIP Agent (acting at the direction of the Required DIP Lenders) shall have the right to credit bid up to the full amount of the outstanding DIP Obligations including any accrued interest and expenses, in any sale of DIP Collateral, as provided for in section 363(k) of the Bankruptcy Code, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

16.     <u>Proceeds of Subsequent Financing</u>.   If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c), or 364(d) in violation of the DIP Documents at any time prior to the indefeasible repayment in full of all DIP Obligations, and the termination of the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this Interim Order and the DIP Documents.

17.     <u>Cash Collection</u>.   From and after the date of the entry of this Interim Order, the Debtors shall maintain cash management consistent with prepetition practices and in accordance with the Cash Management Order.   Except as otherwise permitted in the Cash Management Order or otherwise agreed to in writing by the DIP Agent (acting at the direction of the Required DIP Lenders), the Debtors shall maintain no accounts except those identified, or opened or closed in accordance with the procedures set forth in, the Cash Management Order and the DIP Credit Agreement.   The Debtors and the financial institutions where the Debtors maintain deposit accounts (as identified in any Cash Management Order), are authorized and

25

directed to remit, without offset or deduction, funds in such deposit accounts upon receipt of any direction to that effect from the DIP Agent (acting at the direction of the Required DIP Lenders).

18.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations and the termination of the DIP Agent and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Facility, as applicable; and (b) maintain the cash management system in accordance with the Cash Management Order, as modified by any order that may be entered by the Court which has first been agreed to by the DIP Agent (acting at the direction of the Required DIP Lenders) or as otherwise required by the DIP Documents.

19.    <u>DIP Termination Date</u>.  On the DIP Termination Date (as defined below), subject to the Carve Out, all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the applicable DIP Facility will terminate, other than as required in paragraph 26 with respect to the Carve Out.

20.    <u>Events of Default</u>.  Until the DIP Obligations are indefeasibly paid in full and all commitments thereunder are terminated (the "**DIP Repayment**"), the occurrence of any of the following events, unless waived by the DIP Agent (acting at the direction of the Required DIP Lenders) in writing and in accordance with the terms of the DIP Credit Agreement, shall constitute an event of default (collectively, the "**Events of Default**") under this Interim Order: (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (except where such failure would not adversely affect the DIP Agent and the DIP Lenders), or (b) the occurrence of any other "Event of Default" under, and as defined in, the DIP Credit Agreement.

21.    <u>Rights and Remedies Upon Event of Default</u>.    (a) The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) to enforce all of their rights under this Interim Order and the DIP Documents and, immediately upon the occurrence and during the continuation of an Event of Default and subject to the giving by the DIP Agent (acting at the direction of the Required DIP Lenders) of five (5) calendar days' prior written notice (the "**Termination Notice**"; and such notice period, the "**Remedies Notice Period**," provided that such period may be extended by written agreement between the Debtors and the DIP Agent (acting at the direction of the Required DIP Lenders), in their respective sole discretion), delivered to counsel to the Debtors, with copies to the U.S. Trustee and counsel to the Creditors' Committee (if appointed), subject in all respects to the terms of this Interim Order, including clause (b) below, the DIP Agent (acting at the direction of the Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "**Termination Declaration**") (1) all DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains outstanding under the DIP Facility, (3) termination of the DIP Credit Agreement and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (4) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein) to the Debtors (the date which is the earliest date a Termination Declaration is delivered following the expiration of the Remedies Notice Period, the "**DIP Termination Date**").  Upon the DIP Termination Date, unless the Court orders otherwise, and subject to clause (b) below, the DIP Agent and the DIP Lenders shall be

entitled to exercise their rights and remedies in accordance with the respective DIP Documents and this Interim Order and shall be permitted to satisfy the relevant DIP Obligations, DIP Superpriority Claim and DIP Liens, subject to the Carve Out, and subject to and consistent with this Interim Order.  Unless the Court orders otherwise, the automatic stay, as to all of the DIP Agent and DIP Lenders, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, and subject to the Carve Out in all respects, including the requirements of paragraph 26 hereof, the DIP Agent and DIP Lenders shall be permitted to exercise all remedies set forth herein, in the DIP Documents and as otherwise available at law without further order of or application or motion to the Court.

(b)    Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, during the Remedies Notice Period, the Debtors shall be permitted to use proceeds of the DIP Facility and other DIP Collateral, to (1) pay any amounts in accordance with the Carve Out, (2) pay accrued wages and any other critical employee-related expenses, and (3) subject to the consent of the DIP Agent (at the direction of the Required DIP Lenders, which shall not be unreasonably withheld), pay any other critical business-related expenses necessary to operate the Debtors' business or preserve the DIP Collateral as determined by the Debtors in their reasonable discretion and in good faith.

22.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Agent and the DIP Lenders have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with

section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified or amended by a subsequent order of this Court or any other court, the DIP Agent and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification or amendment shall not affect the validity and enforceability of any advances previously made hereunder, or any lien, claim or priority authorized or created hereby.

23.    <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay, within ten (10) calendar days of invoicing, all reasonable and documented prepetition and postpetition fees and expenses of the DIP Agent and DIP Lenders in connection with the DIP Facility (including without limitation the Lender Professionals), as and to the extent provided in the DIP Documents (including, for the avoidance of doubt, the non-refundable payment of the Origination Fee as set forth in the DIP Credit Agreement), whether or not the transactions contemplated hereby are consummated, including attorneys' fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses, in each case to the extent provided for in this Interim Order and the DIP Documents.  Payment of all such fees and expenses shall not be subject to allowance by the Court.  Professionals for the DIP Agent and the DIP Lenders shall not be required to comply with the U.S. Trustee fee guidelines, provided, however, that any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide copies of its fee and expense statements or invoices in summary form (which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of

29

the attorney work product doctrine) to the U.S. Trustee and counsel for a Creditors' Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  No attorney or advisor to the DIP Agent or DIP Lenders shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

24.    Indemnification.  The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement, and subject to the limitations set forth therein.

25.    Proofs of Claim.  The DIP Agent and the DIP Lenders will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.

26.    Carve Out.

(a)    As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time and consistent with the Budget, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior

30

to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 (allocated $150,000 to the Debtor Professionals and $50,000 to the Committee Professionals) incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their counsel, the U.S. Trustee, and counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default in connection with the issuance of a Termination Declaration and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     On the day on which a Carve Out Trigger Notice is given by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors with a copy to counsel to the U.S. Trustee and counsel to the Creditors' Committee (if any) (the "**Carve Out Trigger Notice Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand constituting DIP Collateral as of such date and any such cash thereafter held by any Debtor to pay and/or establish a reserve for the payment of all unpaid Allowed Professional Fees prior to any and all other claims.  The Debtors also shall also hold in trust for the benefit of the Professional Persons an amount equal to the Post-Carve Out Trigger Notice Cap, which shall exclusively be used to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap.  Within five (5) business days following the Carve Out Trigger Notice Date,

the Debtors shall deliver a statement to the DIP Agent setting forth their estimate of the total

Allowed Professional Fees incurred prior to the Carve Out Trigger Notice Date.

(c)     Notwithstanding anything to the contrary in the DIP Documents or this

Interim Order, following delivery of a Carve Out Trigger Notice, if the DIP Agent (at the

direction of the Required DIP Lenders) sweeps or forecloses on cash (including cash received as

a result of the sale or other disposition of any assets) of the Debtors, the DIP Agent shall

promptly deposit cash swept or foreclosed upon after delivery of the Carve Out Trigger Notice

(including cash received as a result of the sale or other disposition of assets) into an account

designated by the Debtors up to an amount equal to the sum of the Allowed Professional Fees

plus $200,000.

(d)     For the avoidance of doubt and notwithstanding anything to the contrary

herein or in the DIP Documents, the Carve Out shall be senior to all liens and claims securing the

DIP Facility.

(e)     Neither the DIP Agent nor the DIP Lenders shall be responsible for the

payment or reimbursement of any fees or disbursements of any Professional Persons incurred in

connection with the Chapter 11 Cases or any Successor Cases under any chapter of the

Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the

DIP Agent or the DIP Lenders in any way, to directly pay compensation to, or to reimburse

expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to

pay such compensation or reimbursement.

(f)     Prior to the Carve Out Trigger Notice Date, the Debtors shall be permitted

to pay compensation and reimbursement of all Allowed Professional Fees of Professional

Persons, as the same may be due and payable, and such payments shall not reduce the Carve Out.

Upon the receipt of the Carve Out Trigger Notice, the right of the Debtors to pay professional fees outside the Carve Out shall terminate and the Debtors shall provide immediate notice to all Professional Persons informing them that such notice was delivered and further advising them that the Debtors' ability to pay such Professional Persons is subject to and limited by the Carve Out.

(g)    Any payment or reimbursement made on or after the occurrence of the DIP Termination Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Credit Documents, the Bankruptcy Code, and applicable law.

27.    <u>Limitations on Use of DIP Proceeds and Carve Out</u>.  The DIP Facility, the DIP Collateral, and the Carve Out may not be used in connection with: (a) preventing, restricting, hindering, delaying, objecting to, contesting, modifying or interfering with any of the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral in accordance with the Interim Order and the DIP Documents; (b) selling or otherwise disposing of DIP Collateral without the consent of the DIP Agent (acting at the direction of the Required DIP Lenders) other than as permitted in the DIP Documents and this Interim Order; (c) using or seeking to use any insurance proceeds constituting DIP Collateral outside the ordinary course of business without the consent of the DIP Agent (acting at the direction of the Required DIP Lenders); (d) incurring indebtedness without the prior consent of the DIP Agent (acting at the direction of the Required DIP Lenders), except to the extent permitted under the DIP Credit Agreement; (e) seeking to amend or modify any of the rights granted to the DIP Agent or the DIP

Lenders under this Interim Order or the DIP Documents without their consent; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the DIP Superpriority Claim, the DIP Collateral, or any other claims or liens, held by or on behalf of any of the DIP Agent or the DIP Lenders; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, any so-called "lender liability" claims and causes of action, or actions to recover or disgorge payments, against any of the DIP Agent, the DIP Lenders, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, trustees, administrators, managers, advisors, attorneys and representatives, solely in their capacities as such; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, or any rights or interests of any of the DIP Agent or the DIP Lenders granted under this Interim Order or the DIP Documents; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations, the DIP Liens or the DIP Superpriority Claim.

28.     <u>Payment of Compensation</u>.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Agent or the DIP Lenders to object to the allowance and payment of such fees and expenses.

29.     <u>Effect of Stipulations on Third Parties</u>.

(i)     *Generally*.  The Debtors' Stipulations shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest

and assigns, including, without limitation, any official committee that may be appointed in these cases, unless, and solely to the extent that, (i) a Creditors' Committee (if any) or any other party in interest with standing and requisite authority (other than the Debtors, as to which any Challenge (as defined herein) shall be waived) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules, challenging the Debtors' Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**") no later than (1) for a Creditors' Committee (to the extent one is appointed), sixty (60) calendar days from the date of the Creditors' Committee's appointment, or (2) seventy-five (75) calendar days from the entry of the Interim Order for any other party in interest with requisite standing (the "**Challenge Deadline**"), as such applicable date may be extended in writing from time to time by the PEFI Secured Parties or RAI Secured Parties, as applicable, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal; provided that any trustee appointed or elected in these Chapter 11 Cases prior to the expiration of the Challenge Deadline shall have until the later of (x) the Challenge Deadline or (y) 10 calendar days from the date such trustee is appointed, to commence a Challenge proceeding.  If the Creditors' Committee (if any) or any other party in interest files a motion for standing to bring a Challenge by the Challenge Deadline, such Challenge Deadline shall be tolled pending further order of the Court.  For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or

contested matter timely commenced prior to the Challenge Deadline pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest with the requisite standing on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Interim Order.

        (ii)    *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Debtors' Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Debtors' Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above, except to the extent that any of such Debtors' Stipulations is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the PEFI Agent and RAI Agent, as applicable, shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the PEFI Credit Agreement or RAI Credit Agreement,

as applicable, in defending themselves and PEFI Secured Parties or RAI Secured Parties, as applicable in any such proceeding as adequate protection.  For the avoidance of doubt, if a Challenge is successful as set forth in a final judgment, the Court may fashion any appropriate remedy, including disgorgement of any payments made to the Prepetition Secured Parties in respect of the Prepetition Secured Obligations.

30.    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

31.    Section 506(c) Claims.  Subject to the entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent or the DIP Lenders, or any of their claims, the DIP Collateral, or the DIP Superpriority Claim, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

32.    No Marshaling/Applications of Proceeds.  Subject to the entry of a Final Order, the DIP Agent and the DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

33.    Access to DIP Collateral. Without limiting any other rights or remedies of the DIP Agent, exercisable on behalf of the DIP Lenders, contained in this Interim Order, the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon written notice to the landlord of any leased premises that an Event of Default or the DIP Termination Date has occurred and is continuing, the DIP Agent (acting at the

direction of the Required DIP Lenders) may, subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord and the DIP Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder.  Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded in this paragraph.  For the avoidance of doubt, subject to (and without waiver of) the rights of the DIP Agent and/or DIP Lenders under applicable nonbankruptcy law, the DIP Agent and/or DIP Lenders can only enter upon a leased premises after an Event of Default or the DIP Termination Date in accordance with (i) a separate agreement with the landlord at the applicable leased premises, (ii) consent of the landlord, or (iii) upon entry of an order of this Court obtained by motion of the DIP Agent and/or DIP Lenders, on such notice to the landlord as shall be required by this Court or applicable law.

34.    <u>Limits on Lender Liability</u>.  Subject to the entry of a Final Order, nothing in this Interim Order or in any of the DIP Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the restructuring efforts and the administration of these Chapter 11 Cases.  The DIP Agent and the DIP Lenders shall not be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or

state statute) as a result of or in connection with this Interim Order and the DIP Documents. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

35.    <u>Insurance Proceeds and Policies</u>.  Upon the entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that constitutes DIP Collateral.

36.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

37.    <u>Rights Preserved</u>.  Except as provided in this Interim Order and the DIP Documents, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agent's and the DIP Lenders' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Agent or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions

of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent or DIP Lenders. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Creditors' Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the Chapter 11 Cases.

38.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent or the DIP Lenders.

39.     <u>Binding Effect of Interim Order</u>.  Immediately upon the entry of the Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, all other creditors of any of the Debtors, any Creditors' Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

40.     <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations and have been indefeasibly paid in full in cash (such payment being without prejudice to any

terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent acting at the direction of the Required DIP Lenders, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior in priority to the DIP Superpriority Claim, other than the Carve Out; (b) without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided herein and in the other DIP Documents; or (c) without the prior written consent of the DIP Agent, any modification, stay, vacatur or amendment to this Interim Order affecting the rights, duties or obligations of the DIP Agent.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent.

41.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

42.    <u>Discharge</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the

provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash and all commitments have been terminated in writing, on or before the effective date of such confirmed plan of reorganization or the DIP Agent (acting at the direction of the Required DIP Lenders) has otherwise agreed in writing.

43.    Survival.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent and the DIP Lenders, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash and all commitments have been terminated. The terms and provisions concerning the indemnification of the DIP Agent and DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

44.    Satisfaction of DIP Claims.    Subject to entry of the Final Order, in connection with any allocation of the Debtors' property for purposes of determining the value the RAI Secured Parties' interests in the Prepetition RAI Collateral and satisfying the Prepetition RAI Warehouse Obligations, the DIP Claims shall be satisfied from all present and after acquired

42

property of the Debtors (including the proceeds, product, offspring, profits or value thereof), wherever located, that does not constitute Prepetition RAI Collateral until the Prepetition RAI Warehouse Obligations have been satisfied in full.

45.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 202[ ], at ___ __.m. (Eastern Standard Time)** before the Honorable United States Bankruptcy Judge [____], at the United States Bankruptcy Court for the District of Delaware.  On or before December ___, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order, the proposed Final Order and (to the extent not previously served) the DIP Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Creditors' Committee (if appointed); and (d) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **_____, 2020**, which objections shall be served so as to be received on or before such date by:  (i) counsel to the Debtors, Bryan Cave Leighton Paisner LLP, 120 Broadway, Suite 300, Santa Monica, CA 90401, Attn: Sharon Weiss, and Culhane Meadows PLLC, 4023 Kennett Pike #165, Wilmington, DE 19807, Attn:  Mette Kurth; (ii) counsel to the DIP Agent and DIP Lenders, Hunton Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166, Attn: Peter S. Partee, Sr., Hunton Andrews Kurth LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, Attn: Michael P. Goldman, and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, DE 19801, Attn: Robert Dehney; (iii) counsel

to any Creditors' Committee; and (iv) the Office of the U.S. Trustee for Region 3, 844 King Street, Suite 3307, Wilmington, DE 19801, Attn: Benjamin Hackman.

46.     <u>Nunc Pro Tunc Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable nunc pro tunc to the Petition Date immediately upon execution thereof.

47.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

48.     No later than two (2) business days after the date of this Interim Order, the Debtors shall serve a copy of the Interim Order on the Notice Parties and shall file a certificate of service no later than 24 hours after service.


_____
United States Bankruptcy Judge


Dated: December ___, 2020
Wilmington, Delaware

**EXHIBIT A**

DIP Credit Agreement

**EXHIBIT B**

Initial Budget

**<u>Exhibit B</u>**

**DIP Agreement**

**Execution Version**

SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

dated as of December 21, 2020

by and among

Personal Energy Finance, Inc. and Renovate America, Inc., collectively, as Borrower,

Finance of America Mortgage LLC,
as Administrative Agent, Collateral Agent, and Initial Lender,

and the other Lenders
party hereto from time to time

# TABLE OF CONTENTS

**Page**

ARTICLE I

DEFINITIONS ....................................................................................................... 1

Section 1.1    Defined Terms .................................................................................. 1
Section 1.2    Money .............................................................................................. 20
Section 1.3    Division or Plan of Division under Delaware Law ........................ 20

ARTICLE II

PROGRAM AMOUNT ........................................................................................... 20

Section 2.1    Program Amount ............................................................................. 20
Section 2.2    Fees ................................................................................................. 22
Section 2.3    Payments Generally; Credit Bidding .............................................. 23

ARTICLE III

COLLATERAL ....................................................................................................... 24

Section 3.1    Collateral ........................................................................................ 24
Section 3.2    Collateral Representations and Warranties .................................... 25
Section 3.3    Accounts ......................................................................................... 25
Section 3.4    Contract Datasite Access ............................................................... 27
Section 3.5    Settlement Procedures .................................................................... 27
Section 3.6    Appointment; Duties of the Collateral Agent ................................ 28
Section 3.7    Access to Required Documents; Release of Required Documents ... 29
Section 3.8    Indemnification of Collateral Agent .............................................. 29
Section 3.9    Reserved ......................................................................................... 30
Section 3.10   Reserved ......................................................................................... 30
Section 3.11   Liability of the Collateral Agent .................................................... 30
Section 3.12   Certain Matters Affecting the Collateral Agent ............................ 31
Section 3.13   Merger, Conversion, Consolidation of, or Succession to Business of,
              the Collateral Agent ...................................................................... 33
Section 3.14   Termination .................................................................................... 33

ARTICLE IV

CONDITIONS PRECEDENT TO THE DRAWS ................................................. 34

Section 4.1    Conditions Precedent to the Initial Draw ...................................... 34
Section 4.2    Conditions Precedent to Draws (other than the initial Draw) ........ 36

ARTICLE V

REPRESENTATIONS AND WARRANTIES ....................................................... 37

Section 5.1    Borrower Representations and Warranties ..................................... 37

ARTICLE VI

AFFIRMATIVE COVENANTS ............................................................................. 41

Section 6.1    Preservation of Existence ............................................................... 41

| Section 6.2 | Material Adverse Effects and Litigation | 41 |
|---|---|---|
| Section 6.3 | Financial Records | 41 |
| Section 6.4 | Operations and Variance Reports | 41 |
| Section 6.5 | Milestones | 42 |
| Section 6.6 | Minimum Liquidity | 43 |
| Section 6.7 | Compliance Certificates | 43 |
| Section 6.8 | Reserved | 43 |
| Section 6.9 | Regulatory Inspection Reports | 43 |
| Section 6.10 | Notice of Event of Default, Termination Event or Governmental Authority Default | 44 |
| Section 6.11 | Monthly Contract Reports | 44 |
| Section 6.12 | Additional Information | 44 |
| Section 6.13 | Fiscal Year; Fiscal Quarter | 44 |
| Section 6.14 | Electronic Listing of Contracts | 44 |
| Section 6.15 | Other Agreements | 45 |
| Section 6.16 | Use of Proceeds | 45 |
| Section 6.17 | Taxes, Charges and Liens | 45 |
| Section 6.18 | Management and Operations | 45 |
| Section 6.19 | Change of Location | 45 |
| Section 6.20 | Title to Assets and Property; Insurance | 45 |
| Section 6.21 | Notice of ERISA Matters | 46 |
| Section 6.22 | Other Information | 46 |
| Section 6.23 | Schedule of Contracts | 46 |
| Section 6.24 | Additional Assurances | 46 |
| Section 6.25 | Authorization to do Business | 46 |

## ARTICLE VII

NEGATIVE COVENANTS 46

| Section 7.1 | Indebtedness | 46 |
|---|---|---|
| Section 7.2 | Liens | 47 |
| Section 7.3 | Transfers | 47 |
| Section 7.4 | Operations and Use of Proceeds | 47 |
| Section 7.5 | Other Agreements | 47 |
| Section 7.6 | Distributions | 47 |
| Section 7.7 | Loans, Acquisitions and Guaranties | 47 |
| Section 7.8 | Change of Control | 47 |
| Section 7.9 | Affiliate Transactions | 47 |
| Section 7.10 | BENJI Program Documents | 48 |
| Section 7.11 | Bankruptcy Cases | 48 |

## ARTICLE VIII

EVENTS OF DEFAULT 48

| Section 8.1 | Events of Default | 48 |
|---|---|---|
| Section 8.2 | Effect of an Event of Default | 51 |
| Section 8.3 | Termination Event | 52 |

## ARTICLE IX

MISCELLANEOUS PROVISIONS                                                52

Section 9.1      Amendments.................................................................................52
Section 9.2      Applicable Law ...........................................................................52
Section 9.3      Caption Headings .........................................................................52
Section 9.4      Assignment and Loan Participation................................................52
Section 9.5      Controlling Terms ........................................................................54
Section 9.6      Costs and Expenses; Indemnification.............................................54
Section 9.7      Increased Costs; Tax Withholding .................................................55
Section 9.8      Calculation of Time Periods.........................................................59
Section 9.9      Entire Agreement.........................................................................59
Section 9.10     Provisions with Respect to the Agents ..........................................59
Section 9.11     Maximum Interest Rate ................................................................64
Section 9.12     Notices.......................................................................................64
Section 9.13     Severability.................................................................................65
Section 9.14     Sole Discretion of Lenders ...........................................................66
Section 9.15     Successors and Assigns ................................................................66
Section 9.16     Survival......................................................................................66
Section 9.17     Waiver .......................................................................................66
Section 9.18     No Advisory or Fiduciary Responsibility........................................66
Section 9.19     Right of Setoff ............................................................................67
Section 9.20     Confidentiality.............................................................................67
Section 9.21     WAIVER OF JURY TRIAL .........................................................68
Section 9.22     Counterparts ...............................................................................68
Section 9.23     Contractual Recognition of Bail-In ...............................................68
Section 9.24     Obligations Joint and Several .......................................................69

- iii -

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** is entered into as of December 21, 2020 (as amended or otherwise modified from time to time, the "*Agreement*"), by and among Personal Energy Finance, Inc., a Delaware corporation ("*PEFI*") and Renovate America, Inc., a Delaware corporation ("*RAI*", and collectively with PEFI, the "*Borrower*") and Finance of America Mortgage LLC, a Delaware limited liability company("*FAM*") , as administrative agent (in such capacity, the "*Administrative Agent*"), collateral agent (in such capacity, the "*Collateral Agent*") and initial lender ("*Initial Lender*"), and each other Lender party hereto from time to time (the "*Lenders*").

**WHEREAS**, the Borrower is in the business of providing consumer financing for home improvement projects, including specifically the business operated by Borrower under the "BENJI" brand (the "*Business*");

**WHEREAS**, on December 21, 2020 (the "*Petition Date*"), Borrower commenced in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") voluntary cases (collectively, the "*Bankruptcy Cases*") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*");

**WHEREAS**, FAM and the Borrower are parties to that certain Asset Purchase Agreement (as the same may be amended, modified, or supplemented from time to time, the "*Stalking Horse APA*"), dated as of the date hereof, pursuant to which, among other things, the Borrower has agreed to sell to FAM, and FAM has agreed to purchase from the Borrower, the assets used in the Business (the "*Purchased Assets*"); and

**WHEREAS**, the Borrower has applied to FAM to enter into a senior secured debtor-in-possession revolving credit facility (the "*DIP Facility*") to fund the operation of the Business and the Bankruptcy Cases until the consummation of the transactions contemplated by the Stalking Horse APA, and FAM has agreed to make loans to Borrower on the terms set forth herein.

**NOW**, **THEREFORE**, for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower, the Collateral Agent, the Administrative Agent and the Lenders agree as follows:

# ARTICLE I
# DEFINITIONS

Section 1.1    Defined Terms. The following terms shall have the following meanings when used in this Agreement.

"*Account*" means any "account," as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower, and, in any event, shall include, without limitation, each of the following, whether now owned or hereafter acquired by such Debtor: (a) all rights of the Borrower to payment for goods sold or leased or services rendered, whether or not earned by performance, (b) all accounts receivable of the Borrower, (c) all rights of the Borrower to receive any payment of money or other form of consideration, (d) all security pledged, assigned

or granted to or held by the Borrower to secure any of the foregoing, (e) all guaranties of, or indemnifications with respect to, any of the foregoing, and (f) all rights of the Borrower as an unpaid seller of goods or services, including, but not limited to, all rights of stoppage in transit, replevin, reclamation and resale.

"_Account Bank_" means Bank of America, N.A., in its capacity as account bank, or such other bank selected by the Administrative Agent.

"_Administrative Agent_" means FAM, acting in its capacity as administrative agent for the Lenders under Section 9.10 of this Agreement and any successor Person appointed as "Administrative Agent" in accordance with this Agreement.

"_Advance Rate_" means 90%.

"_Affiliate_" means, as to any Person, any other Person (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities/equities of such Person, or (iii) ten percent (10%) or more of the voting securities/equities of which is directly or indirectly beneficially owned or held by the Person in question.  The term "control" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities/equities, by control, or otherwise.

"_Agent_" or "_Agents_" means, respectively, any of the Administrative Agent and the Collateral Agent, or all collectively.

"_Aggregate Principal Balance_" means, when used with respect to all or a portion of the Contracts, the sum of the Principal Balances of all or of such portion of such Contracts.

"_Aggregate Unpaids_" means, with respect to any date, an amount equal to the sum of (i) the Outstanding Principal Balance, (ii) all accrued but unpaid Interest and (iii) all other Indebtedness owed (whether due or accrued) by the Borrower to the Lenders or the Agents under this Agreement and the Loan Documents.

"_Agreement_" has the meaning given to such term in the Preamble.

"_Ameris Agreement_" means that certain Master Purchase and Servicing Agreement dated as of April 10, 2019 by and between PEFI, as seller and servicer, and Ameris Bank, as buyer (as the same may be amended, modified, supplemented or restated).

"_Applicable Laws_" has the meaning given to such term in Section 3.12(f).

"_Approved Contractor_" means a Contractor that is approved for the sale and installation of Home Improvement Projects pursuant to the Contractor Approval Policy.

- 2 -

"*Approved Forms*" means the forms of retail installment sale contracts and related documents used by the Borrower as of the Closing Date, and any additions or modifications thereto that are in compliance with Section 7.10.

"*Approved Takeout*" means collectively, and subject to satisfaction of the Approved Takeout Conditions, transactions executed under (i) the FAM Loan Purchase Agreement, (ii) the Ameris Purchase Agreement and (iii) any other loan purchase agreement providing for the sale of Contracts by PEFI to any Person, which loan purchase agreement is approved by FAM in its reasonable discretion.

"*Approved Takeout Conditions*" means, collectively: (i) the eligibility guidelines and other purchase conditions of the Approved Takeout; (ii) with respect to any FAM Takeout, the Outstanding Principal Balance shall be at least equal to the then current Program Amount minus the then current Fixed Commitment Amount minus $2,000,000 and Borrower shall have first delivered written notice to the Administrative Agent pursuant to Section 2.1(c) requesting that the Lenders increase the then current Program Amount by the amount of the proposed FAM Takeout as contemplated by Section 2.01(a) of the FAM Loan Purchase Agreement, and the Lenders, in their sole individual discretion, shall not have agreed unanimously to such request; and (iii) with respect to any Approved Takeout other than a FAM Takeout, the Borrower shall have first complied with the right of first refusal condition set forth in Section 2.01(b) of the FAM Loan Purchase Agreement, and FAM shall have elected not to purchase the Contracts subject to such proposed Approved Takeout.

"*Asset Base*" as of any date of determination means the Aggregate Principal Balance of all Eligible Contracts.

"*Assignment by Seller*" means the Assignment by Seller executed by an Approved Contractor, as seller, for the benefit of the Borrower, as assignee.

"*Authorized Individual*" means the chief executive officer, chief financial officer, chief operating officer, chief capital officer, chief revenue officer, and any other officer, employee or representative of the Borrower whom the Borrower designates in a written notice delivered to Administrative Agent as authorized to request a Draw.

"*Avoidance Actions*" means causes of action of the Borrowers arising under chapter 5 of the Bankruptcy Code.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"*Bankruptcy Cases*" has the meaning set forth in the Recitals.

- 3 -

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Benefit Plan*" means a "benefit plan investor" as defined in 29 C.F.R. Section 2510.3101 as amended by Section 3(42) of ERISA, which includes (i) employee benefit plans (as defined in Section 3(3) of ERISA) that are subject to the fiduciary responsibility provisions of Title I of ERISA, (ii) plans subject to Section 4975(e)(1) of the Code, including individual retirement accounts and Keogh Plans and (iii) any entities whose underlying assets include plan assets by reason of a plan's investment in such entities.

"*BENJI Program Documents*" means collectively the Approved Forms, the Contractor Approval Policy, and the Credit and Collection Policies.

"*Bid Procedures Order*" means an order of the Bankruptcy Court, which order shall be in substantially the form attached as Exhibit B to the Stalking Horse APA, with such changes as may be required by the Bankruptcy Court and that are in form and substance acceptable to the Borrower and FAM in their reasonable discretion.

"*Borrower*" has the meaning set forth in the Preamble.

"*Borrowing Base*" means the Asset Base multiplied by the Advance Rate.

"*Borrowing Date*" means (i) each Payment Date, and (ii) each Business Day of a calendar week.

"*Business*" has the meaning set forth in the Recitals.

"*Business Day*" means a day on which commercial banks are generally open for business in both New York, New York and San Diego, California, excluding Saturdays, Sundays and holidays.

"*Carve Out*" has the meaning assigned to such term in the Interim Order and Final Order, as applicable.

"*Carve-Out Trigger Notice*" has the meaning assigned to such term in the Interim Order and Final Order, as applicable.

"*Change of Control*" means such time as:

(a)     the purchase or other acquisition by any one Person, or more than one Person acting as a group (other than any holder or holders of equity interests of the Thrivepoint (as defined below) on the Closing Date), of the equity interests in Thrivepoint Financial Holdings, Inc., a Delaware corporation ("*Thrivepoint*") that constitutes more than 50% of the total combined value or total combined voting power of all equity interests issued by Thirivepoint; or

- 4 -

(b)    Thrivepoint ceases to own, directly or indirectly, 100% of the equity interests in the Borrower; or

(c)    the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries, to any "person" (within the meaning of Section 13(d) of the Exchange Act of 1934, as amended).

"*Chattel Paper*" means any "chattel paper," as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower, and shall include both electronic Chattel Paper and tangible Chattel Paper.

"*Closing Date*" means the Business Day on which all conditions precedent to the initial Draw have been satisfied or waived, or such other date as agreed to by the Borrower and Administrative Agent.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Collateral*" means all assets of the Borrower and all proceeds thereof, including, but not limited to:

(i)    all Contracts;

(ii)    all Accounts;

(iii)    all Chattel Paper;

(iv)    all General Intangibles;

(v)    all Equipment and Inventory;

(vi)    all Intellectual Property;

(vii)    all Documents;

(viii)    all Instruments;

(ix)    all Pledged Shares;

(x)    all Deposit Accounts and any other cash collateral, deposit or securities accounts;

(xi)    all Investment Property;

(xii)    all other personal property;

(xiii)    all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records ) and Software whether relating to the

- 5 -

foregoing Collateral or otherwise, but in the case of such Software, subject to the rights of any non-affiliated licensee of software; and

(xiv)    the Proceeds, in cash or otherwise, of any of the property described in the foregoing clauses (i) through (xiii) and all Liens, security, rights, remedies and claims of such Borrower with respect thereto (provided that the grant of a security interest in Proceeds set forth is in this subsection (xiv) shall not be deemed to give the applicable Debtor any right to dispose of any of the Collateral, except as may be expressly permitted pursuant to the terms of the this Agreement).

"*Collateral Agent*" means FAM, in its capacity as collateral agent for the Lenders, and any successor Person appointed as Collateral Agent in accordance with this Agreement.

"*Collection Period*" means with respect to any Payment Date, the immediately preceding calendar week.

"*Collections*" means, with respect to any Collection Period and the related Payment Date, (i) all cash collections, distributions, payments or other amounts received (whether in cash or in kind), by the Borrower from any Person in respect of any Contract included in the Collateral, including, but not limited to, all principal, interest, fees, contractual payments, liquidation proceeds, insurance proceeds, distributions and other proceeds payable to the Borrower under or in connection with any such Contracts and all Proceeds from any sale or disposition of any such Contracts, (ii) all payments of purchase price made to the Borrower from the sale of Contracts pursuant to an Approved Takeout, and (iii) all earnings on Permitted Investments; in each case received and deposited in the Deposit Account during or in respect of such Collection Period and the related Payment Date.

"*Committed Amount*" has the meaning set forth in the definition of Program Amount.

"*Compliance Certificate*" has the meaning set forth in Section 6.7 of this Agreement.

"*Confidential Information*" has the meaning set forth in Section 9.20.

"*Contract*" means an unsecured retail installment sale contract or other financing agreement for a Home Improvement Project acquired by the Borrower from an Approved Contractor in accordance with the Credit and Collections Policies and the Approved Takeout Conditions and documented on an Approved Form.

"*Contract File*" means, with respect to any Contract, (a) each of the Required Documents with respect to such Contract and (b) the Obligor application and any other agreements, files and records evidencing securing, guarantying or relating to such Contract.

"*Contract Schedule*" means the Contract Schedule in the form attached as Schedule IV hereto.

"*Contract Datasite*" means the database(s) accessible through the internet in which the Borrower stores electronic copies of the Required Documents.

- 6 -

"*Contractor*" means a contractor that in the ordinary course of business sells or installs Home Improvement Projects.

"*Contractor Approval Policy*" means the Renovate America Contractor Onboarding Standard setting forth the qualification requirements that entities must meet to become Approved Contractors, and any additions or modifications thereto that are in compliance with Section 7.10, but excluding any provisions or requirements in the Renovate America Contractor Onboarding Standard that are solely applicable to the HERO program.

"*Credit and Collection Policies*" means collectively, the Compliance Management Program Policy, Consumer Credit Policy, Fair Lending Policy, Underwriting Policy, and Servicing and Collections Overview as in effect on the Closing Date, and any additions or modifications thereto that are in compliance with Section 7.10.

"*Defaulted Contract*" means any Contract (i) that has been pledged as Collateral under this Agreement for more than sixty (60) consecutive days, (ii) that is charged off or uncollectible, (iii) any portion of which is more than thirty (30) days contractually delinquent, or (iv) that the Borrower has knowledge that the related Debtor is subject to any bankruptcy or insolvency proceeding.

"*Defaulting Lender*" means any Lender that (i) has failed, within two (2) Business Days of the date required to be funded or paid (a) to fund any portion of its pro rata share of a Draw or (b) to pay the Borrower any other amount required to be paid by it hereunder, unless in the case of clause (a) such Lender notifies the Administrative Agent in writing (which may be provided via electronic mail) that such failure is the result of such Lender's reasonable good faith determination that a condition precedent to funding hereunder (specifically identified and including the particular default, if any) has not been satisfied, (ii) has notified the Borrower in writing (which may be provided via electronic mail) that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit or (iii) has become the subject of an insolvency proceeding (other than an Undisclosed Administration).   The term "*Undisclosed Administration*" means in relation to a Lender or its direct or indirect parent company that is a solvent person, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian, or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or such parent company is subject to home jurisdiction, if applicable law requires that such appointment not be disclosed.   For the avoidance of doubt, the provisions relating to Defaulting Lenders herein are solely intended to describe the obligations amongst Lenders to the extent there are two or more Lenders party to this Agreement.

"*Default Notice*" means a notice delivered by the Administrative Agent to the Borrower declaring the occurrence and continuance of an Event of Default.

"*Deposit Account*" means the account listed as the Deposit Account on <u>Exhibit E</u>.

"*Deposit Account Control Agreement*" means a deposit account control agreement, with respect to the Program Funding Account and the Deposit Account, among the Borrower, the

- 7 -

Collateral Agent and the Account Bank, in form and substance satisfactory to Administrative Agent and the Collateral Agent in their reasonable discretion.

"*Determination Date*" means, the last day of the related Collection Period.

"*DIP Budget*" means the budget prepared by the Borrower and approved by FAM and attached hereto as Exhibit D.

"*DIP Facility*" has the meaning set forth in the Recitals.

"*DIP Liens*" means the liens granted by the Borrower to the Collateral Agent for the ratable benefit of the Secured Parties to the secure the Indebtedness.

"*Disbursements Variance*" has the meaning set forth in Section 6.4.

"*Dollars*" and "*$*" means dollars in lawful currency of the United States of America.

"*Draw*" means any funding of the Lenders' pro rata share of the Program Amount by the Administrative Agent at the direction of, or on behalf of, the Borrower subject to the terms and conditions of this Agreement.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Electronic Collateral Control Agreement*" means that certain Electronic Collateral Control Agreement, dated on or about the date hereof, among the Collateral Agent, Personal Energy Finance, Inc., Renovate America, Inc. and eOriginal, Inc.

"*Eligible Contract*" means, as of any date of determination, a Contract with respect to which each of the criteria set forth on Schedule II attached hereto relating to such Contract was true on the Borrowing Date and is true as of such date of determination.

"*Eligible Property*" means any residential property (not commercial) designated as eligible under the Credit and Collection Policies.

"*Equipment*" means any "equipment" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower.

- 8 -

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means (i) any corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as the Borrower, (ii) a trade or business (whether or not incorporated) under common control (within the meaning of Section 414(c) of the Code) with the Borrower or (iii) a member of the same affiliated service group (within the meaning of Section 414(m) or (o) of the Code) as the Borrower.

"*Event of Default*" means and includes each of the Events of Default set forth in Section 8.1 of this Agreement.

"*Excluded Taxes*" means (i) Taxes imposed on or measured by an Indemnified Party's net income (however denominated), and franchise taxes and branch profit taxes, in each case, (A) imposed on it, by the jurisdiction under the laws of which such Indemnified Party is organized, its principal or applicable lending office is located or any political subdivision of the foregoing or (B) that are Other Connection Taxes, (ii) Taxes imposed pursuant to FATCA, (iii) U.S. federal withholding Tax that is imposed on amounts payable to a Lender at the time such Lender became a party to this Agreement (or designated a new lending office) (other than as a result of an assignment made pursuant to clauses (c) and (g) of Section 9.7), except to the extent that such Lender, or in the case of an assignment or transfer, the assignor or transferring Lender was entitled at the time of designating a new lending office or assignment, participation or transfer (as applicable), to receive a payment under Section 9.7 with respect to such withholding Tax and (iv) any Tax that is attributable to a Lender's failure to comply with Section 9.7(d).

"*FAM*" has the meaning set forth in the Recitals.

"*FAM Loan Purchase Agreement*" means that certain Loan Purchase Agreement, dated as of the date hereof, by and among PEFI, as seller and servicer, and FAM, as buyer (as the same may be amended, modified, supplemented or restated).

"*FAM LPA Approval Order*" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to FAM, approving the FAM Loan Purchase Agreement.

"*FAM Takeout*" has the meaning given to such term in Section 3.5.

"*FAS 166/167 Capital Guidelines*" means the final rule, titled "Risk-Based Capital Guidelines; Capital Adequacy Guidelines; Capital Maintenance: Regulatory Capital; Impact of Modifications to Generally Accepted Accounting Principles; Consolidation of Asset-Backed Commercial Paper Programs; and Other Related Issues", adopted December 15, 2009, by the United States banking regulatory agencies.

"*FATCA*" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any U.S. Treasury regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement treaty or convention among Governmental Authorities and implementing such Sections of the Code.

- 9 -

"*Federal Reserve Bank of New York's Website*" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"*Final Order*" means the order of the Bankruptcy Court authorizing and approving the Borrower's entry into this Agreement on a final basis, including the granting of the Liens in respect of the DIP Facility in favor of the Collateral Agent for the ratable benefit of the Secured Parties, which shall be in form and substance acceptable to FAM in its sole discretion.

"*Fixed Commitment Amount*" means an amount equal to twenty-three percent (23%) of the then current Program Amount.

"*Funding Period*" means the period that begins on the Closing Date and ends on the Maturity Date.

"*Funding Request*" has the meaning set forth in Section 2.1(b) of this Agreement.

"*GAAP*" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"*General Intangibles*" means any "general intangibles," as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower and, in any event, shall include, without limitation, each of the following, whether now owned or hereafter acquired by the Borrower: (a) all of the Borrower's Intellectual Property; (b) all of the Borrower's books, records, data, plans, manuals, computer software, computer tapes, computer disks, computer programs, source codes, object codes and all rights of the Borrower to retrieve data and other information from third parties; (c) all of the Borrower's contract rights (including, without limitation, all of the Borrower's right, title and interest in and to any amounts payable to it upon the termination, acceleration, liquidation or close-out of any repurchase agreement or any other master netting agreement (as such terms is defined in Bankruptcy Code Section 101(38A)), but only after giving effect to any netting, offset and recoupment rights of the parties thereto pursuant to the terms thereof or of any other agreement), partnership interests, membership interests, joint venture interests, securities, deposit accounts, securities accounts and certificates of deposit; (d) all rights of the Borrower to payment under chattel paper, documents, instruments and similar agreements; (e) letters of credit, letters of credit rights supporting obligations and rights to payment for money or funds advanced or sold of the Borrower; (f) all tax refunds and tax refund claims of the Borrower; (g) all choses in action and causes of action of the Borrower (whether arising in contract, tort or otherwise and whether or not currently in litigation), including all Avoidance Actions, and all judgments in favor of the Borrower; (h) all rights and claims of the Borrower under warranties and indemnities, (i) all health care receivables; and (j) all rights of the Borrower under any insurance, surety or similar contract or arrangement.

"*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency,

- 10 -

authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Holdout Lender*" has the meaning given to such term in Section 9.10(d).

"*Home Improvement Project*" means the repair, remodel, alteration, conversion or modernization of, or the addition to, a residential property, in each case provided by or installed by an Approved Contractor.

"*Indebtedness*" means all Draws, all fees and expenses of the Agents and Lender Professionals, debts, liabilities, indemnities, obligations and other indebtedness of the Borrower to the Secured Parties or any of their respective assigns, whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under this Agreement, the Notes and the other Loan Documents, together with Interest, reasonable and actually incurred costs, expenses, attorneys' fees and other reasonable and actually incurred fees and charges as more fully set forth herein, whether or not any such Indebtedness may be barred under any statute of limitations or may be otherwise unenforceable or voidable for any reason.

"*Indemnified Party*" has the meaning given to such term in Section 9.6 of this Agreement.

"*Indemnified Taxes*" means (A) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under this Agreement or any Loan Document and (B) to the extent not otherwise described in (A), Other Taxes.

"*ING*" means ING Capital LLC.

"*Initial Lender*" has the meaning set forth in the Preamble.

"*Initial Program Amount*" means $18,000,000.

"*Instrument*" shall mean any "instrument," as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower, and, in any event, shall include all promissory notes (including without limitation, any intercompany notes held by the Borrower), drafts, bills of exchange and trade acceptances, whether now owned or hereafter acquired.

"*Intellectual Property*" shall mean patents, patent licenses, copyrights, copyright licenses, trademarks, trademark licenses, trade secrets, registrations, goodwill, franchises, permits, proprietary information, customer lists, designs, inventions, and all other intellectual property rights.

"*Interest*" means, for any Interest Period and each Draw outstanding during such Interest Period, interest payable on the principal amount of such Draw computed pursuant to Section 2.1(e); *provided*, *however*, that (i) no provision of this Agreement shall require or permit

- 11 -

the collection of Interest in excess of the Maximum Rate and (ii) Interest shall not be considered paid by any distribution if at any time such distribution is rescinded or must otherwise be returned for any reason.

"*Interest Period*" means, with respect to each Draw, (i) with respect to the initial Payment Date following the related Borrowing Date, the period from (and including) such Borrowing Date to (but excluding) the date of such Payment Date, and (ii) with respect to each succeeding Payment Date, the period from and including the date of the immediately preceding Payment Date to but excluding the date of such current Payment Date; *provided*, *however*, that any Interest Period that commences before the Maturity Date that would otherwise end after the Maturity Date shall end on the Maturity Date or, if later, the date when actually paid to the Administrative Agent for the benefit of the Lenders.

"*Interest Rate*" means 7% per annum, compounded monthly.

"*Interim Order*" means the order of the Bankruptcy Court authorizing and approving the Borrower's entry into this Agreement on an interim basis, including the granting of the Liens in respect of the DIP Facility in favor of the Collateral Agent for the ratable benefit of the Secured Parties, which shall be in form and substance acceptable to FAM in its sole discretion.

"*Inventory*" means any "inventory," as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower.

"*Investment Property*" means any "investment property" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower, and in any event, shall include without limitation all shares of stock and other equity, partnership or membership interests constituting securities, of the domestic subsidiaries of the Borrower from time to time owned or acquired by the Borrower in any manner (including, without limitation, the Pledged Shares), and the certificates and all dividends, cash, instruments, rights and other property from time to time received, receivable or otherwise distributed or distributable in respect of or in exchange for any or all of such shares, but excluding any shares of stock or other equity, partnership or membership interests in any foreign subsidiaries of the Borrower.

"*IPO*" has the meaning set forth in Section 3.1.

"*Lender*" or "*Lenders*" means, individually or collectively, the Initial Lender, and each of its successors and assigns, if any, and each other party that becomes a party to this Agreement as a "Lender" and their respective successors and assigns, including, without limitation, any assignee or other transferee pursuant to Section 9.4 of this Agreement.

"*Lender Assignment Agreement*" means an agreement substantially similar in form and substance to the form of Lender Assignment and Acceptance Agreement attached hereto as Exhibit C.

"*Lender Group*" means the group of Lenders consisting of the Initial Lender and other Lenders acceptable to the Administrative Agent and the Borrower and as set forth on Schedule III attached hereto.

- 12 -

"*Lender Professionals*" means Hunton Andrews Kurth LLP and Morris, Nichols, Arsht & Tunnell LLP.

"*Loan Documents*" means this Agreement, the Interim Order, the Final Order, any Security Agreement, the Deposit Account Control Agreement(s), the Electronic Collateral Control Agreement, the Servicing Agreement, the Servicing Agreement Amendment, and, if any issued hereunder, the Notes.

"*Majority Lenders*" means the Lenders whose pro rata share of the Program Amount equal more than fifty percent (50%) of the aggregate Program Amount.

"*Master Contract Schedule*" means the Master Contract Schedule in the form attached hereto as Schedule I, which reflects the current information for all Contracts outstanding as of the date of such Master Contract Schedule, as the same may be amended, modified, supplemented, restated or replaced from time to time in accordance with the terms of this Agreement.

"*Material Adverse Effect*" means any occurrence, change, event, effect or circumstance, that, individually or when taken together with all other relevant occurrences, changes, events, effects or circumstances, has, or would reasonably be expected to have, a material adverse impact or effect on (a) the financial condition, business or operations of the Borrower, (b) the value of the Collateral taken as a whole, (c) the validity, enforceability, collectibility or transferability of any material portion of the Contracts comprising Collateral, (d) the ability of the Borrower to perform any of its obligations under this Agreement or any other Loan Document to which either is a party; or (e) the legality, validity, binding effect or enforceability of this Agreement or any other Loan Document.

"*Maturity Date*" means the earliest of (i) the date that is ninety (90) days after the Closing; (ii) the effective date of a Chapter 11 plan of the Borrower; (iii) the consummation of the transactions contemplated by the Stalking Horse APA; (iv) the date on which the Auction closes or the Borrower files a notice with the Bankruptcy Court identifying a successful Auction bidder or bidders other than the Stalking Horse Bidder, whichever is earlier, or the date on which the Borrower shall otherwise agree (other than pursuant to the Auction) to sell all or substantially all of the Purchased Assets to any party other than the Stalking Horse Bidder; and (v) the acceleration of the Indebtedness, including, without limitation, as a result of the delivery of a Default Notice.

"*Maximum Loan Amount*" means, as of any date of determination, the sum of (i) ninety percent (90%) of the Aggregate Principal Balance plus accrued interest under the Contracts as of such date and (ii) the Fixed Commitment Amount as of such date; *provided*, *however*, that notwithstanding the foregoing limitation, the Maximum Loan Amount shall not exceed the Program Amount.

"*Maximum Program Amount*" means $50,000,000.

"*Maximum Rate*" has the meaning given to such term in Section 9.11.

"*Measuring Period*" has the meaning given to such term in Section 6.4.

- 13 -

"*Non-U.S. Lender*" means each Lender that is not a "*U.S. Lender*".

"*Note*" means any promissory note evidencing the obligations of the Borrower to repay the Draws to a Lender in substantially the form attached hereto as Exhibit A.

"*Note Register*" has the meaning given to such term in Section 9.10(a).

"*Obligor*" means, in respect of any Contract, the Person primarily obligated to pay amounts due in respect of such Contract, including any applicable guarantors.

"*Origination Fee*" means the $175,000 fee payable to FAM on the Closing Date, which shall be paid as set forth in Section 2.1(d).

"*Other Connection Taxes*" means, with respect to any Indemnified Party, Taxes imposed as a result of a present or former connection between such Indemnified Party and the jurisdiction imposing such Tax (other than connections arising from such Indemnified Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Note or Indebtedness under this Agreement or any other Loan Document).

"*Other Taxes*" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to clauses (c) and (g) of Section 9.7).

"*Outstanding Principal Balance*" means the aggregate unpaid principal balance of all Draws made to the Borrower under this Agreement.

"*Participant Register*" has the meaning given to such term in Section 9.4.

"*PATRIOT Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"*Payment Date*" means (i) each date on which payments of purchase price are made in cash to the Borrower from the sale of Contracts pursuant to an Approved Takeout (other than pursuant to the FAM Loan Purchase Agreement) and (ii) each date on which outstanding Indebtedness under this Agreement is deemed paid in connection with sales and purchases of Contracts under the FAM Loan Purchase Agreement.  For the avoidance of doubt, the Maturity Date, with respect to all Indebtedness not paid in full, shall be a Payment Date.

"*PEFF*" has the meaning set forth in the Recitals.

- 14 -

"*PEFI / ING Facility*" means that certain Loan and Security Agreement dated as of December 9, 2019 (as amended, modified, or supplemented thereafter) by and among PEFI, as borrower, ING, as administrative agent and initial lender, and TMF Group New York, LLC, as collateral agent and escrow agent.

"*Permitted Investments*" means any of the following negotiable instruments or securities or other investments:

(i)     marketable obligations of the United States, the full and timely payment of which are backed by the full faith and credit of the United States and which have a maturity of not more than 365 days from the date of acquisition;

(ii)     bankers' acceptances and certificates of deposit and other interest-bearing obligations (in each case having a maturity of not more than 270 days from the date of acquisition) denominated in Dollars and issued by any bank with capital, surplus and undivided profits aggregating at least $5,000,000,000, the short-term obligations of which meet or exceed the Short-Term Rating Requirement;

(iii)     commercial paper rated at least A-l by S&P and Prime-1 by Moody's;

(iv)     demand deposits, bank deposit products, time deposits or certificates of deposit (having original maturities of no more than 365 days) of depository institutions or trust companies incorporated under the laws of the United States or any State (or domestic branches of any foreign bank) and subject to supervision and examination by federal or State banking or depository institution authorities; *provided*, *however*, that at the time such investment, or the commitment to make such investment, is entered into, the short-term debt rating of such depository institution or trust company shall meet or exceed the Short-Term Rating Requirement;

(v)     investments in money market funds for which the Account Bank is investment manager, controlling party or advisor having a rating, as of the time of such investment, in the highest rating category from any rating agency then rating such investment; provided that such money market funds participate in investments solely of the type described in clause (i) above; and

(vi)     any other investments approved in writing by the Administrative Agent (acting in its sole discretion).

"*Permitted Liens*" means (a) the DIP Liens; (b) any other Liens in favor of Lenders; (c) liens for taxes, assessments or similar charges either not yet delinquent or being contested in good faith and by appropriate proceedings and as to which adequate reserves have been provided; (d) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (e) liens arising by virtue of the rendition, entry or issuance against the Borrower, or any property of the Borrower, of any judgment, writ, order, or decree so long as such lien is in existence for less than thirty consecutive days after it first arises and is being contested in good faith and for which adequate reserves have been provided; (f) deposits made in the ordinary course of business to secure liability to insurance carriers; (g) liens

- 15 -

granted to financial institutions as a part of their normal deposit account opening instructions in connection with the Deposit Account and the Program Funding Account; and (h) liens granted by RAI to secure obligations under the Renovate / ING Facility.

"*Permitted Variance*" means: (x) with respect to the Receipts Variance: (i) for the first three Measuring Periods following the Petition Date, the Receipts Variance shall not be greater than a 20%; and (ii) for the following Measuring Periods, the Receipts Variance shall not be greater than 15%; and (y) with respect to the Disbursements Variance, for any Measuring Period, the Receipts Variance shall not be greater than 15%.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other form of entity.

"*Petition Date*" has the meaning set forth in the Recitals.

"*Post-Default Interest Rate*" means nine percent (9%) per annum compounded monthly.

"*Prime Rate*" means, on any day, the annual rate of interest for such day published by *The Wall Street Journal* as the "U.S. Prime Rate" and, if not published by The Wall Street Journal, then the rate reasonably established by Administrative Agent as its prime rate, as notified in writing by the Administrative Agent to the Borrower.

"*Principal Balance*" means, with respect to any Contract, as of any date of determination, the outstanding principal amount thereof.

"*Proceeds*" means any "proceeds," as such term is defined in Article or Chapter 9 of the UCC and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to the Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting, or purporting to act, for or on behalf of any Governmental Authority), and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"*Program*" means the secured revolving loan program set forth in this Agreement.

"*Program Amount*" means collectively with respect to each Lender, such Lender's pro rata share of an amount determined from time to time by the Borrower with the consent of the Lenders up to an amount not to exceed the Maximum Program Amount; *provided*, *however*, that during the period commencing on the Closing Date and until such time as the first Requested Increase Amount shall be effective, the Program Amount shall be the Initial Program Amount, which amount may be incrementally increased at any time and from time to time in amounts aggregating (together with the Initial Program Amount) up to the Maximum Program Amount pursuant to the procedures set forth in Section 2.1(c).

- 16 -

"*Program Deficiency*" means, at any time, the amount (if any) by which the Aggregate Unpaids exceed the Maximum Loan Amount.

"*Program Funding Account*" means the account listed as the Program Funding Account on Exhibit E.

"*Purchased Assets*" has the meaning set forth in the Recitals.

"*RAI*" has the meaning set forth in the Recitals.

"*Receipts Variance*" has the meaning given to such term in Section 6.4.

"*Regulatory Change*" means (i) any change after the date of this Agreement in the United States (federal, state or municipal) or foreign laws, regulations (including Regulation D) or accounting principles or the adoption or making after such date of any interpretations, directives or requests of or under any United States (federal, state or municipal) or foreign laws, regulations (whether or not having the force of law) or accounting principles by any court, governmental or monetary authority, or accounting board or authority (whether or not part of government) charged with the establishment, interpretation or administration thereof and (ii) any change, whether commenced prior to or after the Closing Date, relating to (a) the FAS 166/67 Capital Guidelines, (b) the second Basel Accord issued by the Basel Committee on Banking Supervision, (c) the third Basel Accord issued by the Basel Committee on Banking Supervision, or (d) the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any existing or future rules, regulations, guidance, interpretations or directives from the bank regulatory agencies relating to the FAS 166/167 Capital Guidelines, the second Basel Accord issued by the Basel Committee on Banking Supervision, the third Basel Accord issued by the Basel Committee on Banking Supervision or the Dodd-Frank Wall Street Reform and Consumer Protection Act (whether or not having the force of law).  For the avoidance of doubt, any change in accounting standards or the issuance of any other pronouncement, release or interpretation (or revisions to the foregoing) that causes or requires the consolidation of all or a portion of the assets and liabilities of a Borrower with the assets and liabilities of the Administrative Agent, the Collateral Agent or the Lenders shall constitute a Regulatory Change.

"*Related Parties*" means, as to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, attorneys-in-fact, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"*Remedies Notice Period*" means the period beginning on the date when the Administrative Agent delivers a Default Notice to Borrower and ending on the fifth day thereafter.

"*Renovate / ING Facility*" means the Amended and Restated Credit Agreement, dated as of March 22, 2019, by and among Renovate America, Inc., as borrower, Cortland, as collateral agent and escrow agent, ING, as administrative agent and initial lender, and the other lenders party thereto from time to time, as the same may be amended, modified, supplemented or restated from time to time.

"*Requested Increase Amount*" has the meaning set forth in Section 2.1(c).

- 17 -

"*Required Documents*" means, for each Contract, originals (except as otherwise indicated) of the following documents or instruments:

(a)    the single authoritative copy of the electronic record that evidences the Contract (which includes the truth in lending regulatory disclosure statements applicable to such Contract), as fully executed by the applicable Contractor and the Obligor(s), together with any amendments or modifications thereto, and any other applicable regulatory disclosure statements (such as "Gramm Leach Bliley", "Equal Credit Opportunity Act and Fair Credit Reporting Act" disclosures); provided that so long as such disclosure statements are maintained by the Borrower or the Servicer and are made available upon request, such disclosure statements need not be delivered to the electronic vault maintained in the name of the Borrower;

(b)    any written or tape recorded authorization for payment by ACH (including amendments thereto) provided by the Obligor; provided that so long as such written or tape recorded authorizations are maintained by the Borrower or the Servicer and made available upon request, such authorization need not be delivered to the electronic vault maintained in the name of the Borrower;

(c)    the related Assignment by Seller; and

(d)    all documents and agreements delivered to or executed by the related Obligor contemporaneously with the related Contract in accordance with the Contractor's then current customary practices and procedures;

*provided*, *however*, that all parties acknowledge and agree that copies of such Required Documents (if provided other than to the Collateral Agent or Servicer) will exclude the related Obligor name, address, social security number and other personally identifiable information and will instead be referenced by a loan number so as to comply with regulations regarding protection of personally identifiable information.

"*Required Lenders*" means (a) all Lenders then party hereto if there are less than three (3) Lenders or if the aggregate Program Amount has expired or been terminated, and (b) if there are three (3) or more Lenders under this Agreement, the Majority Lenders.

"*Sanctions*" has the meaning set forth in Section 5.1(v).

"*Secured Parties*" means the Agents and the Lenders.

"*Security Agreement*" means and includes, to the extent in writing and signed by the Borrower, each agreement creating a Security Interest.

"*Security Interest*" means and includes without limitation any and all present and future mortgages, pledges, liens, security interests, assignments and other security agreements securing the repayment of the Indebtedness, whether created by law, contract, or otherwise.

"*Servicer*" means Concord Servicing Corporation.

- 18 -

"*Servicing Agreement*" means the Servicing Agreement, dated as of September 14, 2015, between the Borrower and the Servicer, as amended, modified, supplemented or restated from time to time.

"*Servicing Agreement Amendment*" means the amendment to the Servicing Agreement, dated on or about the date hereof, by and among the Borrower, Collateral Agent, and the Servicer, in form and substance reasonably satisfactory to the Collateral Agent, providing for, among other things, all Collections under or in respect of Contracts shall be deposited into the Deposit Account directly by the relevant Obligors or by the Servicer.

"*Settlement Agent*" means Performance Trust or another financial institution acceptable to the Administrative Agent.

"*Short Term Rating Requirement*" means at least A-1 by S&P and Prime-1 by Moody's.

"*Software*" means all "software" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Borrower.

"*Sources and Uses Statement*" means a schedule substantially similar in form and substance to the form of Sources and Uses Statement attached hereto as Exhibit F.

"*Stalking Horse APA*" has the meaning set forth in the Recitals.

"*Stalking Horse Bid*" means the bid of the Stalking Horse Bidder as set forth in the Stalking Horse APA.

"*Stalking Horse Bidder*" means FAM or its designee, as set forth in the Stalking Horse APA.

"*State*" means a State of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

"*Subsidiary*" means, with respect to any Person, (a) any corporation, association or other business entity of which more than 50% of the total voting power of shares of voting securities/equities thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, or which is otherwise controlled directly or indirectly by such Person by voting agreement or other contract, and (b) any partnership in which such Person or any of its subsidiaries is a general partner.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, assessments, fees or other charges or withholdings (including backup withholdings) imposed by any Governmental Authority and all interest, additions to tax, or penalties with respect thereto.

"*Termination Event*" means that activities of the Initial Lender, the Lender Group, the Collateral Agent, or the Administrative Agent are suspended or terminated by a regulatory authority, and written notice thereof is provided to the Borrower.

- 19 -

"*UCC*" means, the Uniform Commercial Code, as in effect from time to time in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or creation or priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" shall mean the Uniform Commercial Code, as in effect from time to time in such other jurisdictions for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or creation or priority of a security interest.

"*USCO*" has the meaning set forth in Section 3.1.

"*U.S. Lender*" means a Lender that is a "United States person" under Section 7701(a)(30) of the Code.

"*USPTO*" has the meaning set forth in Section 3.1.

"*Variance Report*" has the meaning given to such term in Section 6.4.

"*Write-down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.2    Money.  All references to dollar amounts in the Loan Documents shall mean amounts in lawful money of the United States of America.

Section 1.3    Division or Plan of Division under Delaware Law.  Without the prior written consent of the Administrative Agent, Borrower shall not undertake or purport to enter into, cause or consent to any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) if any asset, right, obligation or liability of the Borrower comprising Collateral under this Agreement or securing the obligations of the Borrower under this Agreement would, pursuant to such division or plan of division become an asset, right, obligation or liability of a different Person other than the Administrative Agent (for the benefit of the Lenders) or of the Lenders.  However, to the extent that pursuant to any such division or plan of division any such asset, right, obligation or liability of the Borrower becomes an asset, right, obligation or liability of the Administrative Agent or a Lender, then (a) it shall be deemed to have been transferred from the Borrower to the Administrative Agent (for the benefit of the Lenders) or to the Lenders, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II
## PROGRAM AMOUNT

Section 2.1    Program Amount.

(a)    *Commitment / Option to Fund Draws*.  Subject to and upon the terms and conditions contained in this Agreement, and relying on the representations and warranties contained in this Agreement, each Lender agrees to make loans to the Borrower, such loans to be

- 20 -

made in one or more Draws during the Funding Period, <u>provided</u> that in no event shall any Lender be obligated to fund any Draw if, after giving effect to such Draw, the Outstanding Principal Balance would exceed the lesser of the Maximum Loan Amount or the Program Amount; <u>provided</u>, <u>further</u>, that no Lender shall be obligated to fund any Draw if, after giving effect thereto, the aggregate amount of all Draws outstanding from such Lender would exceed such Lender's Program Amount.  Neither the Administrative Agent nor any Lender shall be responsible for the failure of any other Lender to fund any Draw.  No Draw will be permitted after the Funding Period has terminated.  Within the foregoing limits, the Borrower may borrow under the Program during the Funding Period and prepay in accordance with the provisions of Section 2.1(f), (g) and (h).  Each Lender may at its option fund any Draw if, after giving effect to such Draw, the Outstanding Principal Balance would exceed the lesser of the Maximum Loan Amount or the Program Amount.

(b)     *Making a Draw on the Program Amount*.  During the Funding Period, so long as no Event of Default or Termination Event has occurred and is continuing, any Authorized Individual of the Borrower may request a Draw under the Program Amount in writing (which may be provided via electronic mail) in the form of Exhibit B attached to this Agreement (the "*<u>Funding Request</u>*").  Each Funding Request shall be delivered to the Administrative Agent not later than 11:59 p.m., New York, New York time, one (1) Business Day prior to the requested Borrowing Date, and shall be accompanied by a duly executed Compliance Certificate certifying as to the satisfaction of all conditions precedent to a Draw hereunder and under the Loan Documents and delivered to the Administrative Agent.  Each Draw shall be conclusively deemed to have been made at the request of and for the benefit of Borrower when drawn in accordance with the instructions of an Authorized Individual.  Each Draw, other than in respect of fees as described in Section 2.1(d) below, shall be funded pro-ratably by the Lenders to the Program Funding Account no later than 2:00 p.m., New York, New York time, on each Borrowing Date.

(c)     *Increase in Program Amount*.  At any time and from time to time, the Borrower shall have the right to request one or more increases in the Program Amount from the Initial Program Amount to an amount not to exceed the Maximum Program Amount by delivering written notice of each such request to the Administrative Agent on or prior to 1:00 p.m. (New York, New York time).  Each such request shall specify the amount of the requested increase (the "*<u>Requested Increase Amount</u>*"), which amount shall be in a minimum amount of $5,000,000, and no such request shall cause the Program Amount to exceed the Maximum Program Amount.  The Administrative Agent shall duly notify the Lenders of the Requested Increase Amount and each such Lender shall advise the Administrative Agent of its determination to consent to or to withhold consent to any such request (each Lender acting in its sole individual discretion) no later than 5:00 p.m. (New York, New York time) on the date of the Borrower's notice.  A Lender's failure to respond in accordance with the foregoing schedule shall be deemed to be such Lender's rejection of the Requested Increase Amount for all purposes of this Agreement.  At the request of the Borrower or the Administrative Agent, the parties to this Agreement shall enter into an amendment to this Agreement to memorialize the increase in the Program Amount, which amendment shall be in form and substance reasonably satisfactory to the Administrative Agent and the Borrower.  In the event any one or more of the Lenders shall not have consented to the Borrower's request to increase the Program Amount, the Program Amount shall remain unchanged.

(d)    *Draw for Fees*.  Each Lender shall include in the amount of any Draw requested in accordance with Section 2.1(b) such amount as Borrower may request in order to pay to such Lender any fee or charge provided for under this Agreement or any other Loan Document, including, in the case of the first Draw funded by FAM on the Closing Date, the Origination Fee and all fees and expenses of the Agents, including the fees and expenses of the Lender Professionals.

(e)    *Interest*.  The Outstanding Principal Balance under the Notes shall bear Interest at the Interest Rate, *provided, however* that after the occurrence and continuance of an Event of Default, at the option of the Lenders by written notice (which may be provided by electronic mail) to the Borrower and the Administrative Agent, the Outstanding Principal Balance under the Notes shall bear interest at the Post-Default Interest Rate.  The Borrower shall make payments to the Administrative Agent for the account of the Lenders of unpaid Interest accrued on the Outstanding Principal Balance with respect to Contracts that are sold in an Approved Takeout (other than to FAM) on each Payment Date.  All unpaid and accrued Interest not due and payable earlier, shall be paid by Borrower to the Administrative Agent for the account of the Lenders on the Maturity Date.

(f)    *Mandatory Principal Repayments*.  In addition to the requirements to repay all or any part of the other Indebtedness under this Agreement in accordance with the terms hereof, Borrower shall pay to the Administrative Agent for the account of the Lenders on the Maturity Date in full the aggregate Outstanding Principal Balance and all accrued unpaid Interest, together with all other Indebtedness, if any, not yet paid.  Notwithstanding the foregoing sentence, if the Maturity Date occurs on account of an event described in clause (iv) of the definition of "Maturity Date," the aggregate Outstanding Principal Balance and all accrued unpaid Interest, together with all other Indebtedness shall be due and payable in full within five (5) Business Days of such Maturity Date, and the Funding Period shall not expire until the expiration of such five (5) Business Day period so long as the Lenders have received, in form and substance satisfactory to each DIP Lender in its sole reasonable discretion, (i) an executed commitment to repay the aggregate Outstanding Principal Balance and all accrued unpaid Interest, together with all other Indebtedness within such five (5) Business Day period, and (ii) proof of funds with respect to such commitment.

(g)    *Optional Principal Prepayments*.  Borrower shall have the right to prepay all or a portion of the Indebtedness in connection with an Approved Takeout.  Other than in connection with an Approved Takeout, the Borrower shall not prepay any portion of the Indebtedness without the written consent of the Administrative Agent.

(h)    *Payments in General*.  All amounts required to be paid pursuant to this Article II shall be paid and applied in accordance with the priorities set forth in Section 3.5.

Section 2.2    Fees.  The Borrower agrees to pay the Origination Fee as set forth in Section 2.1(d). The Borrower further agrees to pay all reasonable costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by FAM and its employees, agents, and Lender Professionals (whether incurred prior to the Petition Date or after the Petition Date) in connection with the negotiation, documentation, execution and approval of, and enforcement of remedies under, the Loan Documents (including, but not limited to, fees and expenses incurred by

- 22 -

the Lender Professionals in connection with any motion, court appearance or other matter directly or indirectly related to this Agreement, the Interim Order, the Final Order, or any other Loan Document).  Borrower's payment obligations under this Section 2.2 constitute Indebtedness.

Section 2.3    Payments Generally; Credit Bidding.

(a)    All amounts owing and payable to each Lender, in respect of the Indebtedness or any other amount, including the principal thereof, Interest, fees, indemnities, expenses or other amounts payable under this Agreement, shall be paid by the Borrower to the Administrative Agent (pursuant to wiring instructions from time to time provided by Administrative Agent) for the ratable benefit and account of the Lenders and the Agents, in Dollars, in immediately available funds, in accordance with priorities set forth in Section 3.5, and all without counterclaim, setoff, deduction, defense, abatement, suspension or deferment. Payments received by the Administrative Agent after 3:00 p.m. (*New York, New York time)* on a Business Day may be deemed to have been paid on the next following Business Day.

(b)    Except as otherwise expressly provided herein, all computations of Interest, fees and other Indebtedness shall be made on the basis of a year of 365 days and the actual days elapsed in computing Interest on the Draws, the date of the making of the initial Draw shall be included and the date of payment shall be excluded, *provided*, *however*, that if any Draw is repaid on the date made, one day of Interest shall accrue thereon.  All computations made by Administrative Agent under this Agreement shall be conclusive absent manifest error provided that the foregoing is not intended to limit the Borrower's right to raise reasonable objections to any such calculations within a reasonable time period.

(c)    The Secured Parties hereby irrevocably authorize and gives the power and right to, without further assent of such Secured Parties, the Administrative Agent, at the direction of the Required Lenders, to "credit bid" all or any portion of the Indebtedness (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral: (i) as contemplated by and pursuant to the Stalking Horse Bid; (ii) at any other sale of the Collateral conducted under the provisions of the Bankruptcy Code or as part of any restructuring plan confirmed under the Bankruptcy Code, including under Section 363, 1123 or 1129 of the Bankruptcy Code; or (iii) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with Applicable Law, including pursuant to Section 9-610 or 9-620 of the UCC.

(d)    In connection with any such credit bid and purchase, the Indebtedness owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Indebtedness with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the equity interests or debt instruments of any acquisition vehicles that are used to consummate such purchase).  In connection with any such credit bid, (i) the Administrative Agent is hereby authorized to form one or more

- 23 -

acquisition vehicles to make a bid (including forming one or more acquisition vehicles to effectuate the Stalking Horse Bid), (ii) the Administrative Agent is hereby authorized to adopt documents providing for the governance of such acquisition vehicles (<u>provided</u> that any actions by the Administrative Agent with respect to such acquisition vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.10(d), (iii) the Administrative Agent is hereby authorized to assign the relevant Indebtedness to such acquisition vehicles (including to the Stalking Horse Bidder) pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any equity interests and/or debt instruments issued by such acquisition vehicles (including the Stalking Horse Bidder) on account of the assignment of the Indebtedness to be credit bid, all without the need for any Secured Party or any acquisition vehicle to take any further action, and (iv) to the extent that the Indebtedness is assigned to any acquisition vehicle (including the Stalking Horse Bidder) are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Indebtedness assigned to such acquisition vehicle exceeds the amount of debt credit bid by such acquisition vehicle, or otherwise), such Indebtedness shall automatically be reassigned to the Lenders pro rata and the equity interests and/or debt instruments issued by such acquisition vehicle on account of the Stalking Horse Bid that had been assigned to such acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

(e)     Each Secured Party hereby agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any Loan Documents, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

## ARTICLE III
## COLLATERAL

Section 3.1     <u>Collateral</u>.  To secure payment of the Indebtedness and performance of all other obligations and duties owed by the Borrower to Lenders under this Agreement or any other Loan Document, the Borrower grants to the Collateral Agent on the Closing Date, for the ratable benefit of the Secured Parties, a continuing Security Interest in the Collateral, whether now owned or existing or hereafter created, acquired, or arising and wheresoever located.  Except for any Permitted Liens or as otherwise permitted hereunder, the Borrower agrees not to transfer or encumber any of the Collateral, without the written consent (including by email) of the Collateral Agent (at the written direction of the Administrative Agent (acting at the direction of the Lenders)). By its signature hereto, the Borrower hereby authorizes the Collateral Agent to file against the Borrower, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code or assignment documentation with the U.S. Patent and Trademark Office ("<u>*USPTO*</u>"), U.S. Copyright Office ("<u>*USCO*</u>") and similar foreign intellectual property offices (collectively, "<u>*IPOs*</u>") in form and substance satisfactory to the Collateral Agent.  In addition, the Borrower shall provide to the Lender UCC financing statements and assignment documentation to be filed with one or more IPOs required or reasonably requested by the Collateral Agent to be filed

- 24 -

in order to create in favor of the Collateral Agent a perfected Lien on the Collateral, which shall be in proper form for filing, registration, or recordation. All charges, expenses, and fees the Collateral Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall constitute Indebtedness. Following the occurrence an Event of Default, the Collateral Agent may, consistent with the Interim Order or Final Order, as applicable, take such steps as the Collateral Agent deems necessary to protect the interest of the Secured Parties in, and to preserve, the Collateral.

Section 3.2    <u>Collateral Representations and Warranties</u>. In addition to the agreements, representations and warranties included in any Security Agreement, with respect to Contracts included in the Collateral, the Borrower agrees and represents and warrants to Secured Parties that (a) all such Contracts were or will be acquired by Borrower in the ordinary course of business and Credit and Collection Policies of Borrower and will comply with all applicable federal, State and local laws, ordinances, rules, and regulations, (b) the Contracts financed by any Draw and set forth in the Master Contract Schedule conform in all material respects to the requirements set forth on Schedule II and all conditions to the purchase commitment of the Approved Takeout, (c) all Contracts information listed on schedules or supplied in any Funding Requests delivered to Lenders in accordance with the terms of this Agreement will be true and correct in all material respects, and (d) the Required Documents shall be true, accurate and complete prior to a request for a Draw in respect of the Contracts relating to such Required Documents. Any inspection, examination, review or audit of the records of the Borrower allowed under this Agreement shall be conducted at the offices of the Borrower or the Collateral Agent, to the extent any such records are in Collateral Agent's possession or control (or any securities intermediary appointed to act on its behalf) during normal business hours after at least five (5) Business Days' prior written notice (which may be provided by electronic mail).

Section 3.3    <u>Accounts</u>.

(a)    <u>Deposit Account</u>. Pursuant to the Servicing Agreement Amendment, the Borrower shall require that all Collections under or in respect of Contracts shall be deposited into the Deposit Account directly by the relevant Obligors or by the Servicer. The Borrower shall also instruct any purchaser under an Approved Takeout to make payments for the purchase of Contracts from the Borrower directly to the Settlement Agent, which shall in turn remit the portion necessary to reduce the Outstanding Principal Balance directly to the Administrative Agent, as set forth in a Sources and Uses Statement approved or deemed approved by the Administrative Agent in accordance with the following sentence. The Borrower shall deliver a copy of such Sources and Uses Statement to the Administrative Agent (at one or more email addresses notified by the Administrative Agent to the Borrower from time to time) no later than one Business Day prior to the time at which payment is to be made by the respective purchaser, and shall not complete the related sale of Contracts until the earlier of (x) receipt of written approval from the Administrative Agent, which may be by email, or (y) twenty four hours has elapsed since the Sources and Uses Statement was sent to the Administrative Agent at which time approval from the Administrative Agent is deemed given. Alternatively, the Borrower may direct any purchaser under an Approved Takeout to make payments for the purchase of Contracts from the Borrower, to the extent such Contracts are part of the Collateral at the time of such sale, directly to the Deposit Account. Collections received directly by the Borrower or its Affiliates in respect of the Contracts shall be deposited into the Deposit Account, no later than two (2) Business Days after receipt. During the

- 25 -

term of this Agreement, all Collections received in the Deposit Account shall be disbursed by the Borrower solely in accordance with the settlement procedures set forth in Section 3.5. Deposit Account balances, in excess, if any, of the Indebtedness due and payable on such Payment Date prior to the occurrence of an Event of Default or Termination Event shall be remitted to Borrower in accordance with the settlement procedures set forth in Section 3.5. After the occurrence of an Event of Default or a Termination Event no amounts on deposit in the Deposit Account shall be disbursed to the Borrower until such time as the Indebtedness is paid in full. To the extent there are uninvested amounts on deposit in the Deposit Account, such amounts may only be invested in Permitted Investments (which may be pursuant to a standing order), which Permitted Investments shall be selected (i) prior to the occurrence of any Termination Event or any Event of Default, by the Borrower, or (ii) from and after the occurrence of any Termination Event or any Event of Default, by the Administrative Agent. Absent such written direction, the amounts on deposit in the Deposit Account shall remain uninvested. No Permitted Investment may be purchased at a premium and all Permitted Investments can be purchased by the Account Bank or through an Affiliate of the Account Bank. Each of the Borrower and the Administrative Agent acknowledges that upon its written request and at no additional cost, it has the right to receive notification after the completion of each purchase and sale of Permitted Investments or the Account Bank's receipt of a broker's confirmation. Each of the Borrower and the Administrative Agent agrees that such notifications shall not be provided by the Account Bank hereunder, and the Account Bank shall make available, upon request and in lieu of notifications, periodic account statements that reflect such investment activity. No statement need be made available for any fund/account if no activity has occurred in such fund/account during such period. All earnings on Permitted Investments shall be credited to the Deposit Account.

(b)    <u>Program Funding Account</u>. All Draws shall be deposited into the Program Funding Account, which shall be subject to the Deposit Account Control Agreement. After the occurrence of an Event of Default or a Termination Event, no amounts on deposit in the Program Funding Account shall be disbursed to the Borrower or any of its Affiliates until such time as the Indebtedness is paid in full, and the Administrative Agent may direct the Collateral Agent to apply funds then on deposit in the Program Funding Account, to cause the deposit of the same into the Deposit Account, the immediate application thereof to repay Indebtedness or otherwise. To the extent there are uninvested amounts on deposit in the Program Funding Account, such amounts may only be invested in Permitted Investments (which may be pursuant to a standing order), which Permitted Investments shall be selected (i) prior to the occurrence of any Termination Event or any Event of Default, by the Borrower, or (ii) from and after the occurrence of any Termination Event or any Event of Default, by the Administrative Agent. Absent such written direction, the amounts on deposit in the Program Funding Account shall remain uninvested. No Permitted Investment may be purchased at a premium and all Permitted Investments can be purchased by the Account Bank or through an Affiliate of the Account Bank. Each of the Borrower and the Administrative Agent acknowledges that upon its written request and at no additional cost, it has the right to receive notification after the completion of each purchase and sale of Permitted Investments or the Account Bank's receipt of a broker's confirmation. Each of the Borrower and the Administrative Agent agrees that such notifications shall not be provided by the Account Bank hereunder, and the Account Bank shall make available, upon request and in lieu of notifications, periodic account statements that reflect such investment activity. No statement need be made

- 26 -

available for any fund/account if no activity has occurred in such fund/account during such period. All earnings on Permitted Investments shall be credited to the Program Funding Account.

Section 3.4    Contract Datasite Access.  On the Closing Date, the Borrower shall grant electronic read-only access, and maintain such accessibility during the term of this Agreement, to the Collateral Agent and the Administrative Agent to the Required Documents relating to Contracts pledged hereunder on the Contract Datasite.  The Borrower shall cause all Required Documents relating to Contracts to be pledged as Collateral to be made available on the Contract Datasite on the date of such Draw.  The Borrower shall provide at least ten (10) Business Days advance notice to the Collateral Agent of any change in the manner or location where any Required Documents are maintained or change in the electronic access to the Required Documents and records related thereto.  The Borrower shall hold the Required Documents held by it in digital form under secure, appropriately "backed-up" and safeguarded procedures, or in respect of physical records, in secure and fire resistant facilities in accordance with customary procedures for maintaining records.  If any of the Lenders suffers or incurs costs, expenses, losses or damages as a result of the destruction or loss of any of the Required Documents, the Borrower shall, (i) at the request of the Lenders make any appropriate claim under any bond or insurance, if any, and (ii) to the extent of the applicable Lender's costs, expenses, losses or damages, promptly pay the proceeds thereof to the Administrative Agent for the account of the Lenders unless the Borrower has replaced the lost or destroyed items and has reimbursed such Lender for such losses or damages.

Section 3.5    Settlement Procedures.

(a)    In connection with each sale and purchase of Contracts under the FAM Loan Purchase Agreement (each, a "_FAM Takeout_"), the Outstanding Principal Balance shall be deemed reduced by an amount equal to the sum of 90% of the Principal Balance plus accrued interest under the Contracts sold in such FAM Takeout (net of any prepayments made in respect of any such Contract from the Obligor thereunder that have been deposited into the Deposit Account).  On every other Payment Date occurring as a result of an Approved Takeout (other than a FAM Takeout), the Borrower shall pay to the Administrative Agent, or cause to be paid to the Administrative Agent by the Settlement Agent, the amount set forth in the Sources and Uses Statement approved by the Administrative Agent pursuant to Section 3.3 in connection with such Approved Takeout, and the Administrative Agent shall remit the funds as follows:

(i)    FIRST, to Administrative Agent for the account of the unpaid fees and expenses of the Agents, including fees and expenses of the Lender Professionals;

(ii)    SECOND, to Administrative Agent for the account of the Lender Group, _pro rata_, in an amount equal to any accrued and unpaid Interest which is payable at the Interest Rate under the Notes;

(iii)    THIRD, to the Administrative Agent for the account of the Lender Group, _pro rata_ the amount necessary to reduce the Program Deficiency, if any, to zero;

- 27 -

(iv)    FOURTH, to the Administrative Agent for the account of the Lender Group, *pro rata*, all Aggregate Unpaids (other than any amount of principal), then due under this Agreement and the Loan Documents; and

(v)    FIFTH, the remaining funds, to Borrower, free and clear of the lien of this Agreement and each Security Agreement.

(b)    On the Maturity Date (or, on the fifth (5th) Business Day thereafter if the Maturity Date occurs as a result of the occurrence of an event described in clause (iv) of the definition of "Maturity Date"), all Indebtedness shall be immediately due and payable, and the Borrower shall pay to the Administrative Agent the aggregate Outstanding Principal Balance and all accrued unpaid Interest, together with all other Indebtedness, fees, costs and charges due under this Agreement or any other Loan Document, and the Administrative Agent shall remit the funds as follows:

(i)    FIRST, to Administrative Agent for the account of the unpaid fees and expenses of the Agents, including fees and expenses of the Lender Professionals;

(ii)    SECOND, to Administrative Agent for the account of the Lender Group, *pro rata*, in an amount equal to any accrued and unpaid Interest which is payable at the Interest Rate under the Notes;

(iii)    THIRD, to the Administrative Agent for the account of the Lender Group, *pro rata* the amount necessary to reduce the Program Deficiency, if any, to zero;

(iv)    FOURTH, to the Administrative Agent for the account of the Lender Group, *pro rata*, all Aggregate Unpaids (other than any amount of principal), then due under this Agreement and the Loan Documents; and

(v)    FIFTH, the remaining funds, to Borrower, free and clear of the lien of this Agreement and each Security Agreement.

Section 3.6    Appointment; Duties of the Collateral Agent.

(a)    The Lenders hereby appoint FAM to act solely on behalf of the Lenders as initial Collateral Agent under this Agreement.  Except for actions expressly authorized by this Agreement, the Collateral Agent shall not take any action which would or would be likely to impair the security interests created or existing in, to or under any Contracts pursuant to this Agreement or any Security Agreement.  Other than in accordance with the Security Interest granted under this Agreement and any Security Agreement, the Collateral Agent hereby agrees not to assert (in its individual capacity or otherwise) (or permit the assertion of) any liens or claims of any kind against the Required Documents or the related Contracts or any other Collateral and hereby releases and waives any such liens and claims.  In performing its functions and duties under this Agreement, the Collateral Agent shall act solely as agent of the Lenders and the Collateral Agent assumes or

- 28 -

is deemed to have assumed any obligations or relationship of agency or trust with the Borrower, or for any of its Subsidiaries or Affiliates.

(b)    The Collateral Agent hereby acknowledges and agrees that in the event that it shall either be terminated or resign as Collateral Agent pursuant to Section 3.14, the Lenders (or Administrative Agent on behalf of the Lenders) may appoint a successor Collateral Agent for the Lenders, and the Collateral Agent:

(i)    shall continue in the performance of its duties and the enjoyment of its rights under this Agreement, until the removal or resignation of the Collateral Agent pursuant to Section 3.14; and

(ii)    shall maintain all information obtained by it regarding the Borrowers and the Contracts, whether upon the exercise of its rights under this Agreement or otherwise, in confidence, employing a standard of care substantially equal to the standard of care the Collateral Agent employs with respect to its own similar confidential information, which, in any event, shall not be less than reasonable care, and shall not disclose any such information to any other Person, unless such disclosure is reasonably incidental to the performance of its duties and obligations under this Agreement or any other Loan Document or is required under any applicable law or pursuant to subpoena or other similar legal process.

Section 3.7    Access to Required Documents; Release of Required Documents.

(a)    The Borrower and/or the Collateral Agent shall permit inspection at all reasonable times upon at least two (2) Business Days prior written notice (which may be provided by electronic mail) during regular business hours by the Administrative Agent or any Lender (or by such Person's respective auditors when requested by such Person) of (i) the Required Documents, and (ii) the other records of the Borrower and/or the Collateral Agent relating to this Agreement or the Collateral.  At any such inspection, the Administrative Agent or any Lender (or by such Person's respective auditors when requested by such Person in writing (which may be provided via electronic mail)) shall be permitted to make copies of the Required Documents and the records of the Borrower and/or the Collateral Agent relating to this Agreement or the Collateral.  All reasonable and documented expenses incurred in connection therewith shall be borne by the Borrower (excluding any expenses related to travel and lodging).

(b)    During the occurrence and continuance of an Event of Default, the Borrower shall promptly deliver (or authorize the prompt delivery) to the Administrative Agent or its designee all items of Collateral that are in its possession or under its control upon the written request of the Administrative Agent (acting at the direction of the Lenders).

Section 3.8    Indemnification of Collateral Agent.  The Borrower shall indemnify the Collateral Agent and its officers, directors, employees and agents for, and hold them harmless against any loss, liability or expense incurred by the Collateral Agent, other than in connection with the willful misconduct or gross negligence (as determined by a final, non-appealable judgment of a court of competent jurisdiction), arising out of or in connection with (i) the performance of its obligations under and in accordance with this Agreement or any other Loan Document, including

- 29 -

the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties under this Agreement or any other Loan Document and (ii) the negligence, willful misconduct or bad faith of the Borrower or any Lender in the performance of their respective duties hereunder.  The provisions of this Section shall survive the termination of this Agreement.

Section 3.9      Reserved.

Section 3.10     Reserved.

Section 3.11     Liability of the Collateral Agent.

(a)      The Collateral Agent shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by it in such capacity herein and only to the extent such liabilities result from the gross negligence or willful misconduct (as determined by a final, non-appealable judgment of a court of competent jurisdiction).  No implied covenants or obligations shall be read into this Agreement against the Collateral Agent and, in the absence of gross negligence or willful misconduct, the Collateral Agent may conclusively rely on the truth of the statements and the correctness of the opinions expressed in any certificates or opinions furnished to it pursuant to and conforming to the requirements of this Agreement.

(b)      Reserved.

(c)      The Collateral Agent shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of their respective duties hereunder, or in the exercise of any of its rights or powers, except in the case of emergency in which case, the Collateral Agent may take or not take, as it shall determine in its sole and absolute discretion, such action and expend such funds and/or incur financial liability, subject to the Collateral Agent's right to reimbursement for such reasonable and documented expenses.

(d)      The Collateral Agent may rely and shall be protected in acting or refraining from acting upon any resolution, officer's certificate, any report, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(e)      The Collateral Agent may consult with counsel of its choice (which may be counsel to Borrower) with regard to this Agreement or any of the Loan Documents and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Collateral Agent in good faith and in accordance therewith.

(f)      Nothing in this Agreement shall be deemed to require Collateral Agent to determine whether there are any prior or adverse interests in any Required Document, including, without limitation, interests for which it may act as agent; *provided, however,* that the Collateral Agent shall promptly notify the Administrative Agent (with a copy to the Lenders) if an officer of the Collateral Agent having daily responsibilities for administering the transactions contemplated

- 30 -

herein has actual knowledge that there exists any prior or adverse interests in any Required Document.

(g)    The Collateral Agent shall not be responsible for the acts or omissions of the Borrower, the Lenders or any other Person.

(h)    The Collateral Agent makes no representations as to (i) the validity, legality, perfection, priority, enforceability, recordability, ownership, title, sufficiency, due authorization or genuineness of any of the documents contained in any of the Required Documents or (ii) the collectability, insurability, effectiveness or suitability of any such Required Document.

Section 3.12    <u>Certain Matters Affecting the Collateral Agent</u>.

(a)    The Collateral Agent shall have no duties or responsibilities except those that are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Collateral Agent.  The Collateral Agent shall be under no responsibility or duty with respect to the disposition of any Required Documents or the other Collateral while such Required Documents or other Collateral are not in their or any of their agent's (including any securities intermediary appointed to act on its behalf) custody or "control" (within the meaning of Section 8-106(d) of the UCC).  If the Collateral Agent shall request instructions from the Lenders with respect to any act, action or failure to act in connection with and as set forth in this Agreement, the Collateral Agent shall be entitled to refrain from taking such action and continue to refrain from acting unless and until the Collateral Agent shall have received written instructions from the Lenders without incurring any liability therefor to the Lenders, the Borrower or any other Person.

(b)    The Collateral Agent may act in reliance upon any written communication to the extent reasonably believed to have originated from the Borrower or the Lenders concerning the delivery, custody or "control" (within the meaning of Section 8-106(d) of the UCC) of the Required Documents or the other Collateral pursuant to this Agreement.  The Collateral Agent shall not assume or shall have any responsibility for, nor make any representation as to, monitoring the value of the Required Documents or other Collateral.  The Collateral Agent shall not be liable for any act or omission to act hereunder, except for its own or its agents' gross negligence or willful misconduct (as determined by a final, non-appealable judgment of a court of competent jurisdiction).  In no event shall the Collateral Agent have any responsibility to ascertain or take action with respect to the Required Documents or other Collateral, except as expressly provided herein.  The Collateral Agent may execute any of its duties under this Agreement or any other Loan Documents by or through agents or attorneys-in-fact, and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects as long as such selection was made with reasonable care.

(c)    If the Collateral Agent shall at any time receive conflicting instructions from any of the Administrative Agent, the Lenders, the Borrower or any other party to this Agreement and the conflict between such instructions cannot be resolved by reference to the terms of this Agreement (as determined by the Collateral Agent in its good faith discretion), the Collateral Agent shall be entitled to rely on the instructions of the Administrative Agent (acting at the direction of the Lenders).  In the absence of gross negligence or willful misconduct (as determined

- 31 -

by a final, non-appealable judgment of a court of competent jurisdiction), the Collateral Agent may rely and shall be protected in acting or refraining from acting upon any resolution, officer's certificate, any report, certificate of auditors, or any other certificate, statement, instrument, opinion, report, notice request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Collateral Agent may rely upon the validity of documents delivered to it, without investigation as to their authenticity or legal effectiveness, and the Borrower and the other parties to this Agreement will hold the Collateral Agent harmless from and against any claims that may arise or be asserted against the Collateral Agent because of the invalidity of any such documents or their failure to fulfill their intended purpose. The Collateral Agent shall not be bound to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or any other agreement on the part of any party, except as may otherwise be specifically set forth herein. The Collateral Agent may consult with counsel of its choice with regard to legal questions arising out of or in connection with this Agreement and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the either of the Collateral Agent in good faith in accordance therewith.

(d)     In the event any Required Document under the Collateral Agent's custody or "control" (within the meaning of Section 8-106(d) of the UCC) is lost, destroyed or misplaced, then, in addition to any other liability the Collateral Agent may have in respect thereof pursuant to the terms of this Agreement or otherwise, the Collateral Agent agrees to execute and deliver to the Administrative Agent and the Lenders, upon the Administrative Agent or any Lender's written request, an affidavit stating that such Required Document has been lost, destroyed or misplaced, as applicable, and, if necessary, such other affidavits or certificates as maybe reasonably necessary to obtain a replacement Required Document.

(e)     The Collateral Agent is authorized, in its sole discretion, to disregard any and all notices or instructions given by any other party hereto or by any other Person, firm or corporation, except such notices or instructions as are herein provided for and orders entered by any court of competent jurisdiction. If any property subject hereto is at any time attached, garnished or levied upon, under any court order or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part hereof, then and in any of such events the Collateral Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree with which it is advised by legal counsel of its own choosing is binding upon it, and if it complies with any such order, writ, judgment or decree it shall not be liable to any other party hereto or to any other Person, firm or corporation by reason of such compliance even though such order, writ, judgment or decree maybe subsequently reversed, modified, annulled, set aside or vacated.

(f)     In order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering, including without limitation the PATRIOT Act of the United States ("*Applicable Laws*"), each Agent and each of the Lenders are required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with such Agent or such Lender. Accordingly, each of the parties agrees to provide

- 32 -

each such Agent and each such Lender upon its request from time to time such identifying information and documentation as may be available for such party in order to enable the Collateral Agent, the Administrative Agent and the Lenders to comply with Applicable Laws.  In particular, the Borrower shall provide to each Agent and each Lender (i) a form W-9 or such other tax form as may be applicable to Borrower, (ii) copies of its certificate of incorporation or such other certificates of incorporation in the jurisdiction in which Borrower was organized, and (iii) a certificate of good standing.

Section 3.13    <u>Merger, Conversion, Consolidation of, or Succession to Business of, the Collateral Agent</u>.  Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which to Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent, shall be the successor of the Collateral Agent under this Agreement, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 3.14    <u>Termination</u>.

(a)    The Collateral Agent may:

(i)    terminate its obligations as Collateral Agent under this Agreement upon at least 30 days' prior written notice (which may be provided by electronic mail) to the Borrower and the Administrative Agent (with a copy to the Lenders); or

(ii)    be removed at any time and for any reason by written demand of the Administrative Agent (acting at the direction of the Lenders) delivered to the Collateral Agent and the Borrower;

*provided, however,* that, without the written consent of the Administrative Agent (acting at the direction of the Lenders), such resignation or removal shall not be effective until a successor Collateral Agent reasonably acceptable to the Lenders shall have accepted appointment as Collateral Agent, and shall have agreed to be bound by the terms of this Agreement. The Administrative Agent (acting at the direction of the Lenders) shall appoint a successor Collateral Agent and will make reasonable efforts to appoint a successor Collateral Agent, as long as no Event of Default or a Termination Event has occurred and is continuing, reasonably acceptable to the Borrower.  If, however, a successor Collateral Agent is not appointed by the Administrative Agent (acting at the direction of the Lenders) within sixty (60) calendar days after the giving of notice of resignation or removal (as applicable), the Collateral Agent shall have the right to petition a court of competent jurisdiction to appoint a successor in such capacity.  Borrower shall indemnify Collateral Agent for any and all expenses incurred (including the fees and costs of counsel selected by Collateral Agent) in connection with the enforcement by Collateral Agent of its rights hereunder.

(b)    Within five (5) Business Days or as soon as practicable thereafter after the Collateral Agent receives written notice of the appointment of a successor Collateral Agent, the

- 33 -

Collateral Agent shall promptly transfer to the successor Collateral Agent, all Required Documents under the custody or "control" (within the meaning of Section 8-106(d) of the UCC) of the Collateral Agent under this Agreement.

(c)     Any successor Collateral Agent appointed shall (i) execute, acknowledge, and deliver to the Administrative Agent, the Borrower, and to the predecessor Collateral Agent an instrument accepting such appointment under this Agreement and (ii) shall have been approved by the Lenders.  Thereupon, the resignation or removal of the predecessor Collateral Agent shall become effective and such successor Collateral Agent, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties, and obligations of its predecessor as Collateral Agent under this Agreement, with like effect as if originally named as Collateral Agent or Escrow Agent.  The predecessor Collateral Agent shall deliver to the successor Collateral Agent all documents and statements and monies held by it under this Agreement; and the Borrower, the Administrative Agent, on behalf of the Lenders, and the predecessor Collateral Agent shall execute and deliver such instruments and do such other things as may reasonably be required for fully and certainly vesting and confirming in the successor Collateral Agent all such rights, powers, duties, and obligations.

(d)     Unless the Collateral Agent is terminated as a result of its own gross negligence or willful misconduct or as a result of a material breach by the Collateral Agent, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction, hereunder or under any other Loan Document, or resigns, the Borrower shall reimburse the Collateral Agent for the reasonable out of pocket expenses of the Collateral Agent incurred in transferring custody of "control" (within the meaning of Section 8-106(d) of the UCC) of the Required Documents to the successor Collateral Agent.

## ARTICLE IV
## CONDITIONS PRECEDENT TO THE DRAWS

Section 4.1     Conditions Precedent to the Initial Draw.  The obligation of the Lenders to make the initial Draw on or after the Closing Date shall be subject to the fulfillment of all of the following conditions to the satisfaction of the Administrative Agent (acting at the direction of the Majority Lenders):

(a)     Loan Documents; Deposit Account Control Agreement.  The Borrower shall have provided Agents with a copy of this Agreement, and each other Loan Document, fully executed and in form reasonably satisfactory to the Lenders, and any other documents required under this Agreement.  The Borrower shall have made accessible, all Required Documents relating to the Contracts to be pledged on the date of such Draw to the Collateral Agent in accordance with Section 3.4 and Section 3.7.  The Deposit Account Control Agreement shall have been executed in form and substance satisfactory to the Lenders.

(b)     Authorizations.  The Borrower shall have provided to the Administrative Agent, in form and substance reasonably satisfactory to the Lenders, evidence that the execution and delivery of this Agreement and the other Loan Documents have been duly authorized by the Borrower.

- 34 -

(c)    <u>Security Interest Creation, Perfection and Priority</u>.  The Security Interests in the Collateral shall have been duly authorized, created and perfected with first lien priority (subject only to Permitted Liens and as further set forth in the Interim Order and Final Order, as applicable) and shall be in full force and effect and Lenders shall have received evidence in the form of UCC search results (satisfactory to the Lenders) of the priority of the Security Interests in the Collateral as contemplated by this Agreement.

(d)    <u>Funding Request</u>.  The Borrower shall have timely submitted a Funding Request with attached Compliance Certificate.

(e)    <u>Interim Order</u>.  The Interim Order shall have been entered in form and substance satisfactory to FAM in its sole discretion and shall not be subject to any stay.

(f)    <u>Payment of Fees and Expenses</u>.  The Funding Request for such initial Draw shall have provided for payment from such initial Draw, or the Borrower otherwise shall have paid, all fees, charges, and other expenses of the Lenders, the Collateral Agent, and the Administrative Agent that are then due and payable as specified in this Agreement or any Loan Document, including the Origination Fee and the fees and expenses of the Lender Professionals.

(g)    <u>Representations and Warranties</u>.  The representations and warranties of Borrower set forth in this Agreement, in the Loan Documents, and in any document or certificate delivered to Collateral Agent, Administrative Agent or any Lender under this Agreement are true and correct in all material respects, as evidenced by a certification from Borrower to the Administrative Agent, Collateral Agent and the Lenders.

(h)    <u>No Event of Default or Termination Event</u>.  The Stalking Horse APA and FAM Loan Purchase Agreement shall have been executed and shall remain in full force and effect. There shall not exist, at the time of the initial Draw, an Event of Default or a Termination Event under this Agreement, any other Loan Document, the Stalking Horse APA, or the FAM Loan Purchase Agreement.

(i)    <u>Know Your Customer</u>.  The Administrative Agent shall have received documents and information required by it in connection with its know-your-customer review, in form and substance satisfactory to the Administrative Agent.

(j)    <u>Material Adverse Effect</u>.  There shall not have occurred from September 30, 2020 any Material Adverse Effect (other than those occurrences that are customarily a result of events and circumstances leading up to and following the filing of the Bankruptcy Cases).

(k)    <u>PEFI / ING Facility</u>.  All outstanding obligations of PEFI under the PEFI / ING Facility shall have been paid in full or shall be paid in full with the proceeds of the initial Draw and the PEFI / ING Facility shall have been terminated or shall be terminated simultaneously with the funding of the initial Draw.

(l)    <u>Asset Sales</u>.  The Borrower shall not have entered into any arrangement to sell all or a material portion of the Purchased Assets of the Borrower (other than the Stalking Horse APA) or to sell any Contracts (other than pursuant to an Approved Takeout).

- 35 -

Section 4.2    Conditions Precedent to Draws (other than the initial Draw). The obligation of each Lender to make any Draw following the Closing Date (other than the initial Draw on or after the Closing Date) during the Funding Period shall be subject to the fulfillment of all of the following conditions to the satisfaction of the Administrative Agent (with notice to the Majority Lenders):

(a)    Documents.   The Borrower shall have made accessible all Required Documents for all Contracts to be pledged as Collateral on the date of such Draw to the Collateral Agent in accordance with Section 3.4 and Section 3.7.  All Loan Documents shall continue to be in full force and effect.

(b)    Security Interest Maintenance.  The Security Interests in the Collateral shall be in full force and effect.

(c)    Funding Request.  The Borrower shall have timely submitted a Funding Request with attached Compliance Certificate.

(d)    Payment of Fees and Expenses.  The Funding Request for such Draw shall have provided for payment from such Draw, or the Borrower otherwise shall have paid, all fees, charges, and other expenses of the Lenders and the Agents that are then due and payable as specified in this Agreement or any Loan Document.

(e)    Representations and Warranties.  The representations and warranties set forth in this Agreement and in the other Loan Documents, and in any document or certificate delivered to Collateral Agent, Administrative Agent and/or Lenders under this Agreement are true and correct in all material respects as of the date of such Draw.

(f)    No Event of Default or Termination Event.  The Stalking Horse APA and FAM Loan Purchase Agreement shall have been executed and shall remain in full force and effect. There shall not exist, at the time of such Draw, an Event of Default or a Termination Event under this Agreement, any other Loan Document, the Stalking Horse APA, or the FAM Loan Purchase Agreement.

(g)    No Material Adverse Effect.  There shall not have occurred from the Closing Date, at the time of such Draw, any Material Adverse Effect other than those occurrences that are customarily a result of events and circumstances leading up to and following the filing of the Bankruptcy Cases.

(h)    DIP Orders.  No order shall have been entered reversing, amending, staying, vacating, terminating, or otherwise modifying the Interim Order or the Final Order, as applicable, in any manner adverse to the Secured Parties without the consent of the Administrative Agent and the Required Lenders.

(i)    Bid Procedures Order.  With respect to all Draws requested of the Lenders after entry of the Bid Procedures Order or FAM LPA Approval Order, as applicable, no order shall have been entered reversing, amending, staying, vacating, terminating, or otherwise modifying the Bid Procedures Order or FAM LPA Approval Order without the consent of FAM.

- 36 -

(j)    <u>Asset Sales</u>.  Except with respect to Draws to be made during the extended Funding Period described in <u>Section 2.1(f)</u>, the Borrower shall not have entered into any arrangement to sell all or a material portion of the Purchased Assets of the Borrower (other than the Stalking Horse APA) or to sell any Contracts (other than pursuant to an Approved Takeout).

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1    <u>Borrower Representations and Warranties</u>.  The Borrower represents and warrants to the Agents and the Lenders as of the date of this Agreement and as of the date of any Draw:

(a)    <u>Organization</u>.  Each of PEFI and RAI is a Delaware corporation and is duly organized, validly existing and is in good standing under the laws of the jurisdiction of its organization, is duly qualified to do business in and is in good standing in every jurisdiction where the failure to so qualify would reasonably be expected to have or cause a Material Adverse Effect, and has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted except where the failure to obtain such licenses, authorizations, consents and approvals would not reasonably be expected to result in a Material Adverse Effect.

(b)    <u>Authorization</u>.  The execution, delivery and performance of this Agreement and each other Loan Document to which the Borrower is a party and the Approved Takeout have been duly authorized by Borrower, and do not conflict with, and will not result in a violation of, or constitute or give rise to an event of default under (i) any of Borrower's organizational documents, (ii) any agreement or other instrument which may be binding upon the Borrower, (iii) any law or governmental regulation or court decree or order applicable to it or its properties, except, in each case, where such conflict, violation or event of default could not reasonably be expected to result in a Material Adverse Effect.  Borrower has the power and authority to enter into this Agreement and each other Loan Document to which it is a party and has the power and authority to grant collateral security for the Indebtedness.  Borrower has the further power and authority to own and to hold all of its assets and properties, and to carry on its business as now conducted.

(c)    <u>Financial Information – Borrower</u>.  The Borrower does not have any contingent obligations or liabilities that are required to be disclosed by GAAP that were not previously disclosed in writing (which may be provided via electronic mail) to the Lenders.

(d)    <u>Other Debt</u>.  The Borrower does not have any indebtedness for borrowed money (direct or contingent) other than (i) Indebtedness owed to Lenders, (ii) obligations under any bank deposit and similar agreements required by Lenders hereunder, (iii) owing to an Affiliate to the extent subordinated (pursuant to a subordination agreement acceptable to Lenders) to the Indebtedness owing to Lenders and to which the Lenders have given their prior written consent, and (iv) the indebtedness set forth on Schedule V attached hereto as of the Closing Date.  For the avoidance of doubt, any sale or transfer by the Borrower of Contracts pursuant to an Approved Takeout that does not create actual or contingent claims or recourse against the Borrower or Liens on or interests in the Collateral not sold in such transaction beyond the liabilities contemplated by

- 37 -

the Approved Takeout shall not constitute indebtedness for borrowed money for purposes of this paragraph or Section 7.1.

(e)    Properties.  Except for Permitted Liens, each of PEFI and RAI owns and has good title to all of its assets which constitute Collateral free and clear of all security interests, and has not executed any security documents or authorized the filing of any financing statements relating to the Collateral.  All of the Collateral is titled in the name of PEFI or RAI, as applicable, except as otherwise required or permitted under this Agreement.

(f)    Litigation.    There are no actions, suits, arbitrations, investigations (including, without limitation, any of the foregoing which are pending or threatened) or other legal or arbitrable proceedings affecting either PEFI or RAI, their assets or property, this Agreement or any Loan Documents, before any court or by any governmental agency that (i) questions or challenges the validity or enforceability of any of the Loan Documents or any action to be taken in connection with the transactions contemplated by the transaction documents, (ii) makes a claim or claims in an aggregate amount greater than $100,000, or (iii) which, individually or in the aggregate, if adversely determined could reasonably be likely to have a Material Adverse Effect, other than those previously disclosed to the Lenders in writing (which may be provided via electronic mail).

(g)    Taxes.  All of PEFI's and RAI's tax returns and reports that are or were required to be timely filed, have been filed (or an extension has been timely requested), and all Taxes, assessments and other governmental charges have been paid in full, except those that are not yet delinquent and those presently being or to be contested in good faith in the ordinary course of business and for which adequate reserves have been provided.

(h)    Lien Priority.  Neither PEFI nor RAI has entered into or granted any security agreements, or permitted the filing or attachment of any security interests on or affecting any of the Collateral, that would be prior or *pari passu* with or that may in any way be superior to the Security Interests and rights in and to such Collateral, except for Permitted Liens and the Carve Out.  Upon identification of any Contract or related property or assets as Collateral in relation to any Draw, the Collateral Agent will have a first priority perfected security interest in such Collateral for the benefit of the Lenders.

(i)    Binding Effect.  This Agreement, the Notes, the Security Agreement and all other Loan Documents executed by the Borrower and the Approved Takeout are binding upon it, as well as upon its successors, representatives and assigns, and are legally enforceable in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or equitable principles relating to enforceability.  The Borrower is in compliance with the Approved Takeout in all material respects.

(j)    Draw Purposes.  The Borrower shall use the proceeds of a Draw solely for purposes described in Section 6.16.

(k)    Employee Benefit Plans.  Neither PEFI nor RAI maintains, contributes to, has any obligation to contribute to or has any material liability with respect to any employee benefit

- 38 -

plan that is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA (a "*Multiemployer Plan*") or that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code (collectively, a "*Pension Plan*").  To the extent that Borrower or any ERISA Affiliate maintains, contributes to or has any obligation to contribute to any Benefit Plan that is not a Pension Plan or Multiemployer Plan, such Benefit Plan, in both form and operation, is in material compliance with applicable provisions of ERISA and the Code except as would not have a material and adverse effect.  Borrower is not, and is not acting on behalf of or with any assets of, any Benefit Plan, nor will it be during the term of this Agreement.  Assuming that no Lender is a Benefit Plan or using the assets of a Benefit Plan, neither the execution of this Agreement nor the making of each Draw hereunder will give rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4875 of the Code.

(l)    Investment Company.  The Borrower is (i) not an "Investment Company" as that term is defined under the 1940 Act and (ii) not a "covered fund" under the Volcker Rule.

(m)    Location of Records.    The Borrower keeps records concerning the Collateral at 16870 West Bernardo Drive, Suite 408, San Diego, CA 92127.

(n)    Tax Identification Number; Organizational Identification Number.  PEFI's Federal Employer Tax Identification Number is 47-1318208 and RAI's Federal Employer Tax Identification Number is 26-4104352.  The organizational identification number assigned to PEFI by the agency of that jurisdiction where its organizational documents are filed is as follows: 5567333.  The organizational identification number assigned to RAI by the agency of that jurisdiction where its organizational documents are filed is as follows:  4645827.

(o)    Schedule of Contracts.  Each of the representations set forth on Schedule II is true and correct with respect to the Contracts that are used for purposes of calculating the Borrowing Base, except for immaterial variances and any Contracts for which the Lenders, in their sole discretion, have waived one or more of the criteria in respect of such Contracts.

(p)    Information.    All written information heretofore or contemporaneously herewith furnished by the Borrower to Administrative Agent or Lenders for the purposes of or in connection with this Agreement or any transaction contemplated hereby (other than with respect to projected financial information) is, and all information hereafter furnished by or on behalf of the Borrower to Administrative Agent or Lenders will be, true and accurate in all material respects on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in any material respect. With respect to projected financial information concerning the Borrower, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time prepared.

(q)    Fiscal Year.  The fiscal year of the Borrower ends on December 31.

(r)    Compliance with Applicable Laws.  Borrower (and each of its agents) has complied with (and shall comply with) all federal, State or local laws applicable to it or in connection with its acquisition of, or any actions taken with respect to, the Contracts.  To the knowledge of Borrower, all parties which have had any interest in the Contracts, whether as

originator, servicer, administrator, assignee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with all federal, State or local laws applicable to it or in connection with any actions taken with respect to, the Contracts.

(s)    <u>Material Adverse Effect</u>.  No Material Adverse Effect has occurred (i) since September 30, 2020 in the case of this representation when made as of the Closing Date, or (ii) since the Closing Date in the case of this representation when made as of a date subsequent to the Closing Date.

(t)    <u>Commissions to Third Parties</u>.  The Borrower has not dealt with any broker or agent or other Person (other than the Administrative Agent or the Collateral Agent) who might be entitled to a fee, commission or compensation in connection with the transactions provided for in this Agreement.

(u)    <u>Survival of Representation and Warranties</u>.  The Borrower understands and agrees that the Administrative Agent, the Collateral Agent and each Lender is and will be relying upon the above representations and warranties in providing the Program and making or processing each Draw.  The parties each further agree that the foregoing representations and warranties shall be made only as of the date of this Agreement and as of the date of each Draw.

(v)    <u>AML/OFAC Compliance</u>.  Borrower has conducted its businesses in compliance with applicable economic sanctions, anti-money laundering, and anti-corruption laws, rules and regulations and have instituted and maintain policies and procedures reasonably designed to promote and achieve compliance with such laws.  The Borrower is not, nor to the knowledge of the Borrower, any Subsidiary of the Borrower, any of its respective directors, officers, employees, agents, Affiliates or representatives of any of them is a Person currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "*Sanctions*"), nor is the Borrower nor any of its Affiliates or Subsidiaries located, organized or resident in a country or territory that is the subject of Sanctions.

(w)    <u>Validity of Required Documents</u>.  All Required Documents relating to the Contracts have been duly and validly executed and are in full force and effect.

(x)    <u>Contract Compliance.</u>  Each Contract is in compliance with all applicable federal, State or local laws applicable to it or in connection with its origination, financing, administration or ownership, including licensing requirements applicable to the Borrower.

(y)    <u>Adverse Selection</u>.  In selecting the Contracts that form part of the Collateral, the Borrower has not used selection procedures believed by the Borrower to be adverse to the interests of Lenders in relation to the selection procedures that have been utilized in selecting other Contracts purchased on or about the same period (i) by the Borrower but allocated to other financing sources, or (ii) by Affiliates of the Borrower, or (iii) for an Approved Takeout.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

The Borrower covenants and agrees with the Agents and each Lender that, so long as this Agreement remains in effect, the Borrower shall comply with the following affirmative covenants:

Section 6.1    Preservation of Existence.  The Borrower will preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its formation and qualify and remain qualified in good standing in each jurisdiction where failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or could reasonably be expected to have, a Material Adverse Effect.  The Borrower will not change its corporate form from a corporation to a limited liability company, limited partnership, or other type of entity.

Section 6.2    Material Adverse Effects and Litigation.  The Borrower shall duly inquire as to whether there has been, and shall promptly after becoming aware thereof inform Administrative Agent (with a copy to the Collateral Agent and the Lenders) in writing (which may be provided via electronic mail) of, (a) the occurrence of a Material Adverse Effect, (b) a material adverse effect on (i) the collectability of the Contracts, taken as a whole, (ii) the condition (financial or otherwise), business or properties of the Borrower, or (iii) the interests of Lenders under this Agreement or any related Agreement, and (c) any and all litigation, investigations and claims and any and all threatened litigation and claims affecting it which, in any such case, would reasonably be expected to have or cause a Material Adverse Effect.

Section 6.3    Financial Records.  The Borrower shall maintain its books and records in accordance with generally accepted accounting principles in all material respects, applied on a consistent basis, and permit the Administrative Agent and the Lenders, or any of their respective employees and agents, to inspect, examine, review and/or audit its books, accounts, ledger sheets and records (including, without limitation, reviews and audits of all records relating to Contracts and other Collateral).  If the Borrower now or at any time maintains any records (including, without limitation, computer generated records and computer programs for the generation of such records) in the possession of a third party, the Borrower, upon request of a Lender, shall notify such party to permit Administrative Agent free access to such records and to provide such Lender with copies of any records it may request, all at the expense of the Borrower; provided however, prior to the occurrence and continuance of an Event of Default, the Borrower shall not be required to pay expenses for more than one (1) such audit per calendar year.  Unless an Event of Default then exists, any inspection, examination, review or audit of the records of such Person allowed under this Agreement shall be conducted at the offices of such Person or the third-party possessor during normal business hours after at least three (3) Business Days' prior notice.  After an Event of Default occurs, any such inspection, examination, review or audit shall be conducted at such time and place as may reasonably be requested by any Lender and at the expense of the Borrower.

Section 6.4    Operations and Variance Reports.  The Borrower shall operate in the ordinary course of business at all times during the Funding Period and in accordance with the DIP Budget (subject to the Permitted Variances).  The Borrowers shall, beginning on the third business day of the first full calendar week following the week during which the Bankruptcy Court enters the Interim Order, and on a weekly basis thereafter (by 5:00 p.m. New York City time on the third

- 41 -

business day of each week), deliver to the Administrative Agent and the Lender Professionals a variance report as of the end of the preceding week comparing, for each line item set forth in the Budget and on a cumulative basis: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative rolling basis since the Petition Date; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative rolling basis since the Petition Date; together with a statement certifying compliance with the Permitted Variances for such period (each a "*Measuring Period*") and explaining in reasonable detail all material variances (each such report, a "*Variance Report*," which shall be in a form reasonably acceptable to the Administrative Agent).  For purposes of each Measuring Period, the Borrower shall calculate:  (x) the numerical difference between total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative basis since the Petition Date, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "*Receipts Variance*"); and (y) the numerical difference between total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative basis since the Petition Date, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period; *provided* the disbursements shall not include any amounts in the Budget related to professional fees (the "*Disbursements Variance*").

Section 6.5    Milestones.  By the times and the dates set forth below (as any such time and date may be extended with the consent of the Administrative Agent), the Borrower shall cause the following to occur (collectively, the "*Milestones*"):

(a)    By no later than one (1) Business Day following the Petition Date, the Borrower shall have filed a motion seeking approval of the Bid Procedures Order, in form and substance acceptable to the Required Lenders;

(b)    By no later than three (3) days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order;

(c)    By no later than fifteen (15) days following the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order, which order shall designate FAM as the "Stalking Horse Bidder" and the Stalking Horse APA as the "Stalking Horse Bid" (each as defined in the Bid Procedures Order);

(d)    By no later than thirty five (35) days following the Petition Date, the Bankruptcy Court shall have entered the Final Order;

(e)    By no later than thirty five (35) days following the entry of the Bid Procedures Order, the Borrower shall have either (i) received Qualified Bids (as defined in the Bid Procedures Order) or (ii) announced the cancellation of the Auction and the designation of the Stalking Horse Bid of the Stalking Horse Bidder as the prevailing bid, and the deadline to object to the Sale Order and to object to the assumption and assignment of executory contracts (including cure amounts with respect thereto) shall have occurred;

(f)    By no later than forty (40) days following the entry of the Bid Procedures Order, if Qualified Bids are received prior to the deadline set forth in the preceding Milestone, the Borrower shall conduct an Auction for the sale of the Purchased Assets;

(g)    By no later than forty five (45) days following the entry of the Bid Procedures Order, if the Borrower has selected a bidder other than the Stalking Horse Bidder as the winning bidder, the deadline to object to the conduct of the Auction and the proposed sale to such alternate bidder shall have occurred;

(h)    By no later than fifty (50) days after entry of the Bid Procedures Order, the Bankruptcy Court shall have entered the Sale Order approving the Sale Transaction; and

(i)    By no later than fifteen (15) days after entry of the Sale Order, the Sale Transaction shall have closed and all Indebtedness and other obligations under this Agreement shall have been indefeasibly satisfied in full.

Section 6.6    <u>Minimum Liquidity</u>.  The Borrower shall at all times during the Funding Period have not less than $500,000 in unrestricted cash and cash equivalents (which may be in the form of Permitted Investments and which, for the avoidance of doubt, shall not include any amounts that are cash collateralizing letters of credit), without regard to any availability under the Program and excluding any Collections in the Deposit Account.

Section 6.7    <u>Compliance Certificates</u>.  The Borrower shall, without demand or request by the Administrative Agent or the Lenders, together with each Funding Request, and simultaneously with each Variance Report, furnish Administrative Agent (with a copy to the Lenders) with a certificate (a "*Compliance Certificate*"), in reasonable detail and in form and content reasonably acceptable to the Lenders, prepared by the Borrower and certified, by the chief financial representative of Borrower or another officer of Borrower reasonably acceptable to Lenders, as true and correct, that the Borrower is in compliance with all terms and conditions of this Agreement, including statements that (a) all of the representations and warranties in this Agreement and the Loan Documents are true and correct in all material respects as of the date they were made, (b) no Event of Default or Termination Event has occurred under this Agreement or the Loan Documents (except as otherwise specified therein), and (c) no event has occurred which, with notice, the lapse of time or otherwise, would reasonably be expected to constitute an Event of Default or a Termination Event under this Agreement or the Loan Documents (except as otherwise specified therein).  In addition, the Compliance Certificate shall demonstrate the calculation of the Maximum Loan Amount (including the Borrowing Base) and whether it is less than the Outstanding Principal Balance (after giving effect to any previously requested Draws that have not yet been funded).

Section 6.8    <u>Reserved</u>.

Section 6.9    <u>Regulatory Inspection Reports</u>.  The Borrower shall, promptly following any request of Administrative Agent or any Lender, furnish Administrative Agent with copies of all inspection reports issued by all supervisory regulatory agencies for Borrower, if any.

- 43 -

Section 6.10    Notice of Event of Default, Termination Event or Governmental Authority Default.  The Borrower shall promptly notify the Collateral Agent, the Administrative Agent and the Lenders if any event has occurred which, with notice, the lapse of time or otherwise, would reasonably be expected to constitute an Event of Default, Termination Event or a Governmental Authority Default under this Agreement or the Loan Documents (except as otherwise specified therein).

Section 6.11    Monthly Contract Reports.  The Borrower shall, without demand or request by the Administrative Agent or the Lenders and not later than ten (10) Business Days after the end of each calendar month, furnish Administrative Agent, for the month most recently ended, a report providing the following supporting information:

        (a)    a Master Contract Schedule with respect to all Contracts;

        (b)    a listing of all charge-offs,

        (c)    notice of any material litigation, investigations and claims and all material threatened litigation and claims relating to Contracts, and

        (d)    such other information as the Administrative Agent or the Lenders may reasonably request.

The monthly Contracts reports shall be certified by the Borrower, as being true and correct to the knowledge and belief by the chief financial representative of the Borrower or other Person acceptable to the Lenders and shall be in form and substance satisfactory to the Administrative Agent and the Lenders; _provided_, _however_, if no reportable activity has occurred with respect to clauses (b) through (d) of this Section 6.11 since the last report delivered to the Administrative Agent, then the Borrower shall only be required to provide (i) an updated Master Contract Schedule with respect to all Contracts and (ii) a certification that no reportable activity has occurred with respect to clauses (b) through (d) during the past calendar month.

Section 6.12    Additional Information.    The Borrower acknowledges that the Administrative Agent, the Collateral Agent and each Lender is, or may be, subject to governmental regulations requiring such Person to obtain, verify, and record information that identifies their customers, including all loan parties.  The Borrower agrees to provide any such Person with any information (financial or otherwise) such Person reasonably deems necessary to comply with all such regulations.  The Borrower shall provide the Administrative Agent with a copy of any material reports provided to any purchaser under an Approved Takeout.

Section 6.13    Fiscal Year; Fiscal Quarter.  The Borrower shall not change its fiscal year or any of its fiscal quarters, without Administrative Agent's and Lenders' prior written consent, which consent shall not be unreasonably withheld or delayed.

Section 6.14    Electronic Listing of Contracts.  Promptly following the inclusion of same in the Collateral and in accordance with Section 3.4 and Section 3.7, the Borrower shall furnish to the Collateral Agent and the Administrative Agent (with a copy to the Lenders) an electronic listing

- 44 -

of all Contracts pledged as Collateral, which shall supplement and be incorporated into the Master Contract Schedule.

Section 6.15    Other Agreements.    The Borrower shall comply with all terms and conditions of all other agreements, whether now or hereafter existing, between the Borrower and any other Person, except to the extent such non-compliance would not reasonably be expected to have a Material Adverse Effect, and shall notify Administrative Agent (with a copy to the Lenders) immediately in writing (which may be provided via electronic mail) of any default (and of the applicable cure period, if any) in connection with any other such agreements that would reasonably be expected to have a Material Adverse Effect if not timely cured.

Section 6.16    Use of Proceeds.    Unless specifically consented to the contrary by the Lenders in writing (which may be provided via electronic mail), the Borrower shall use each Draw solely for purpose of financing Eligible Contracts, the payment of the Origination Fee and Agent Fees and Expenses (including the fees and expenses of the Lender Professionals) as set forth in with Section 2.1(d), the repayment in full of all outstanding obligations under the PEFI / ING Facility, or for general corporate purposes as contemplated by and in accordance in all material respects with the terms of the DIP Budget (subject to the Permitted Variances).  The DIP Budget may not be updated, modified, replaced, or supplemented by the Borrower without the consent of the Administrative Agent, in its reasonable discretion.

Section 6.17    Taxes, Charges and Liens.    The Borrower shall timely pay and discharge, before they become delinquent, all of its income Taxes, and all other material assessments, governmental charges and levies imposed upon the Borrower or the properties, income, or profits of the Borrower, prior to the date on which penalties and interest would attach, and all lawful claims that, if unpaid, would reasonably be expected become a lien or charge upon any of the properties, income, or profits of the Borrower (other than Permitted Liens); *provided, however*, the Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (a) the validity of the same shall be contested in good faith by appropriate proceedings, and (b) appropriate and adequate reserves shall have been established with respect to such contested assessment, tax, charge or levy.

Section 6.18    Management and Operations.    The Borrower shall conduct its business affairs in a reasonable and prudent manner and in compliance with all applicable laws, ordinances, rules, and regulations respecting its properties, charters, businesses and operations.

Section 6.19    Change of Location.    The Borrower shall promptly notify the Administrative Agent and the Collateral Agent in writing (which may be provided via electronic mail) of any additions to or changes in the name, organizational identification number, business location or chief executive office location of the Borrower or its state of organization or changes in the location of any of the tangible Collateral.

Section 6.20    Title to Assets and Property; Insurance.    The Borrower shall maintain good and marketable title to all of the Collateral, subject only to Permitted Liens.  The Borrower shall maintain with financial sound and reputable insurance companies fidelity bond coverage or errors and omissions insurance of at least one million dollars ($1,000,000).

- 45 -

Section 6.21    Notice of ERISA Matters.  The Borrower shall promptly, and in any event within fifteen (15) days after Borrower knows or should reasonably be expected to know, notify the Collateral Agent, the Administrative Agent and the Lenders in the event that either (i) the Borrower at any time becomes a Benefit Plan or fulfills any obligations under this Agreement with the assets of a Benefit Plan, or (ii) the Borrower or any ERISA Affiliate at any time maintains, contributes to or has any obligation to contribute to any Multiemployer Plan or Pension Plan that could have a material and adverse effect and, in either such event, shall provide such additional information and representations as the Collateral Agent, Administrative Agent or any Lender may reasonably request relating to, with respect to subclause (i), compliance with ERISA and Section 4975 of the Code and, with respect to subclause (ii), exposure to liability thereunder.

Section 6.22    Other Information.  The Borrower shall, from time to time, provide the Administrative Agent, the Collateral Agent and the Lenders with such other information about the Borrower and its businesses and assets as the Administrative Agent, the Collateral Agent or any Lender may reasonably request.

Section 6.23    Schedule of Contracts.  Except for immaterial variances, the Borrower shall ensure that each Contract included in the calculation of the Borrowing Base complies with each of the Contract characteristics set forth on Schedule II to this Agreement (other than those Contract characteristics for which the Lenders, in their sole discretion, have waived one or more of the criteria in respect of such Contracts).

Section 6.24    Additional Assurances.  The Borrower shall make, execute and deliver to Administrative Agent or the Collateral Agent, as applicable, such promissory notes, security agreements, financing statements, instruments, documents and other agreements as any Lender or its attorneys may reasonably request to carry out more effectively the purposes of this Agreement and secure the Indebtedness.

Section 6.25    Authorization to do Business.  The Borrower shall, at all times, be authorized to do business and in good standing in every jurisdiction where the failure to so qualify could have or cause a Material Adverse Effect.

## ARTICLE VII
## NEGATIVE COVENANTS

The Borrower covenants and agrees with the Agents and the Lenders as to itself that as long as this Agreement remains in effect, without the prior written consent of the Administrative Agent and the Lenders (with a copy thereof to the other Agents), which consent shall not be unreasonably withheld or delayed, it shall comply with the following negative covenants:

Section 7.1    Indebtedness.  The Borrower shall not create, incur or assume any indebtedness for borrowed money (direct or contingent) without Lenders' prior written consent, other than as permitted by Section 5.1(d); *provided*, *however*, that the Borrower shall not be permitted to amend, modify, or supplement the terms of the Renovate / ING Facility or any other the indebtedness set forth on Schedule V without the consent of the Lenders.

- 46 -

Section 7.2    Liens.  Except as allowed as a Permitted Lien, the Borrower shall not create or permit to exist any lien affecting, or otherwise encumbering, any of the Collateral other than the Carve Out.

Section 7.3    Transfers.  Following the occurrence and during the continuance of an Event of Default or a Termination Event, Borrower shall not sell, transfer or otherwise alienate any of the Collateral unless it shall have first received the Lenders' written consent.

Section 7.4    Operations and Use of Proceeds.  The Borrower shall not (a) engage in any business activities substantially different than those in which the Borrower is presently contemplating to be engaged in or other similar finance and credit services businesses without the prior written consent of the Lenders or (b) cease operations, liquidate, merge or consolidate with any other entity or dissolve.  Unless specifically consented to by the Lenders in writing (which may be provided via electronic mail), the Borrower shall not use any Draw other than for the uses authorized by Section 6.16.  Without limiting the generality of the foregoing sentence and Section 6.16, the Borrower shall not use, or consent to or support the use of, any Draw to finance in any way (by the Borrower or any Affiliate, any official committee of unsecured creditors appointed in the Bankruptcy Cases, the U.S. Trustee or any other estate representative appointed in the Bankruptcy Cases (or any successor case) or any other Person) any investigation (including by way of examinations or discovery proceedings), adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation of any type which seeks relief that is or may be, in the reasonable judgment of FAM, the Agents, the Lenders, and other Secured Parties, as applicable, materially adverse to the interests of any or all of FAM, the Agents, the Lenders, the other Secured Parties, or their respective rights and remedies under the Loan Documents, the Interim Order or the Final Order of the FAM Loan Purchase Agreement.

Section 7.5    Other Agreements.  The Borrower shall not enter into any agreement containing any provision that would be violated or breached by the performance of its obligations hereunder or under any instrument or document delivered or to be delivered by it hereunder or in connection herewith.

Section 7.6    Distributions.  The Borrower shall not make any distributions from the Collateral to its equity interest holders.  For purposes of this provision, the term "distribution" includes (i) all cash distributions paid to the equity interest holders of the Borrower, and (ii) the value of all non-cash distributions made to the equity interest holders of the Borrower.

Section 7.7    Loans, Acquisitions and Guaranties.  The Borrower shall not loan, invest in or advance money to any other Person other than in the ordinary course of business (including, without limitation, the acquisition of Contracts).

Section 7.8    Change of Control.  There shall not be a Change of Control without the prior written consent of the Lenders in the Lenders' sole discretion.

Section 7.9    Affiliate Transactions.  The Borrower shall not sell, lease, lend, assign or otherwise transfer any material amount of its properties or assets (or any interests therein) to, or purchase, lease, or otherwise acquire any material amount of properties or assets from, any of its

- 47 -

Affiliates, unless the Borrower receives reasonably equivalent value in connection with such sale, lease, transfer, purchase, or acquisition.

Section 7.10    BENJI Program Documents.  The Borrower shall not, without the prior written consent of the Administrative Agent, amend, modify, or supplement the BENJI Program Documents.

Section 7.11    Bankruptcy Cases.  The Borrower shall not file or prosecute any motion, pleading, or other document with the Bankruptcy Court, or support any Person in filing or prosecuting any motion, pleading, or other document with the Bankruptcy Court seeking relief that is inconsistent with the achievement of the Milestones.  The Borrower shall not propose, file, support, pursue, seek entry of, or aid in another party proposing, filing, supporting, pursuing or seeking entry of, an order confirming a chapter 11 plan that adversely impacts the Secured Parties' rights under any Loan Document without the Secured Parties' prior written consent.

## ARTICLE VIII
## EVENTS OF DEFAULT

Section 8.1    Events of Default.  The following actions or inactions or both shall constitute Events of Default under this Agreement:

(a)    *Default Under the Indebtedness.*  Should the Borrower default in the payment of (i) Interest under the Indebtedness or any other fees, expenses or amounts payable hereunder or any Loan Documents, which remains unpaid for three (3) Business Days after written notice (which shall include notice by electronic mail) to the Borrower, or (ii) should the Borrower default in the payment of principal under the Indebtedness payable on the Maturity Date.

(b)    *Diversion of Funds.*  Should the Borrower divert or use any portion of any amount received on account of the Collateral while any of the Indebtedness remains outstanding, other than for repayment of the Indebtedness or deposit into the Deposit Account, *provided*, *however*, that if any such diversion or use thereof is unintentional, the Borrower shall have two (2) Business Days to cure such diversion after actual knowledge thereof by an Authorized Individual or receipt of notice thereof.

(c)    *Program Deficiency.*  Should a Program Deficiency exist and such violation or failure shall not have been remedied by Borrower within three (3) Business Days after written notice (which may be provided by electronic mail) of such violation or failure by Lenders to the Borrower or actual knowledge thereof by an Authorized Individual.

(d)    *Failure to Provide Contract Datasite Access.*  Should the Borrower violate, or fail to comply fully with, Section 3.4 or Section 3.7 of this Agreement, and within three (3) Business Days after written notice (which may be provided by electronic mail) of such violation or failure by the Administrative Agent to the Borrower or actual knowledge thereof by an Authorized Individual, the Borrower does not (i) cure such violation or failure, and (ii) provide to Administrative Agent a copy of any information reasonably requested by Administrative Agent that is covered by Section 3.4 or Section 3.7, as applicable.

- 48 -

(e)     *Other Default Under this Agreement or Related Agreements*.  Should the Borrower violate, or fail to comply fully with, any of the other covenants, agreements, undertakings, representations, warranties, or terms and conditions of, this Agreement (including the Milestones), or any other Loan Documents (not otherwise provided for in this Section 8.1), the Stalking Horse APA, the FAM Loan Purchase Agreement, the Interim Order or the Final Order, the Bid Procedures Order, or the FAM LPA Approval Order, and such violation or failure shall not have been remedied by Borrower within five (5) Business Days after written notice (which may be provided by electronic mail) of such violation or failure by the Administrative Agent to the Borrower or actual knowledge thereof by an Authorized Individual.

(f)     *Stalking Horse APA*.  Should the Borrower terminate the Stalking Horse APA other than as a result of a breach thereof by FAM or take any action to restrict, prohibit, or impede the rights of the Secured Parties to credit bid (in connection with the consummation of the transactions contemplated by the Stalking Horse APA or otherwise).

(g)     *Alternate Sale*.  Should the Borrower select a winning bidder at the Auction, or otherwise agree to sell all or substantially all of the Purchased Assets to any party, other than the Stalking Horse Bidder, unless such bidder provides the written commitment and proof of funds described in Section 2.1(f).

(h)     *FAM Loan Purchase Agreement*.  Should the Borrower terminate the FAM Loan Purchase Agreement other than as a result of a breach thereof by FAM or take any action to restrict, prohibit, or impede the rights of FAM under the FAM Loan Purchase Agreement.

(i)     *Account Control Agreements.*  Should the Deposit Account Control Agreement not be in full force and effect.

(j)     *Default in Favor of Third Parties*.  Should the Borrower default (after expiration of any applicable grace or cure periods) under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor, the result of which could be reasonably likely to cause a Material Adverse Effect.

(k)     *False Statements*.  Should any representation or warranty of the Borrower made under this Agreement or any of the other Loan Documents, or any certificate, document, report, Funding Request, or financial or other statement delivered thereby, prove to be incorrect or misleading in any material respect as of the time made or deemed made, and such representation or warranty cannot be or has not been corrected within five (5) Business Days of discovery by, or written notice by the Administrative Agent thereof to, the Borrower, as applicable.

(l)     *Defective Collateralization*.  Should any Loan Document granting the Collateral Agent a Security Interest in any of the Collateral cease to be in full force and effect (including the failure of any such Loan Document to create a valid first priority Security Interest (subject only to Permitted Liens)) at any time for any reason and such defect in collateralization shall not have been remedied within ten (10) calendar days after written notice of such collateralization defect by Administrative Agent to the Borrower or actual and specific knowledge thereof by an Authorized Individual.

- 49 -

(m)    *Invalidity of Agreement.*    Should any material provision of this Agreement or any other Loan Document to which the Borrower is a party shall cease to be in full force and effect or the Borrower shall assert in writing (which may be provided via electronic mail) that this Agreement is no longer in full force and or effect.

(n)    *Stay Relief and Other Adverse Orders*.    Should (i) the Bankruptcy Court or any court adjudicating an appeal of an order of the Bankruptcy Court (A) enter an order granting relief from the Automatic Stay to permit foreclosure of security interests in any material assets of the Borrower; (B) without the express prior written consent of the Agents and the Required Lenders (which shall not be unreasonably withheld), enter an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify in any manner the Interim Order or the Final Order; (C) without the express prior written consent of FAM (which shall not be unreasonably withheld), enter an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify in any manner the Bid Procedures Order, the Sale Order, or the FAM LPA Approval Order; (D) enter an order appointing a trustee or examiner or terminating the Borrower's exclusive period to file a chapter 11 plan and solicit acceptances thereof; (E) enter an order granting or permitting any administrative expenses or claims (now existing or hereafter arising of any kind or nature whatsoever) that have administrative priority equal or superior to the Indebtedness (other than the Carve Out);  or (F) enter an order granting or permitting any Liens that are pari passu with or senior to the DIP Liens (other than Permitted Liens and the Carve Out) (or, in the case of (i)(B) through (i)(F) above, such an order is sought by any party and not actively contested by the Borrower) or (ii) the Borrower file a motion (without consent of the Lenders) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Secured Parties) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Lenders with any creditor of any Borrower providing for payments as adequate protection or otherwise to such secured creditor or (C) permit other actions that would have a Material Adverse Effect on the Borrower.

(o)    *Indictments.*    Should the Borrower or any of their executive officers be indicted for a felony offense that is a business or financial related crime.  For purposes hereof, the indictment (and any Event of Default under this clause (o)) shall be deemed to be cured if (i) the indictment is dismissed, (ii) the Borrower or an executive officer of the Borrower, enters into an agreement of settlement with the authority that has commenced such indictment, which agreement is entered into without prejudice to such party or without admission of fault or wrongdoing by such party, (iii) the Borrower removes direct responsibility for the origination, acquisition and/or administration of the Collateral from each executive officer, if any, that is the subject of the applicable indictment, or (iv) the Borrower removes direct responsibility for financial management or accounting control matters from each executive officer, if any, that is the subject of the applicable indictment.

(p)    *Other Debt.*    Should the representation set forth in Section 5.1(d) of this Agreement at any time during the term of this Agreement fail to be correct, or should the Borrower or any Affiliate file a motion in the Bankruptcy Cases without the express prior written consent of the Agents and the Lenders, to obtain additional financing from a party other than the Lenders under Section 364(c) or Section 364(d) of the Bankruptcy Code or to use cash collateral under

- 50 -

Section 363(c) of the Bankruptcy Code that does not have the prior written consent of the Agents and the Lenders.

(q)     *Activities of the Borrower*.  Should the activities of the Borrower be suspended or terminated by a regulatory authority.

(r)     *Material Adverse Effect*.  The occurrence of a Material Adverse Effect (other than those occurrences which are customarily a result of events and circumstances leading up to and following the filing of the Bankruptcy Cases).

(s)     *Event of Default under Renovate / ING Facility*.  Should there be any Event of Default (after expiration of any applicable grace or cure periods) under the Renovate / ING Facility after the Petition Date other than any Event of Default arising out of or relating to the commencement of the Bankruptcy Cases.

Section 8.2     <u>Effect of an Event of Default</u>.

(a)     Subject to the terms of the DIP Order and the Remedies Notice Period, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, then, the Administrative Agent, upon the direction of the Lenders, shall deliver a Default Notice declaring all Indebtedness hereunder (with accrued interest thereon) immediately become due and payable, but without affecting the DIP Liens, and the Administrative Agent, upon the request of the Lenders, shall: (i) terminate the commitments of the Lenders to fund Draws and reduce or restrict the right or ability of the Borrower to use any cash collateral; (ii) declare the Indebtedness hereunder (with accrued interest thereon) to be due and payable forthwith, whereupon the same shall immediately become due and payable; (iii) subject to the Remedies Notice Period, (A) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law or (B) take any and all actions described in the DIP Order; and (iv) deliver a Carve-Out Trigger Notice.

(b)     At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Borrower hereby waives its right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the Interim Order or Final Order, as applicable or other Loan Documents.  Except as expressly provided above in this Section 8.2(b) to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

(c)     Subject to any previously granted licenses, each Secured Party is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (to the extent permitted under the applicable licenses and without payment of royalty or other compensation to any Person) any or all Intellectual Property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting,

- 51 -

completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral (in each case after the occurrence, and during the continuance, of an Event of Default). Each Secured Party (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition (it being understood and agreed that each Secured Party and its representatives (and Persons employed on their behalf), may continue to operate, service, maintain, process and sell the Collateral, as well as to engage in bulk sales of Collateral). Upon the occurrence and the continuance of an Event of Default and the exercise by the Secured Parties of their rights and remedies under this Agreement and the other Loan Documents, the Borrower shall assist the Secured Parties in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Secured Parties.

(d)     *Cumulative Remedies.*  Except as may be prohibited by applicable law, all of the rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders shall be cumulative and may be exercised singularly or concurrently.  Election by any Lender, the Administrative Agent or the Collateral Agent to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of the Borrower shall not affect the rights of any Lender, the Administrative Agent or the Collateral Agent to declare a default and to exercise their respective rights and remedies.

Section 8.3     Termination Event.  Upon the occurrence of a Termination Event, all commitments and obligations of the Administrative Agent, acting at the direction of the Lenders, under this Agreement or any of the other Loan Documents or any other agreement immediately will terminate, including without limitation the Administrative Agent's and the Lender Group's commitment to fund any Draws hereunder.

# ARTICLE IX
## MISCELLANEOUS PROVISIONS

The following miscellaneous provisions are a part of this Agreement:

Section 9.1     Amendments.  No alteration of or amendment to this Agreement shall be effective unless given in writing (which may be provided via electronic mail) and signed by each of the parties hereto, subject to Section 9.10(d).

Section 9.2     Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to any principles of law that would require the application of the laws of another State).

Section 9.3     Caption Headings.  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Section 9.4     Assignment and Loan Participation.  Any Lender may assign to an assignee all or a portion of its rights and its obligations under this Agreement (including all or a portion of

the Outstanding Principal Balance or interests therein owned by it, together with ratable portions of the Draws to be made by it) without the Borrower's consent; provided that any assignee shall be adequately capitalized to fulfill in the ordinary course such Assigning Lender's Program Amount hereunder.  Any such assignment shall be evidenced by a Lender Assignment Agreement, a copy of which shall be provided to Administrative Agent, Collateral Agent and Borrower immediately following the execution thereof.  To the extent the assignee is not a Lender hereunder, the Assignor shall deliver to the Collateral Agent all documentation and other information reasonably determined by the Collateral Agent to be required by applicable regulatory authorities required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, prior to such assignment.  No assignment shall be effective until such time as such assignment has been recorded in the Note Register by the Administrative Agent.  In connection with each such assignment, unless waived by the Administrative Agent, the relevant assigning Lender or relevant assignee shall pay to Administrative Agent an assignment processing fee of $3,500.00.  Any Lender may sell or transfer one or more participation interests in the Indebtedness to one or more purchasers.  Administrative Agent and Collateral Agent may provide, subject to Section 9.20, to any one or more purchasers, or potential purchasers, any information or knowledge Lenders may have about the Borrower about any matter relating to the Indebtedness, provided that any such purchaser or potential purchaser has entered into an agreement to comply with confidentiality provisions at least as restrictive as those contained in this Agreement or the Loan Documents.  Neither the Borrower nor any of its Affiliates may be a Lender hereunder.  In the event that any other Person becomes a Lender pursuant to the provisions of this Section 9.4, and the consent or other action of a Lender is required pursuant to the terms of this Agreement, such consent or action shall be provided to the extent that such Lender so consents in accordance with Section 9.10.

Any agreement or instrument pursuant to which a Lender sells, in accordance with the terms of this Agreement, a participation interest in all or any part of its Program Amount shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement (except to the extent such rights are expressly granted to the Administrative Agent or the Collateral Agent herein).  Each Lender that sells a participation shall, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Draws or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and any such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Notwithstanding any other provision of this Agreement to the contrary, any Lender may at any time pledge or grant a security interest in all or any portion of its rights (including, without

- 53 -

limitation, any interest it has in any Draws and any rights to payment on such Draws or interest thereon) under this Agreement, without notice to or consent of any party hereto; *provided that* no such pledge or grant of a security interest shall release such Lender from any of its obligations hereunder, or substitute any such pledgee or grantee for such Lender as a party hereto.

Section 9.5    <u>Controlling Terms</u>.  This Agreement and all of the Loan Documents shall be construed in such a manner as to give full force and effect to all provisions of this Agreement and the other Loan Documents; however, in the event of any irreconcilable conflict between the terms and provisions contained in this Agreement and in any of the other Loan Documents, the terms and provisions of this Agreement shall control.

Section 9.6    <u>Costs and Expenses; Indemnification</u>.  The Borrower agrees to pay, upon demand, costs and expenses of Administrative Agent, Collateral Agent, and Lenders in connection with the preparation and execution of this Agreement and the Loan Documents, including, without limitation, reasonable and documented attorneys' fees and related travel expenses incurred prior to the Closing Date, which may in the sole discretion of the Borrower be included as part of the Funding Request for the initial Draw hereunder.  The Borrower also agrees to pay, upon demand, all of costs and expenses of Administrative Agent, Collateral Agent, and Lenders, including reasonable attorneys' fees actually incurred in connection with amendments, consents, waivers and terminations in connection this Agreement, the other Loan Documents, the Security Interests and the Indebtedness.  The Borrower also agrees to pay, upon demand all reasonable costs and expenses of Administrative Agent, Collateral Agent, and the Lenders, including reasonable attorneys' fees actually incurred, and including the fees of any third party engaged by the Lenders or any of the Agents to assist in the collection of the Indebtedness, in connection with the enforcement, protection, defense and collection of this Agreement, the other Loan Documents, the Security Interests and the Indebtedness.  This includes, subject to any limits under applicable law, the reasonable attorneys' fees and legal expenses of the Lenders, the Administrative Agent, and Collateral Agent actually incurred, whether or not there is a lawsuit, including reasonable attorneys' fees actually incurred for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  The Borrower will pay any court costs, in addition to all other sums provided by law.

The Borrower shall indemnify and hold harmless the Agents, Lenders and their respective Affiliates, officers, directors, employees, agents, managers of, and any Person controlling any of, the foregoing (each, an "*Indemnified Party*") from and against any and all claims, damages, losses, liabilities, obligations, expenses, penalties, actions, suits, judgments and disbursements of any kind or nature whatsoever (including with respect to any Indemnified Party, the reasonable and documented fees and disbursements of one counsel and one local counsel in each appropriate jurisdiction) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of the execution, delivery, enforcement, performance, administration of or otherwise arising out of or incurred in connection with this Agreement, any other Loan Document or any transaction contemplated hereby or thereby (and regardless of whether or not any such transactions are consummated) (collectively, the "*Liabilities*"); <u>except</u> that Borrower shall have no duty to indemnify or hold harmless any Indemnified Party with respect to any liability to the extent such Liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified

- 54 -

Party's gross negligence, material breach or willful misconduct.  For the avoidance of doubt, Section 9.6 shall be applied without duplication of Taxes that are governed by Section 9.7.

To the fullest extent permitted by applicable law, none of the Borrower, Lender, Collateral Agent, nor Administrative Agent shall assert, and each such party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Draw or the use of the proceeds thereof.

Section 9.7    Increased Costs; Tax Withholding.

(a)    If any Lender shall be charged any fee, expense or increased cost on account of any Regulatory Change (i) that subjects such Lender to any Taxes (other than Indemnified Taxes, Taxes described in clauses (ii), (iii) and (iv) in the definition of Excluded Taxes, and Other Connection Taxes that are imposed or measured by net income (however denominated) or that are franchise taxes or branch profit taxes) or (ii) that imposes, modifies or deems applicable any reserve, assessment, insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of such Lender, or credit extended by such Lender pursuant to this Agreement or (iii) except with respect to Taxes that are Excluded Taxes, that imposes any other condition, including without limitation any capital or liquidity requirements, the result of which is to increase the cost to such Lender of performing its obligations under this Agreement, or to reduce the rate of return on such Lender's capital as a consequence of its obligations under this Agreement, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or to require any payment calculated by reference to the amount of interests or loans held or interest received by it, then, upon demand by such Lender, and receipt by Borrower of a certificate as to such amounts (to be conclusive absent manifest error), Borrower shall pay to such Lender, such amounts charged to such Lender or such amounts to otherwise compensate such Lender for such increased cost or such reduction.

(b)    Any and all payments by or on account of any obligation of the Borrower under this Agreement or any Loan Documents shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Taxes are required by Applicable Law to be deducted or withheld from any such payment, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary so that Administrative Agent or such Lender (after payment of all Taxes including Taxes attributable to amounts payable under this Section 9.7) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  In addition, the Borrower shall indemnify the Administrative Agent and each Lender, within five (5) Business Days after written demand thereof, for the full amount of any Indemnified Taxes (including Taxes imposed or asserted on or attributable to amounts payable under this Section 9.7) paid by the Administrative Agent or such Lender, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The

- 55 -

Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    If any Lender requests compensation under this Section 9.7 or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any jurisdiction for the account of any Lender pursuant to this Section 9.7, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Indebtedness hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to this Section 9.7 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.

(d)    <u>Tax Forms</u>.

(i)    Each Non-U.S. Lender that, at any of the following times, is entitled to an exemption from United States withholding tax or, currently or after a change in any applicable law, is subject to such withholding tax at a reduced rate under an applicable tax treaty, shall (x) on or prior to the date such Non-U.S. Lender becomes a "Non-U.S. Lender" hereunder, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (d) and (z) from time to time if requested by the Borrower or the Administrative Agent (or, in the case of a participant, the relevant Lender), provide the Administrative Agent and the Borrower (or, in the case of a participant, the relevant Lender) with two properly completed and duly executed copies of one of the following, as applicable:  (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN or W-8BEN-E (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to the Administrative Agent and Borrower that such Non-U.S. Lender is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender under the Loan Documents; <u>*provided*</u>, <u>*however*</u>, notwithstanding anything to the contrary herein, the completion, execution and submission of such documentation described in clause (C) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such

- 56 -

Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Without prejudice to any right of a Non-U.S. Lender to receive additional amounts or increased costs under this Agreement, unless the Borrower and the Administrative Agent have received forms or other valid documentation indicating that payments under this Agreement to or for a Non-U.S. Lender are not subject to U.S. federal withholding tax or are subject to such tax at a reduced rate under an applicable tax treaty, the Borrower and Administrative Agent shall withhold amounts required to be withheld under applicable law from payments at the applicable statutory rate.

(ii)    Each U.S. Lender shall (A) on or prior to the date such Lender becomes a "Lender" hereunder, (B) on or prior to the date on which any such form or certification previously delivered by it expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (ii) and (D) from time to time if requested by the Borrower or the Administrative Agent (or, in the case of a participant, the relevant Lender), provide the Administrative Agent and the Borrower (or, in the case of a participant, the relevant Lender) with two completed copies of Form W-9 (certifying that such Lender is entitled to an exemption from U.S. backup withholding tax) or any successor form.

(iii)    If a payment made to a Lender under this Agreement or any Loan Document would be subject to U.S. withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA, such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation and information prescribed by applicable law and such additional documentation and information reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with its obligations under FATCA, and to determine the amount to deduct and withhold from such payment.  For purposes of this Section 9.7(d), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)    If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines in its sole discretion, that it had received and retained a refund of a Tax that has been indemnified by the Borrower pursuant to this Agreement, which refund in the sole judgment of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower under this Section 9.7, then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower for such amount (net of all out-of-pocket expenses (including Taxes) and without interest (other than any interest paid by the relevant Government Authority with respect to such refund) as the Lender, the Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any taxes imposed on such refund) than it would have been in if the reimbursement had not been required.  The Borrower, upon the request

- 57 -

of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall repay to such Lender, the Administrative Agent or the Collateral Agent, as the case may be, the amount paid over pursuant to this clause (e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is required to repay such refund to such Governmental Authority.  A Lender, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such claim.  None of the Lenders, the Administrative Agent nor the Collateral Agent shall be obligated to disclose any information regarding its tax affairs or computations to the Borrower or any Affiliate or Related Party of the Borrower in connection with this clause (e).

(f)    If the Borrower determines that a reasonable basis exists for contesting a Tax that has been indemnified by the Borrower, each Lender shall use commercially reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax.  The Borrower shall indemnify and hold each Lender harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 9.7(f).  Nothing in this Section 9.7(f) shall obligate any Lender to take any action that such Person, in its sole judgment determines may result in a material detriment to such Person.

(g)    If any Lender requests compensation under this Section 9.7, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender for the account of any Lender pursuant to this Section 9.7, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse, all of its interests, rights (other than its existing rights to payments pursuant to this Section 9.7(g) and obligations under this Agreement and the Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    the Borrower or such assignee shall have paid to the Administrative Agent the assignment fee specified in Section 9.4 if such Lender would otherwise be required to pay such fee pursuant to the terms of Section 9.4;

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Draws, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents;

(iii)    such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)    such assignment does not conflict with applicable law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(h)    If any Lender requests compensation under this Section 9.7 as a result of any Regulatory Change that is commenced prior to the Closing Date or that arises (whether before

- 58 -

or after the Closing Date) under foreign law or regulations, then the Borrower may prepay, without penalty, premium or Breakage Costs, the amounts due hereunder.

Section 9.8    Calculation of Time Periods.    Whenever this Agreement provides for or contemplates a period of time for the performance of any term, provision or condition of this Agreement, all of the days in such period shall be counted consecutively including Saturdays, Sundays and other non-Business Days except in instances where this Agreement expressly provides that only Business Days shall be counted; *provided, however*, if the last day of any such time period falls on a Saturday, Sunday or other non-Business Day, the last day shall be extended to the next succeeding Business Day immediately thereafter occurring.

Section 9.9    Entire Agreement.    This Agreement, the Notes, and the other Loan Documents, embody the final, entire agreement of the parties hereto and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.  There are no oral agreements between the parties to this Agreement.

Section 9.10    Provisions with Respect to the Agents.

(a)    Appointment.    Each Lender hereby irrevocably designates and appoints FAM as administrative agent under this Agreement, and each Lender hereby irrevocably authorizes FAM as Administrative Agent for such Lender, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers as are expressly delegated to Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto, including, without limitation, the right to execute Loan Documents as Administrative Agent for each Lender. The Administrative Agent will maintain (and make available for inspection by the Borrower and the Lenders upon reasonable prior notice at reasonable times) a register for the recordation of, and will record, the names and addresses of the Lenders and the pro rata share and respective amounts (and stated interest) of the Commitments and Draws of each Lender from time to time (the "*Note Register*"); provided that upon any change to the Note Register, the Administrative Agent shall provide an updated copy thereof within five (5) Business Days of such change to the Collateral Agent; provided further, that the Collateral Agent shall be able to rely upon the most recent updated Note Register received by it from the Administrative Agent.  The entries in the Note Register shall be conclusive and binding for all purposes and the Borrower, the Administrative Agent and the Lenders shall, absent manifest error, treat each person whose name is recorded in the Note Register as a Lender hereunder for all purposes of this Agreement.  Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against Administrative Agent.  In performing its functions and duties under this Agreement, the Administrative Agent shall act solely as agent of the Lenders and the Administrative Agent does not assume and shall not be deemed to have assumed any obligation or relationship of agency or trust with the Borrower, or for any of their Subsidiaries or Affiliates.

- 59 -

(b)    Pro Rata.  Except as otherwise provided in Section 9.10(c), the pro rata share of each Lender is shown on Schedule III, as it may be amended, modified or replaced from time to time.

(c)    Sharing of Payments.  Each Lender agrees that if it shall, through the exercise of a right of set-off, compensation, counterclaim, foreclosure, or otherwise, obtain payment with respect to any of the Indebtedness, or from any of the Collateral, which results in its receiving more than its pro rata share of the aggregate payments with respect to all of the Indebtedness, then (a) such Lender shall be deemed to have simultaneously purchased from the other Lenders a share in the Indebtedness so that the amount of the Indebtedness held by each Lender shall be pro rata and (b) such other adjustments shall be made from time to time as shall be equitable to insure that all Lenders share such payments ratably; *provided*, *however*, that for purposes of this Section the term "pro rata" shall be determined after subtraction of the amounts, if any, which any such Lender has not funded its share of the outstanding balance due under the Notes.  If all or any portion of any such excess payment is thereafter recovered from the Lender that received the same, the purchase provided in this Section shall be rescinded to the extent of such recovery, without interest.  Borrower expressly consents to the foregoing arrangements and agrees that each Lender so purchasing a portion of the other Lenders' share of the Indebtedness may exercise all rights of payment (including, without limitation, all rights of set-off, compensation, or counterclaim) with respect to such portions as fully as if such Lender were the direct holder of such portion.  Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of all participations purchased under this Section and will in each case notify Lenders following any such purchases or repayments.  Lenders also acknowledge and agree that any Agent may be entitled to fees for services provided by such Agent pursuant to one or more separate agreements with Borrower that may be related to the Indebtedness, this Agreement or any other Loan Document.  In each such case, such Agent shall have the right to receive and retain any such fees, which will not be shared with Lenders.  For the avoidance of doubt, each Lender has the right to retain any amounts where such Lender is entitled to non-pro rata payments pursuant to any provision in this Agreement or one or more separate agreements that may be related to the Indebtedness, this Agreement or any other Loan Document.

(d)    Decisions.  The consent of all Lenders is required in order to (a) make any changes in the definition or calculation of the Borrowing Base or in any component of the Borrowing Base, (b) make any changes in the maximum principal balance of the Notes, (c) make any changes in the interest rates charged under the Notes or the redemption price with respect thereto, (d) make any changes in the method of determining the interest rates charged under the Notes, (e) renew the Notes or extend the Maturity Date of any Note, (f) extend any payment due date or change the provisions of this Agreement relating to the application of Collections or the proceeds of the sale of the Collateral to the payment of the Indebtedness, (g) change any place of payment where, or the coin or currency in which, any of the Indebtedness is payable, (h) except as otherwise permitted in this Agreement, release or subordinate any Security Interest in any Collateral, (i) amend this Section 9.10(d), or (j) amend any provision where action or consent of all Lenders is required in such provision; *provided, however*, that any consent hereunder that is required by Administrative Agent (as opposed to Lenders) shall only require the consent of Administrative Agent.  Consent of the Majority Lenders shall be required to impair the right to institute suit for the enforcement of the remaining provisions of this Agreement and the Loan

- 60 -

Documents.   All other consents, approvals, elections and other actions of "Lenders" (unless otherwise provided for under this Agreement), and any and all other decisions with respect to the Indebtedness, may be made only with the consent of the Required Lenders.  If any action to be taken by the Lenders hereunder requires the consent, authorization or agreement of all Lenders, and a Lender (the _Holdout Lender_") fails to give its consent, authorization or agreement, then the Required Lenders, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute replacement Lenders (including any Lender then party to this Agreement) and the Holdout Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Holdout lender shall specify the effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date of such notice.  Prior to the effective date of such replacement, the Holdout Lender and each replacement Lender shall execute and deliver a Lender Assignment Agreement, subject only to the Holdout Lender being repaid its pro rata share of the outstanding Draws (together with accrued and unpaid interest thereon) without any premium or penalty of any kind whatsoever.  If the Holdout Lender shall refuse or fail to execute and deliver any such Lender Assignment Agreement prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Lender Assignment Agreement.  Until such time as replacement Lender or Lenders shall have acquired all rights and obligations of the Holdout lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to fund its pro rata share of the Committed Amount.

(e)     Defaulting Lenders.  Notwithstanding anything any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply:

(i)     fees shall cease to accrue on the unfunded portion of the pro rata share of the Committed Amount of such Defaulting Lender;

(ii)     the Program Amount of such Defaulting Lender shall not be considered in determining whether any action of all Required Lenders have been taken or may be taken hereunder; and

(iii)     upon at least five (5) Business Days prior irrevocable notice to such Defaulting Lender, the Required Lenders or Borrower may permanently replace such Defaulting Lender with one or more substitute replacement Lenders (including any Lender then party to this Agreement) and the Defaulting Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Defaulting Lender shall specify the effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date of such notice.  Prior to the effective date of such replacement, the Defaulting Lender and each replacement Lender shall execute and deliver a Lender Assignment Agreement, subject only to the Defaulting Lender being repaid its pro rata share of the outstanding Draws (together with accrued and unpaid interest thereon) without any premium or penalty of any kind whatsoever.  If the Defaulting Lender shall refuse or fail to execute and deliver any such Lender Assignment Agreement prior to the effective date of such

- 61 -

replacement, the Defaulting Lender shall be deemed to have executed and delivered such Lender Assignment Agreement.

(f)    Attorneys-in-fact.  Administrative Agent may execute any of its duties under this Agreement by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Administrative Agent shall not be responsible to Lenders for the negligence, gross negligence or willful misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(g)    Limitation on Liability.  No Agent, nor any of its respective officers, directors, employees, agents or attorneys-in-fact shall be liable to Lenders for any action lawfully taken or omitted to be taken by it or them under or in connection with this Agreement except for its own gross negligence or willful misconduct as determined by a final non-appealable judgment in a court of competent jurisdiction, including in relation to any errors made by an Agent in identifying a Lender as a Defaulting Lender.  No Agent, nor any of its respective affiliates shall be responsible in any manner to any Lender for any recitals, statements, representations or warranties made by Borrower or any of its Affiliates, or any officer or representative of the Borrower or any of its Affiliates contained in this Agreement or in any of the Loan Documents, or in any certificate, report, statement or other document referred to or provided for in or received by the such Agent under or in connection with this Agreement, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the other Loan Documents, or for any failure of Borrower or any of its Affiliates or to perform any of their respective obligations thereunder, or for any recitals, statements, representations or warranties made, or for the value or sufficiency of any Collateral, or for the perfection or priority of any Security Interest.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the terms, covenants or conditions of this Agreement or any of the Loan Documents on the part of any of Borrower or any of its Affiliates or to inspect the properties, books or records of any of Borrower or any of its Affiliates.

(h)    Reliance.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, facsimile transmission, cablegram, telegram, telecopy, electronic mail or telex message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to Borrower or any of its Affiliates), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement unless it shall first receive advice or concurrence of each Lender and it shall first be indemnified to its satisfaction by each Lender against any and all liability and expense which may be incurred by such Agent by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement in accordance with a request of any of the Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all Lenders and all present and future interest holders in the Notes.

(i)    Notice of Default.  No Agent nor any Lender shall be deemed to have knowledge or notice of the occurrence of any Event of Default or Termination Event hereunder

- 62 -

unless such Agent or the Lender has actual knowledge thereof or unless such Agent or the Lender has received written notice from Administrative Agent, Collateral Agent, a Lender or the Borrower referring to this Agreement, describing such Event of Default or Termination Event and stating that such notice is a "notice of default".  In the event that an Agent receives such a notice, the recipient shall promptly give notice thereof to the Administrative Agent and all Lenders.  Administrative Agent shall take such action with respect to such Event of Default or Termination Event as shall be reasonably directed by Lenders; provided that, unless and until Administrative Agent shall have received such directions, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default or Termination Event as it shall deem advisable in the best interests of Lenders.

(j)  Financial Statements and Reports.  Within three (3) Business Days after its receipt thereof from the Borrower or such later date as may be specified in any written request of a Lender therefor, Administrative Agent agrees to furnish Lenders who request the same with copies of all financial statements, reports, schedules, certificates and tax returns required to be furnished to Administrative Agent under this Agreement.  Administrative Agent shall not have any duty or responsibility to provide any Lender with any other information concerning the affairs, financial condition or business of PEFI or RAI or any of their Affiliates that may come into the possession of Administrative Agent if not otherwise required to be furnished under this Agreement.

(k)  AML Compliance.  In order to comply with Applicable Laws, each Agent and each Lender is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with such Agent or such Lender.  Accordingly, each of the parties agrees to provide to each Agent and each Lender upon its request from time to time such identifying information and documentation as may be available for such party in order to enable each such Person to comply with Applicable Laws.

(l)  Resignation or Removal.    Administrative Agent may resign as Administrative Agent under this Agreement at any time.    Majority Lenders may remove Administrative Agent as Administrative Agent under this Agreement at any time and, if such Lenders elect to remove Administrative Agent, Administrative Agent shall resign as Administrative Agent under this Agreement within thirty (30) days after written notice of removal (which may be provided by electronic mail).  If Administrative Agent resigns (voluntarily or involuntarily) as Administrative Agent under this Agreement, the Majority Lenders with the consent of the Borrower not to be unreasonably withheld (as long as no Event of Default or Termination Event has occurred and is continuing) may appoint a successor Administrative Agent for Lenders, which successor Administrative Agent shall be a commercial bank (i) organized under the laws of the United States or any state thereof or (ii) with a branch licensed to operate under the laws of the United States, whereupon such successor Administrative Agent shall succeed to the rights, powers and duties of the former Administrative Agent and the obligations of the former Administrative Agent shall be terminated and canceled, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement.  The former Administrative Agent's resignation shall not become effective until a successor Administrative Agent has been appointed and has succeeded of record to all rights and obligations of the Administrative Agent hereunder; *provided*, *however*, that if Lenders cannot agree as to a

- 63 -

successor Administrative Agent within ninety (90) calendar days after such resignation, Administrative Agent may petition a court of competent jurisdiction for the appointment of a successor Administrative Agent.  At all times, all provisions of this Agreement and the Loan Documents shall remain in full force and effect, even during the period between the resignation an Administrative Agent and the appointment of a successor Administrative Agent.  After any Administrative Agent's resignation as Administrative Agent, the provisions of this Section shall inure to the benefit of the resigned Administrative Agent as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and until a successor Administrative Agent has been appointed.

Section 9.11    Maximum Interest Rate.  No provision of this Agreement, the Notes, or any other Loan Document shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable law (the "*Maximum Rate*").  In determining whether or not interest paid or payable under any Note exceeds the Maximum Rate, the Borrower and the applicable Lender shall, to the extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread, in equal or unequal parts, the total amount of interest throughout the entire contemplated term of the Indebtedness represented by such Note so that interest for the entire term of such Note does not exceed the Maximum Rate.  In the event any Lender ever receives, collects or applies, as interest due and payable under the Notes, any sum in excess of the Maximum Rate, the amount of the excess shall be applied as a payment and reduction of the principal of the indebtedness represented by that Note or any other Note; and if the principal of the Indebtedness represented by any Note has been fully paid, any remaining excess shall forthwith be paid to Borrower.

Section 9.12    Notices.  Any notice or demand which, by provision of this Agreement, is required or permitted to be given or served on the Borrower must be in writing and shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one (1) Business Day after being delivered to such courier, or (if delivered in person or transmitted electronically by facsimile or electronic mail) the same day as delivery, in each case addressed (until another address or addresses are given in writing by the Borrower to each of the other parties hereto) as follows:

Personal Energy Finance, Inc.
16870 West Bernardo Drive, Suite 408
San Diego, CA 92127
Attention:  Mark Matheson
Telephone:  (619) 743-6902
E-Mail:  markmatheson1@gmail.com

With a copy to:

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA  90401

- 64 -

Attention:  Sharon Weiss; David Andersen
E-Mail:  Sharon.weiss@bclplaw.com; dgandersen@bclplaw.com

Any notice or demand which, by any provision of this Agreement, is required or permitted to be given or served on the Administrative Agent, Collateral Agent or the Lenders must be in writing and shall be deemed to have been sufficiently given and served for all purposes (if mailed) three (3) days after being deposited, postage prepaid, in the United States mail, registered or certified mail, or (if delivered by express courier) one (1) Business Day after being delivered to such courier, or (if delivered in person or transmitted electronically by facsimile or electronic mail) the same day as delivery, in each case addressed (until another address or addresses are given in writing by Administrative Agent or Collateral Agent, as applicable, to each of the other parties hereto) as follows:

| | |
|---|---|
| If to FAM, as Lender, Administrative Agent, or Collateral Agent: | 3041 Agoura Road<br>Suite 230<br>Agoura Hills, CA 91301<br>Attention:  Graham Fleming<br>Telephone: (949) 275-4476<br>E-mail:  gfleming@financeofamerica.com |

With a copy to (which will not constitute notice hereunder):

Finance of America Mortgage LLC
2500 Dallas Parkway, Suite 430
Plano, Texas 75093
Attention: Lauren Richmond
Email: larichmond@financeofamerica.com

and

Hunton Andrews Kurth LLP
200 Park Avenue
New York, NY 10166
Attention: Peter S. Partee, Sr. and Michael P. Goldman
Email: ppartee@huntonak.com; mgoldman@huntonak.com

Section 9.13    Severability.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any Person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other Persons or circumstances.  If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be

- 65 -

stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

Section 9.14    Sole Discretion of Lenders.  Unless otherwise provided in this Agreement, whenever the consent or approval of Lenders is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of Lenders and the decision of Lenders shall be final and conclusive.

Section 9.15    Successors and Assigns.  All covenants and agreements contained herein by or on behalf of the Borrower shall bind its successors and assigns and shall inure to the benefit of Lenders, their respective successors and assigns.  However, (i) the Borrower shall not have the right to assign its rights or obligations under this Agreement or any interest therein, without the prior written consent of Lenders and (ii) any assignment or participation by any Lender of its rights or obligations under this Agreement shall be in accordance with the terms of this Article IX.

Section 9.16    Survival.  The indemnification provisions of Section 0, Section 9.6 and Section 9.7 shall survive the termination of this Agreement and payment of the Notes and all other amounts payable hereunder.

Section 9.17    Waiver.  No Lender nor any Agent shall be deemed to have waived any rights under this Agreement unless such waiver is given in writing (which may be provided via electronic mail) and signed by such Lender or such Agent, as applicable.  No delay or omission on the part of any Lender or any Agent in exercising any right shall operate as a waiver of such right or any other right.  A waiver by any Lender or any Agent of a provision of this Agreement shall not prejudice or constitute a waiver of the right of such Lender or any Agent, as applicable, or otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by any Lender, Collateral Agent or Administrative Agent or any course of dealing between any such Person and the Borrower, shall constitute a waiver of any of the rights of such Lender, Collateral Agent or Administrative Agent or of any obligations of the Borrower as to any future transactions.  Whenever the consent of any Lender, Collateral Agent or Administrative Agent is required under this Agreement, the granting of such consent by such Person in any instance shall not constitute continuing consent in subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of such Lender, Collateral Agent or Administrative Agent, except as explicitly otherwise set forth herein.

Section 9.18    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (a) (i) no fiduciary, advisory or agency relationship between Borrower and its Subsidiaries or Affiliates on the one hand and any Lender, or any Agent, on the other hand, is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether any Lenders or any Agent has advised or is advising the Borrower or any Subsidiary on other matters, (ii) the arranging and other services regarding this Agreement provided by any Lenders or any Agent are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and Lenders and Agents on the other hand, (iii) the Borrower has consulted its own legal, accounting, regulatory and

- 66 -

tax advisors to the extent that it has deemed appropriate and (iv) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (b) (i) Lenders and Agents are not and will not be acting as advisors, agents or fiduciaries for the Borrower or any of its Affiliates, or any other Person; (ii) neither any Lender or any Agent has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents and those imposed by law; and (iii) any Lender and any Agent and their respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrower and its Subsidiaries and Affiliates, and no Lender nor any Agent has any obligation to disclose any of such interests to the Borrower or its Subsidiaries or Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against any Lender or any Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.19    <u>Right of Setoff</u>.  Without in any way limiting any other provision of this Agreement, each of the Lenders and each of the Agents is hereby authorized (in addition to any other rights it may have) at any time after the occurrence of an Event of Default or Termination Event, after giving written notice to the Borrower, to set-off, notice, appropriate and apply (without presentment, demand, or protest which are hereby expressly waived) any deposits and any other indebtedness held or owing by a Lender to, or for the account of, the Borrower against the amount of the unpaid principal of the outstanding Draw owing by the Borrower to such Lender (even if contingent or unmatured).

Section 9.20    <u>Confidentiality</u>.  Each Agent and each Lender agrees to maintain the confidentiality of the Confidential Information, except that Confidential Information may be disclosed (a) to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Information confidential in accordance with customary practices); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same (or at least as restrictive) as those of this Section 9.20 (or as may otherwise be reasonably acceptable to the Borrower), to (x) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights and obligations under this Agreement, or (y) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) with the consent of the Borrower; or (h) to the extent that such Confidential Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the Administrative Agent, Collateral Agent, Lenders, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.  For purposes of this Section 9.20, "***Confidential Information***" means all information received from the Borrower or any of its

- 67 -

Affiliates relating to the Borrower or any of its Affiliates or any of their respective businesses, other than any such information that is available to the Agents or Lenders on a nonconfidential basis prior to disclosure by the Borrower or any of its Affiliates.

Section 9.21    <u>WAIVER OF JURY TRIAL</u>.  ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THEY MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO (A) THE NOTES, (B) THIS AGREEMENT, (C) ANY OTHER LOAN DOCUMENT, OR (D) THE COLLATERAL. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.  THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE PARTIES HERETO, AND SAID PARTIES HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY THEM TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  THE PARTIES FURTHER REPRESENT THAT EACH HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT EACH HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.  THE PARTIES FURTHER HEREBY IRREVOCABLY CONSENT TO THE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE FOR SO LONG AS THE BANKRUTPCY CASES ARE PENDING AND, TO THE EXTENT THAT THE BANKRUPTCY CASES HAVE BEEN DISMISSED, CLOSED, OR OTHERWISE DISCONTINUED, STATE COURTS OF NEW YORK AND THE FEDERAL COURTS IN NEW YORK, AND AGREE THAT ANY ACTION OR PROCEEDING ARISING OUT OF OR BROUGHT TO ENFORCE THE PROVISIONS OF THE NOTES, THIS AGREEMENT AND/OR ANY THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN ANY COURT HAVING SUBJECT MATTER JURISDICTION.

Section 9.22    <u>Counterparts</u>.  This Agreement may be executed in any number of identical counterparts, and each counterpart hereof shall be deemed to be an original instrument, but all counterparts hereof taken together shall constitute but a single instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or electronic (i.e., "pdf' or "tif') transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties hereto transmitted by facsimile or electronic (i.e., "pdf' or "tif') transmission shall be deemed to be their original signatures for all purposes.

Section 9.23    <u>Contractual Recognition of Bail-In</u>.  Notwithstanding anything to the contrary in this Agreement or any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under this Agreement or any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

- 68 -

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.24    <u>Obligations Joint and Several</u>.  PEFI and RAI acknowledge and agree that it shall, jointly and severally with such other Borrower, be liable for all of the Indebtedness and the performance of all of the obligations of the Borrower under this Agreement, the Loan Documents, the Interim Order, and the Final Order.  PEFI and RAI each waive demand of payment from and protest to the other Borrower of any of the Indebtedness, and also waives notice of acceptance of its obligations and notice of protest for nonpayment.  The Indebtedness of each Borrower hereunder shall not be affected by (i) the failure of the Administrative Agent to assert any claim or demand or to enforce any right or remedy against either Borrower under the provisions of this Agreement or any of the other Loan Documents or otherwise; (ii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Agreement, any of the other Loan Documents or any other agreement; or (iii) the failure of any Lender to exercise any right or remedy against any other Borrower.  PEFI and RAI further acknowledge and agree that its agreement hereunder constitutes a promise of payment when due and not of collection, and waives any right to require that any resort be had by any Lender to any balance of any deposit account or credit on the books of any Lender in favor of any other Borrower or any other person.  The obligations of each of PEFI and RAI hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the obligations of the other Borrower or otherwise.  Without limiting the generality of the foregoing, the obligations of each of PEFI and RAI hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy under this Agreement or under any other Loan Document or any other agreement, by any waiver or modification in respect of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations of the other Borrower or by any other act or omission which may or might in any manner or to any extent vary the risk of such Borrower or otherwise operate as a discharge of such Borrower as a matter of law or equity.  PEFI and RAI

- 69 -

further acknowledge and agree that their obligations hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any obligation of the other Borrower is rescinded or must otherwise be restored by the Administrative Agent or any Lender upon the bankruptcy or reorganization of any of the other Borrowers or otherwise.

[SIGNATURES ON FOLLOWING PAGE]

THE BORROWER, EACH AGENT AND THE LENDERS ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT, AND THE BORROWER, EACH AGENT AND THE LENDERS AGREE TO ITS TERMS.

**<u>BORROWER:</u>**

**PERSONAL ENERGY FINANCE, INC.**

By: _____

    Name:  Shawn Stone
    Title:   Chief Executive Officer

**RENOVATE AMERICA, INC.**

By: _____

    Name:  Shawn Stone
    Title:   Chief Executive Officer

[Signature Page to Loan Agreement]

**INITIAL LENDER, ADMINISTRATIVE**
**AGENT AND COLLATERAL AGENT:**

**FINANCE OF AMERICA MORTGAGE LLC,**
**as Initial Lender, Administrative Agent, and**
**Collateral Agent**

By: _Graham Fleming_
    Name: Graham Fleming
    Title: Authorized Signer

[Signature Page to Loan Agreement]

## **SCHEDULE I**

## **MASTER CONTRACT SCHEDULE**

## **[ON FILE WITH THE COLLATERAL AGENT]**

084181.0000076 EMF_US 82996854v14

## SCHEDULE II

## SCHEDULE OF CHARACTERISTICS OF CONTRACTS

1.      The Contract is eligible for purchase under the Approved Takeout, taking into account the Approved Takeout Conditions.

2.      The Contract relates to an Eligible Property.

3.      The Contract relates to a Home Improvement Project has been completed by an Approved Contractor and payment is not contingent on any further performance by such Approved Contractor.

4.      The Contract is set forth on an Approved Form.

5.      The Contract is fully executed by all parties.

6.      The representations and warranties made by the Borrower with respect to the Contract in Section 3.2 and Section 5.1(x) are true and correct.

7.      The Collateral Agent has a first-priority perfected security interest in the Contract for benefit of the Lenders.

8.      The Contract is not a Defaulted Contract.

9.      The Contract satisfies all applicable requirements of the Approved Takeout and was originated in the ordinary course of business of the Borrower and in accordance with the Credit and Collections Policies.

10.     The Collateral Agent shall have received all required documents with respect to the Contract.

11.     Any action, notice or filing has been properly and timely completed as required by applicable laws in order to establish and maintain the priority and enforceability of the Contract against the Obligor.

12.     The Contract shall not have been intentionally adversely selected by the Borrower for initial or continued financing pursuant to this Agreement relative to other financing sources of the Borrower and its subsidiaries or relative to the Approved Takeout.

084181.0000076 EMF_US 82996854v14

## <u>SCHEDULE III</u>

### <u>LENDER PRO RATA SHARE OF PROGRAM AMOUNT</u>

| <u>Lender</u> | <u>Pro Rata Share</u> |
|---|---|
| FAM | 100% |

084181.0000076 EMF_US 82996854v14

**SCHEDULE IV**

**FORM OF CONTRACT SCHEDULE**

| Loan Servicing Account Number | BENJI Account Number | Origination Date | Original Amortization Term | Original Loan Amount | Interest Rate | Payment Amount | Promo Length | State | Current Balance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Sch. IV-1

**<u>SCHEDULE V</u>**

**<u>BORROWER PERMITTED DEBT</u>**

The Renovate / ING Facility

The PEFI / ING Facility (until repayment thereof prior to, or from the proceeds of, the initial Draw)

Sch. V-1

**EXHIBIT A**

**FORM OF NOTE**

**PROMISSORY NOTE**

$[_____]                                                       _____ [_], 20__
New York, New York

**PROMISE TO PAY**.  Personal Energy Finance, Inc., a Delaware corporation, and Renovate America, Inc., a Delaware corporation (collectively, the "Borrower") jointly and severally promise to pay Finance America Mortgage LLC, a Delaware limited liability company ("Lender") (or its registered assigns), in lawful money of the United States of America the principal sum of [_____] No/100 DOLLARS (U.S.$ [_____]) or so much thereof as may be outstanding in accordance with the Loan Agreement (as defined below).  The principal amount of the indebtedness evidenced hereby shall be payable in the amounts and on the dates specified in the Loan Agreement, the terms of which are hereby incorporated herein by this reference.

**CREDIT AGREEMENT**.  This Promissory Note (this "Note") is made pursuant to and is entitled to the benefit of the Loan and Security Agreement entered into by Borrower, Collateral Agent, Administrative Agent and Lender, dated as of December 21, 2020, as it may be amended, supplemented or modified from time to time (the "Loan Agreement").  Reference is made to the Loan Agreement for provisions for the acceleration of the maturity hereof on the occurrence of certain events specified therein, the definition of capitalized terms not otherwise defined herein, and for all other pertinent purposes.

**CREDIT FACILITY**.  This Note evidences the Draws from time to time made by Lender in accordance with the terms and conditions of the Loan Agreement.  After the Funding Period, Lender will have no obligation to fund any Draw under this Note.  The Draws under this Note may be requested in accordance with the terms of the Loan Agreement.  Borrower agrees to be liable for all sums drawn in accordance with the instructions of an Authorized Individual.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's or Administrative Agent's internal records, including daily computer printouts. Lender will have no obligation to fund any Draws under this Note if any conditions precedent to any such Draw are not satisfied in accordance with the Loan Agreement.

**INTEREST CALCULATION**.  Interest on this Note shall be computed and paid in accordance with the terms specified in the Loan Agreement.

**PAYMENTS**.  Borrower will repay the outstanding principal balance of all Draws made under this Note plus all accrued unpaid interest on the Maturity Date.  In addition, Borrower will pay interest in accordance with the terms of the Loan Agreement.

**PREPAYMENT**.  Borrower may, or, pursuant to the terms of the Loan Agreement, may be required to, prepay this Note in whole or in part, in each case in accordance with the provisions of the Loan Agreement.

**DEFAULTS AND RIGHTS OF LENDER**.  Should any Event of Default or Termination Event occur, Lender, through the Administrative Agent or Collateral Agent, shall be entitled to exercise its rights under this Note, the Loan Agreement and the other Loan Documents.

**INTEREST AFTER DEFAULT**.  After the occurrence and continuance of an Event of Default, at the option of Administrative Agent by written notice to Borrower, the outstanding and unpaid principal balance under the Note shall bear interest at the Post-Default Interest Rate.

**GOVERNING LAW**.  Borrower agrees that this Note and the line of credit evidenced hereby shall be governed under the laws of the State of New York (without regard to any principles of law that would require the application of the laws of another state).

**WAIVERS**.  Demand, presentment, protest and notice of nonpayment and protest are hereby waived by Borrower to the extent permitted by applicable law.

**SUCCESSORS AND ASSIGNS LIABLE**.  The obligations and agreements of Borrower under this Note shall be binding upon the successors and assigns of Borrower.  The rights and remedies granted to Lender under this Note shall inure to the benefit of the successors and assigns of Lender, as well as to any subsequent holder or holders of this Note, in each case to the extent any such successor, assignee or holder acquired this Note in accordance with the terms of the Loan Agreement.

**CAPTION HEADINGS**.  Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions.  In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SEVERABILITY**.  If any provision of this Note is held to be invalid, illegal or unenforceable by any court, that provision shall be deleted from this Note and the balance of this Note shall be interpreted as if the deleted provision never existed.

**WAIVER OF JURY TRIAL**.  BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF BORROWER, LENDER OR OTHERS WITH RESPECT TO THE LINE OF CREDIT EVIDENCED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER ARISING IN CONTRACT OR TORT OR OTHERWISE.

**CONFLICT**.  To the extent there are any inconsistencies between this Note and the Loan Agreement, the Loan Agreement shall govern.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.**

084181.0000076 EMF_US 82996854v14

**BORROWER:**

**PERSONAL ENERGY FINANCE, INC.**

By: _____
    Name:
    Title:

**RENOVATE AMERICA, INC.**

By: _____
    Name:
    Title:

A-3

## EXHIBIT B

## FORM OF FUNDING REQUEST AND COMPLIANCE CERTIFICATE

Date:_____, 202__

To:    Finance of America Mortgage LLC, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of December 21, 2020 (the "*Loan Agreement*"), by and among Personal Energy Finance, Inc., a Delaware corporation, and Renovate America, Inc., a Delaware corporation (collectively, the "*Borrower*"), Finance of America Mortgage LLC, a Delaware limited liability company ("*FAM*"), as collateral agent and administrative agent for the Lenders and as initial lender and each other Lender party hereto from time to time.

FUNDING REQUEST

    The undersigned, as an Authorized Individual, hereby requests a Draw:

        1.    On [_____], 202[_] (a Business Day); and

        2.    In the aggregate amount of $_____ (the "*Draw Amount*").

The Borrower directs that the proceeds of the Draw be disbursed to the Program Funding Account.

The Borrower hereby represents and warrants that the conditions specified in Article IV of the Agreement have been satisfied on and as of the date hereof and will remain satisfied on the date of the requested Draw.

COMPLIANCE CERTIFICATE

This certification (this "*Compliance Certificate*") is delivered to you pursuant to Section 2.1(b) and Section 6.7 of the Agreement.

The undersigned, [_____], the [_____] of the Borrower, HEREBY CERTIFIES THAT:

    1.    The Borrower is in compliance with all terms and conditions of the Agreement.

    2.    The representations and warranties of the Borrower contained in the Agreement and the Loan Documents are correct in all material respects on and as of the date of this certificate, as though made on and as of the date of the Agreement.

    3.    The Stalking Horse APA and FAM Loan Purchase Agreement remains in full force and effect. No Event of Default or Termination Event under this Agreement, any Loan Document, the Stalking Horse APA, or the FAM Loan Purchase Agreement.

B-1

4.    The Borrower is not party to any material pending litigation, other than as previously disclosed in writing to the Administrative Agent.

5.    No Material Adverse Effect has occurred under the Agreement or the other Loan Documents other than those occurrences that are customarily a result of events and circumstances leading up to and following the filing of the Bankruptcy Cases.

6.    No order has been entered reversing, amending, staying, vacating, terminating, or otherwise modifying the Interim Order or the Final Order, as applicable, in any manner adverse to the Secured Parties without the consent of the Secured Parties.

7.    [Insert in connection with Draws requested of Lenders after entry of the Bid Procedures Order and/or FAM LPA Approval Order:  No order has been entered reversing, amending, staying, vacating, terminating, or otherwise modifying the Bid Procedures Order and/or the FAM LPA Approval Order in any way that is adverse to the interests of FAM without the consent of FAM].

8.    Except with respect to Draws to be made during the extended Funding Period described in Section 2.1(f), the Borrower has not entered into any arrangement to sell all or a material portion of the Purchased Assets of the Borrower (other than the Stalking Horse APA).

9.    The Borrower has not entered into any arrangement or to sell any Contracts (other than pursuant to an Approved Takeout).

10.    The computations of Maximum Loan Amount (including the Borrowing Base) and Outstanding Principal Balance (giving effect to any previously requested Draws that have not yet been funded) attached hereto as Annex I are true and correct.

IN WITNESS WHEREOF, I have subscribed my name as an Authorized Individual of the Company as of this [___] day of [_____], 202[_].

**BORROWER:**

| RENOVATE AMERICA, INC. | PERSONAL ENERGY FINANCE, INC. |
|---|---|
| By:_____ <br> Name:_____ <br> Title:_____ | By:_____ <br> Name:_____ <br> Title:_____ |

B-2

## EXHIBIT C

## FORM OF LENDER ASSIGNMENT AGREEMENT

## LENDER ASSIGNMENT AND ACCEPTANCE AGREEMENT

THIS LENDER ASSIGNMENT AND ACCEPTANCE AGREEMENT (this "*Assignment Agreement*") is entered into as of the ___ day of _____, 202__, by and between _____ ("*Assignor*") and _____ ("*Assignee*").

## PRELIMINARY STATEMENTS

A.    This Assignment Agreement is being executed and delivered in accordance with Section 9.4 of that certain Loan and Security Agreement, dated as of December 21, 2020 (the "*Loan Agreement*"), by and among Personal Energy Finance, Inc., a Delaware corporation, and Renovate America, Inc., a Delaware corporation (collectively, the "*Borrower*"), Finance of America Mortgage LLC, a Delaware limited liability company ("*FAM*"), as collateral agent and administrative agent for the Lenders and as initial lender  and each other Lender party hereto from time to time.  Capitalized terms used and not otherwise defined herein are used with the meanings set forth or incorporated by reference in the Loan Agreement.

B.    Assignor is a Lender party to the Loan Agreement, and Assignee wishes to become a Lender thereunder; and

C.    Assignor is selling and assigning to Assignee an interest in amount described on Schedule I hereto (the "*Transferred Percentage*") in all of Assignor's rights and obligations under the Loan Agreement and the other Loan Documents, including, without limitation, Assignor's pro rata share of the Program Amount (including both the Committed Amount and the Uncommitted Amount) and (if applicable) Assignor's Draws as set forth herein.

## AGREEMENT

The parties hereto hereby agree as follows:

1.    The sale, transfer and assignment effected by this Assignment Agreement shall become effective (the "*Effective Date*") two (2) Business Days following the date on which a notice substantially in the form of Schedule II to this Assignment Agreement ("*Effective Notice*") is delivered by Assignor to the Administrative Agent and the Assignee.  From and after the Effective Date, Assignee shall be a Lender party to the Loan Agreement for all purposes thereof as if Assignee were an original party thereto and Assignee agrees to be bound by all of the terms and provisions contained therein.

2.    If Assignor has no outstanding principal under the Loan Agreement, on the Effective Date, Assignor shall be deemed to have hereby transferred and assigned to Assignee, without recourse, representation or warranty (except as provided in paragraph 6 below), and the Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's pro rata share of the Program Amount and all rights and obligations associated therewith under the terms of the Loan Agreement and the other Loan Documents,

C-1

including, without limitation, the Transferred Percentage of Assignor's future funding obligations under the Loan Agreement.

3.    If Assignor has any outstanding principal under the Loan Agreement, at or before 12:00 noon, New York, New York time, on the Effective Date Assignee shall pay to Assignor, in immediately available funds, an amount equal to the sum of (i) the Transferred Percentage of the outstanding principal of Assignor's Draws (such amount, being hereinafter referred to as the "*Assignee's Principal*"); (ii) all accrued but unpaid (whether or not then due) Interest attributable to Assignee's Draws; and (iii) accruing but unpaid fees and other costs and expenses payable in respect of Assignee's Draws for the period commencing upon each date such unpaid amounts commence accruing, to and including the Effective Date (the "*Assignee's Acquisition Cost*"); whereupon, Assignor shall be deemed to have sold, transferred and assigned to Assignee, without recourse, representation or warranty (except as provided in paragraph 6 below), and Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's pro rata share of the Program Amount, Draws (if applicable) and all related rights and obligations under the Loan Agreement and the other Loan Documents, including, without limitation, the Transferred Percentage of Assignor's future funding obligations under the Loan Agreement.

4.    Concurrently with the execution and delivery hereof, Assignor will provide to Assignee copies of all documents requested by Assignee which were delivered to Assignor pursuant to the Loan Agreement.

5.    Each of the parties to this Assignment Agreement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Assignment Agreement.

6.    By executing and delivering this Assignment Agreement, Assignor and Assignee confirm to and agree with each other, the Administrative Agent, the Collateral Agent and the Lenders as follows:  (a) other than the representation and warranty that it has not created any adverse claim upon any interest being transferred hereunder, Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made by any other Person in or in connection with any of the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of Assignee, the Loan Agreement or any other instrument or document furnished pursuant thereto or the perfection, priority, condition, value or sufficiency of any Collateral; (b) Assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or any Affiliate of Borrower or the performance or observance by Borrower or any Affiliate of Borrower of any of their respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (c) Assignee confirms that it has received a copy of each of the Loan Documents, and other documents and information as it has requested and deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (d) Assignee will, independently and without reliance upon the Administrative Agent, the Collateral Agent, the Borrower or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (e) Assignee appoints and authorizes the

C-2

Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (f) Assignee agrees that it will perform in accordance with their terms all of the obligations which, by the terms of the Loan Documents, are required to be performed by it as a Lender or, when applicable, as a Lender.

7.      Each party hereto represents and warrants to and agrees with the Administrative Agent that it is aware of, has complied with and will comply with the provisions of the Loan Agreement, including without limitation, the payment of the assignment processing fee of $3,500.00 to Administrative Agent (except that such fee shall not be due in connection with an assignment to one or more Affiliates of Assignor).

8.      Schedule I hereto sets forth the revised pro rata share of the Program Amount of Assignor and the pro rata share of the Program Amount of Assignee, as well as administrative information with respect to Assignee.

9.      THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

C-3

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed by their respective duly authorized officers of the date hereof.

[ASSIGNOR]

By: _____
Title:

[ASSIGNEE]

By: _____
Title:

C-4

## SCHEDULE I TO ASSIGNMENT AGREEMENT

### LIST OF LENDING OFFICES, ADDRESSES
### FOR NOTICES AND PRO RATA SHARE AMOUNTS

**Date:**  _____, _____

**Transferred Percentage:**  _____%

| | A-1 | A-2 | B-1 | B-2 |
|---|---|---|---|---|
| **Assignor** | **Pro Rata Share of the Program Amount (prior to giving effect to the Assignment Agreement)** | **Pro Rata Share of the Program Amount (after giving effect to the Assignment Agreement)** | **Outstanding principal (if any)** | **Pro Rata Share of Outstanding principal** |
| | | | | |

| | A-1 | A-2 | B-1 | B-2 |
|---|---|---|---|---|
| **Assignee** | **Pro Rata Share of the Program Amount (prior to giving effect to the Assignment Agreement)** | **Pro Rata Share of the Program Amount (after giving effect to the Assignment Agreement)** | **Outstanding principal (if any)** | **Pro Rata Share of Outstanding principal** |
| | | | | |

## Address for Notices

_____

_____

Attention:
Phone:
Fax:

Sch. I-1

## SCHEDULE II TO ASSIGNMENT AGREEMENT

### EFFECTIVE NOTICE

TO: _____, Assignor

      _____

      _____

TO: _____, Assignee

      _____

      _____

The undersigned, as Administrative Agent under the Loan and Security Agreement, dated as of December 21, 2020 (the "*Loan Agreement*"), by and among Personal Energy Finance, Inc., a Delaware corporation, and Renovate America, Inc., a Delaware corporation (collectively, the "*Borrower*"), Finance of America Mortgage LLC, a Delaware limited liability company ("*FAM*"), as collateral agent and administrative agent for the Lenders and as initial lender  and each other Lender party hereto from time to time, hereby acknowledges receipt of executed counterparts of a completed Lender Assignment and Acceptance Agreement dated as of _____, 202__ ("*Assignment Agreement*") between _____, as Assignor, and _____, as Assignee and attached hereto as Exhibit A and receipt of the assignment processing fee of $3,500.00.  Terms defined in such Assignment Agreement are used herein as therein defined.

1.      Pursuant to such Assignment Agreement, you are advised that the Effective Date will be _____, ____.

[2.      Pursuant to such Assignment Agreement, the Assignee is required to pay $_____ to Assignor at or before 12:00 noon (New York, New York time) on the Effective Date in immediately available funds.]

Very truly yours,

FINANCE OF AMERICA MORTGAGE LLC, as Administrative Agent

By: _____

Title: _____

Sch. II-1

**EXHIBIT D**

**DIP BUDGET**

D-1

**RAI/PEFI Budget**

| Week Ending | Filing 12/21 12/25/2020 | 1/1/2021 | 1/8/2021 | 1/15/2021 | 1/22/2021 | 1/29/2021 | 2/5/2021 | 2/12/2021 | 2/19/2021 | 2/26/2021 | Closing 3/5 3/5/2021 | 3/12/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Starting Cash Balance** | $3,661,319 | $3,036,093 | $1,867,395 | $1,044,509 | $546,342 | $546,140 | $545,595 | $544,933 | $544,733 | $544,923 | $544,539 | $544,369 |
| **Receipts** | | | | | | | | | | | | |
| *Loan Sale Gross Proceeds* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *37,650,662* |
| *FAM DIP Revolver Paydown* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *(33,221,173)* |
| Loan Sale Net Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,429,490 |
| Lending Point Fee Income | 39,993 | 25,364 | 42,273 | 42,273 | 42,273 | 42,273 | 52,841 | 52,841 | 52,841 | 52,841 | 52,841 | 0 |
| Benji Servicing Fee Income | 0 | 0 | 0 | 0 | 0 | 190,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | 39,993 | 25,364 | 42,273 | 42,273 | 42,273 | 232,273 | 52,841 | 52,841 | 52,841 | 52,841 | 52,841 | 4,429,490 |
| **Disbursements** | | | | | | | | | | | | |
| *Benji Contractor Funding* | *(2,586,428)* | *(1,640,324)* | *(2,733,873)* | *(2,733,873)* | *(2,733,873)* | *(2,733,873)* | *(3,417,341)* | *(3,417,341)* | *(3,417,341)* | *(3,417,341)* | *(3,417,341)* | *0* |
| *FAM DIP Revolver Proceeds* | *2,690,904* | *1,534,606* | *2,557,677* | *2,557,677* | *2,557,677* | *2,557,677* | *3,197,096* | *3,197,096* | *3,197,096* | *3,197,096* | *3,197,096* | *0* |
| Net Contractor Funding | 104,475 | (105,717) | (176,196) | (176,196) | (176,196) | (176,196) | (220,244) | (220,244) | (220,244) | (220,244) | (220,244) | 0 |
| Payroll and Related | (12,512) | (465,000) | (12,512) | (594,509) | (12,512) | (465,000) | (12,512) | (465,000) | (12,512) | (465,000) | (12,512) | (953,920) |
| Non-Employee Opex | (43,500) | (309,948) | (495,300) | (132,241) | (220,400) | (578,648) | (260,675) | (57,000) | (63,141) | (617,548) | (319,700) | (57,000) |
| DIP Interest & Fees | (553,682) | (8,397) | (11,151) | (14,810) | (18,669) | (23,074) | (28,141) | (33,408) | (38,485) | (43,946) | (49,577) | (26,071) |
| **Total Disbursements** | **(505,219)** | **(889,062)** | **(695,159)** | **(917,755)** | **(427,777)** | **(1,242,918)** | **(521,573)** | **(775,652)** | **(334,382)** | **(1,346,738)** | **(602,033)** | **(1,036,991)** |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| US Trustee Fees | 0 | 0 | 0 | 0 | (250,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chapter 11 Debtor Legal | (110,000) | (110,000) | (85,000) | (60,000) | (60,000) | (60,000) | (60,000) | (55,000) | (55,000) | (55,000) | (55,000) | (30,000) |
| Chapter 11 Debtor Financial Advisor | (40,000) | (40,000) | (25,000) | (15,000) | (15,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Chapter 11 Debtor Other | (10,000) | (55,000) | (10,000) | (55,000) | (14,000) | 0 | (55,000) | 0 | (14,000) | 0 | 0 | 0 |
| Creditors' Committee Professionals | 0 | (100,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | 0 | 0 | 0 | 0 | 0 |
| Other Cash Flows | 0 | 0 | 0 | 237,496 | 475,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fixed Commitment Draws / (Paydowns) | 0 | 0 | 0 | 319,820 | 299,303 | 1,130,100 | 643,070 | 787,612 | 360,731 | 1,358,513 | 614,022 | (5,513,170) |
| 363 Sale Proceeds | | | | | | | | | | | | 5,000,000 |
| **Total Non-Operating Flows** | **(160,000)** | **(305,000)** | **(170,000)** | **377,315** | **385,303** | **1,010,100** | **468,070** | **722,612** | **281,731** | **1,293,513** | **549,022** | **(553,170)** |
| **Net Cashflow** | (625,226) | (1,168,699) | (822,886) | (498,167) | (201) | (545) | (662) | (200) | 190 | (384) | (170) | 2,839,328 |
| **Ending Cash Balance** | **$3,036,093** | **$1,867,395** | **$1,044,509** | **$546,342** | **$546,140** | **$545,595** | **$544,933** | **$544,733** | **$544,923** | **$544,539** | **$544,369** | **$3,383,697** |

| **Supporting Detail** | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benji Loan Balance Start | $3,389,601 | $6,078,196 | $7,783,314 | $10,625,178 | $13,467,041 | $16,308,904 | $19,150,768 | $22,703,097 | $26,255,426 | $29,807,756 | $33,360,085 | $36,912,414 |
| Benji Originations | $2,688,595 | $1,705,118 | $2,841,863 | $2,841,863 | $2,841,863 | $2,841,863 | $3,552,329 | $3,552,329 | $3,552,329 | $3,552,329 | $3,552,329 | |
| Flow Sales | | | | | | | | | | | | $(36,912,414) |
| Benji Loan Balance End | $6,078,196 | $7,783,314 | $10,625,178 | $13,467,041 | $16,308,904 | $19,150,768 | $22,703,097 | $26,255,426 | $29,807,756 | $33,360,085 | $36,912,414 | $0 |
| | | | | | | | | | | | | |
| FAM DIP Balance Start | $0 | $5,470,377 | $7,004,983 | $9,562,660 | $12,440,157 | $15,297,136 | $18,984,913 | $22,825,080 | $26,809,788 | $30,367,615 | $34,923,225 | $38,734,343 |
| FAM DIP Revolver Draw | $5,470,377 | $1,534,606 | $2,557,677 | $2,557,677 | $2,557,677 | $2,557,677 | $3,197,096 | $3,197,096 | $3,197,096 | $3,197,096 | $3,197,096 | $0 |
| FAM DIP Fixed Commitment Draw | $0 | $0 | $0 | $319,820 | $299,303 | $1,130,100 | $643,070 | $787,612 | $360,731 | $1,358,513 | $614,022 | $0 |
| FAM DIP Paydown | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $(38,734,343) |
| FAM DIP Balance End | $5,470,377 | $7,004,983 | $9,562,660 | $12,440,157 | $15,297,136 | $18,984,913 | $22,825,080 | $26,809,788 | $30,367,615 | $34,923,225 | $38,734,343 | $0 |
| | | | | | | | | | | | | |
| ING Balance Start | $2,779,473 | | | | | | | | | | | |
| ING Paydown | $(2,779,473) | | | | | | | | | | | |
| ING Balance End | $0 | | | | | | | | | | | |

| **Assumptions** | |
|---|---|
| Dealer Discount | 3.8% |
| WH Advance Rate | 90% |
| WH Interest Rate | 7% |
| WH Upfront Fee | $175,000 |
| WH Expense Reimbursement | $375,000 |
| Flow Sale Price | 102.0% |
| 363 Sale Proceeds (Stalking Horse Bid) | $5,000,000 |

**Footnotes:**

1) Under the Loan Purchase Agreement, PEFI can sell loans to Finance of America Mortgage if certain criteria are met. For sake of conservatism this budget assumes no loan sales take place until closing of the 363 sale

2) Assumes Ameris discontinues servicing arrangement under existing forward flow agreement.

## EXHIBIT F

## FORM OF SOURCES AND USES STATEMENT

**Transaction Summary - xxxxxxxx xx, 202x Sale**

| | | | |
|---|---|---|---|
| **Current Balance** | $0.00 | FAM Summary | |
| **Purchase Price** | $0.0000 | $0.00 | Prin |
| **Proceeds (Before Accrued)** | $0.00 | $0.00 | Int |
| **Accrued Interest** | $0.00 | $0.00 | Total |
| **Proceeds (Including Accrued)** | $0.00 | $0.00 | On Line Being Sold |
| **Funds to Ameris reserve account** | $0.00 | $0.00 | On Line Being Repurchased |
| **FAM Line Payoff** | $0.00 | $0.00 | Total on Line |
| **Net to PEFI** | $0.00 | | |

F-1

**Exhibit C**

**Budget**

**RAI/PEFI Budget**

| Week Ending | Filing 12/21 12/25/2020 | 1/1/2021 | 1/8/2021 | 1/15/2021 | 1/22/2021 | 1/29/2021 | 2/5/2021 | 2/12/2021 | 2/19/2021 | 2/26/2021 | Closing 3/5 3/5/2021 | 3/12/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starting Cash Balance | $3,661,319 | $3,036,093 | $1,867,395 | $1,044,509 | $546,342 | $546,140 | $545,595 | $544,933 | $544,733 | $544,923 | $544,539 | $544,369 |
| **Receipts** | | | | | | | | | | | | |
| Loan Sale Gross Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 37,650,662 |
| FAM DIP Revolver Paydown | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (33,221,173) |
| Loan Sale Net Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,429,490 |
| Lending Point Fee Income | 39,993 | 25,364 | 42,273 | 42,273 | 42,273 | 42,273 | 52,841 | 52,841 | 52,841 | 52,841 | 52,841 | 0 |
| Benji Servicing Fee Income | 0 | 0 | 0 | 0 | 0 | 190,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | 39,993 | 25,364 | 42,273 | 42,273 | 42,273 | 232,273 | 52,841 | 52,841 | 52,841 | 52,841 | 52,841 | 4,429,490 |
| **Disbursements** | | | | | | | | | | | | |
| Benji Contractor Funding | (2,586,428) | (1,640,324) | (2,733,873) | (2,733,873) | (2,733,873) | (2,733,873) | (3,417,341) | (3,417,341) | (3,417,341) | (3,417,341) | (3,417,341) | 0 |
| FAM DIP Revolver Proceeds | 2,690,904 | 1,534,606 | 2,557,677 | 2,557,677 | 2,557,677 | 2,557,677 | 3,197,096 | 3,197,096 | 3,197,096 | 3,197,096 | 3,197,096 | 0 |
| Net Contractor Funding | 104,475 | (105,717) | (176,196) | (176,196) | (176,196) | (176,196) | (220,244) | (220,244) | (220,244) | (220,244) | (220,244) | 0 |
| Payroll and Related | (12,512) | (465,000) | (12,512) | (594,509) | (12,512) | (465,000) | (12,512) | (465,000) | (12,512) | (465,000) | (12,512) | (953,920) |
| Non-Employee Opex | (43,500) | (309,948) | (495,300) | (132,241) | (220,400) | (578,648) | (260,675) | (57,000) | (63,141) | (617,548) | (319,700) | (57,000) |
| DIP Interest & Fees | (553,682) | (8,397) | (11,151) | (14,810) | (18,669) | (23,074) | (28,141) | (33,408) | (38,485) | (43,946) | (49,577) | (26,071) |
| **Total Disbursements** | (505,219) | (889,062) | (695,159) | (917,755) | (427,777) | (1,242,918) | (521,573) | (775,652) | (334,382) | (1,346,738) | (602,033) | (1,036,991) |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| US Trustee Fees | 0 | 0 | 0 | 0 | (250,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chapter 11 Debtor Legal | (110,000) | (110,000) | (85,000) | (60,000) | (60,000) | (60,000) | (60,000) | (55,000) | (55,000) | (55,000) | (55,000) | (30,000) |
| Chapter 11 Debtor Financial Advisor | (40,000) | (40,000) | (25,000) | (15,000) | (15,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Chapter 11 Debtor Other | (10,000) | (55,000) | (10,000) | (55,000) | (14,000) | 0 | (55,000) | 0 | (14,000) | 0 | 0 | 0 |
| Creditors' Committee Professionals | 0 | (100,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | 0 | 0 | 0 | 0 | 0 |
| Other Cash Flows | 0 | 0 | 0 | 237,496 | 475,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fixed Commitment Draws / (Paydowns) | 0 | 0 | 0 | 319,820 | 299,303 | 1,130,100 | 643,070 | 787,612 | 360,731 | 1,358,513 | 614,022 | (5,513,170) |
| 363 Sale Proceeds | | | | | | | | | | | | 5,000,000 |
| **Total Non-Operating Flows** | (160,000) | (305,000) | (170,000) | 377,315 | 385,303 | 1,010,100 | 468,070 | 722,612 | 281,731 | 1,293,513 | 549,022 | (553,170) |
| **Net Cashflow** | (625,226) | (1,168,699) | (822,886) | (498,167) | (201) | (545) | (662) | (200) | 190 | (384) | (170) | 2,839,328 |
| **Ending Cash Balance** | $3,036,093 | $1,867,395 | $1,044,509 | $546,342 | $546,140 | $545,595 | $544,933 | $544,733 | $544,923 | $544,539 | $544,369 | $3,383,697 |

**Supporting Detail**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Benji Loan Balance Start | $3,389,601 | $6,078,196 | $7,783,314 | $10,625,178 | $13,467,041 | $16,308,904 | $19,150,768 | $22,703,097 | $26,255,426 | $29,807,756 | $33,360,085 | $36,912,414 |
| Benji Originations | $2,688,595 | $1,705,118 | $2,841,863 | $2,841,863 | $2,841,863 | $2,841,863 | $3,552,329 | $3,552,329 | $3,552,329 | $3,552,329 | $3,552,329 | |
| Flow Sales | | | | | | | | | | | | ($36,912,414) |
| Benji Loan Balance End | $6,078,196 | $7,783,314 | $10,625,178 | $13,467,041 | $16,308,904 | $19,150,768 | $22,703,097 | $26,255,426 | $29,807,756 | $33,360,085 | $36,912,414 | $0 |
| FAM DIP Balance Start | $0 | $5,470,377 | $7,004,983 | $9,562,660 | $12,440,157 | $15,297,136 | $18,984,913 | $22,825,080 | $26,809,788 | $30,367,615 | $34,923,225 | $38,734,343 |
| FAM DIP Revolver Draw | $5,470,377 | $1,534,606 | $2,557,677 | $2,557,677 | $2,557,677 | $2,557,677 | $3,197,096 | $3,197,096 | $3,197,096 | $3,197,096 | $3,197,096 | $0 |
| FAM DIP Fixed Commitment Draw | $0 | $0 | $0 | $319,820 | $299,303 | $1,130,100 | $643,070 | $787,612 | $360,731 | $1,358,513 | $614,022 | $0 |
| FAM DIP Paydown | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($38,734,343) |
| FAM DIP Balance End | $5,470,377 | $7,004,983 | $9,562,660 | $12,440,157 | $15,297,136 | $18,984,913 | $22,825,080 | $26,809,788 | $30,367,615 | $34,923,225 | $38,734,343 | $0 |
| ING Balance Start | $2,779,473 | | | | | | | | | | | |
| ING Paydown | ($2,779,473) | | | | | | | | | | | |
| ING Balance End | $0 | | | | | | | | | | | |

**Assumptions**

| | |
|---|---|
| Dealer Discount | 3.8% |
| WH Advance Rate | 90% |
| WH Interest Rate | 7% |
| WH Upfront Fee | $175,000 |
| WH Expense Reimbursement | $375,000 |
| Flow Sale Price | 102.0% |
| 363 Sale Proceeds (Stalking Horse Bid) | $5,000,000 |

**Footnotes:**
1) Under the Loan Purchase Agreement, PEFI can sell loans to Finance of America Mortgage if certain criteria are met. For sake of conservatism this budget assumes no loan sales take place until closing of the 363 sale
2) Assumes Ameris discontinues servicing arrangement under existing forward flow agreement.